UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In Re:

Roman Catholic Bishop of Helena, Montana,
a Montana Religious Corporation Sole,

the Debtor-In-Possession

Chapter 11

Case No. 14-60074

## DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE ROMAN CATHOLIC BISHOP OF HELENA, MONTANA AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

ELSAESSER JARZABEK ANDERSON
ELLIOTT & MACDONALD, CHTD.
J. Ford Elsaesser, Esq.
Bruce A. Anderson, Esq.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Telephone: 208/667-2900
Facsimile: 208/667-2150

*Attorneys for the Debtor and Debtor-in-Possession*

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

PACHULSKI STANG ZIEHL & JONES LLP
Ilan D. Scharf, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777

*Attorneys for the Official Committee of Unsecured Creditors*

Dated: Helena, Montana
January 20, 2015

DISCLOSURE STATEMENT ..................................................................................................... 1

I.  INTRODUCTION ................................................................................................................. 1

II.  NOTICE TO HOLDERS OF CLAIMS ............................................................................ 2

III.  EXPLANATION OF CHAPTER 11 ............................................................................... 4

    A.   OVERVIEW OF CHAPTER 11 ............................................................................. 4
    B.   CHAPTER 11 PLAN ............................................................................................ 5
    C.   CONFIRMATION OF A CHAPTER 11 PLAN ...................................................... 5
    D.   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS ................... 7

IV.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT ......... 8

V.  VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN ..................................... 12

    A.   MANNER OF VOTING ON PLAN ...................................................................... 12
    B.   CLAIM HOLDERS ENTITLED TO VOTE .......................................................... 12
    C.   CLASSES IMPAIRED AND ENTITLED TO VOTE ON THE PLAN ...................... 13
    D.   VOTE REQUIRED FOR CLASS ACCEPTANCE ................................................ 13

VI.  THE DEBTOR AND ITS OPERATIONS ...................................................................... 13

    A.   GENERAL BACKGROUND ................................................................................ 13
        1.  Pre-Petition .............................................................................................. 13
        2.  Need for Reorganization ......................................................................... 15
        3.  Response to Sexual Abuse ....................................................................... 17

VII.  THE CHAPTER 11 CASE ........................................................................................... 18

        1.  The Chapter 11 Filing .............................................................................. 18
        2.  Retention of Counsel ............................................................................... 18
        3.  Appointment of Creditors' Committee .................................................... 18
        4.  Future Claims Representative .................................................................. 19
        5.  Adequate Protection Stipulations ........................................................... 19
        6.  Asset Sales and Other Dispositions; Planned Dispositions .................... 20
        7.  Placid Enterprises, LLC Loan ................................................................. 21
        8.  Bar Dates and Objections to Claims ...................................................... 21
        9.  Plan Exclusivity ...................................................................................... 22
        10. Post-Petition Operations and Select Financial Information .................... 22
        11. Prepetition Mediation ............................................................................. 23
        12. Deposit and Loan Fund ........................................................................... 24
        13. Real Property of Parishes, Programs and Schools ................................. 24
        14. Foundation for the Diocese of Helena ..................................................... 25
        15. Ursuline Western Province and Motion for Relief From the Automatic Stay ............ 25
        16. Insurance ................................................................................................. 26
        17. Province ................................................................................................... 29

VIII.  SUMMARY OF THE PLAN ....................................................................................... 32

    A.   GENERAL .......................................................................................................... 32
        1.  Brief Explanation of Chapter 11 ............................................................ 32
        2.  Acceptance of the Plan ............................................................................ 32
        3.  Classification of Claims Generally .......................................................... 33
    B.   CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN ........... 33
        1.  Unclassified Claims ................................................................................. 33
           (a)   United States Trustee Fees ............................................................. 33
           (b)   Administrative Claims .................................................................... 34
        2.  Priority Tax Claims ................................................................................. 35
        3.  Class 1 – Other Priority Claims ............................................................. 35
        4.  Class 2 – Secured Claims ....................................................................... 36

5. *Class 3 – General Unsecured Convenience Claims* ............................................................ 36
6. *Class 4 – Tort Claims* ............................................................................................................ 36
7. *Class 5 – Future Tort Claims* ............................................................................................... 37
8. *Class 6 – General Unsecured Claims* .................................................................................. 38
9. *Class 7 - Penalty Claims* ...................................................................................................... 38
10. *Class 8 – Annuitant Claims* ................................................................................................ 38
11. *Class 9 – Abuse Related Contingent Claims* ................................................................... 39
12. *Class 10 – Shaela Evenson Claim* ...................................................................................... 39
13. *Class 11 – Deposit and Loan Fund Claim* ........................................................................ 39
14. *Class 12 – Province Contribution Claim* ......................................................................... 40

C.   MEANS FOR EXECUTION OF THE PLAN ...................................................................................... 40
1. *Establishment of the Trust* .................................................................................................. 40
2. *Funding of Trust* .................................................................................................................... 40
3. *Establishment of Reserve Accounts* .................................................................................. 41
4. *Liquidation and Payment of Tort Claims* .......................................................................... 41
5. *Treatment of Executory Contracts and Unexpired Leases* ........................................... 42

D.   PROCEDURE FOR DETERMINATION OF CLAIMS OTHER THAN TORT CLAIMS BASED ON THE SEXUAL ABUSE
PROOF OF CLAIM FORM ............................................................................................................ 43
1. *Objection to Claims* .............................................................................................................. 43
2. *Disputed Claims* ................................................................................................................... 43
3. *Treatment of Contingent Claims* ....................................................................................... 43

E.   PROVISIONS GOVERNING DISTRIBUTIONS .................................................................................. 43
1. *Distribution Only to Holders of Allowed Claims* ........................................................... 43
2. *Transmittal of Distribution* ................................................................................................. 43
3. *Timing of Distributions* ....................................................................................................... 44
4. *Form of Distributions* .......................................................................................................... 45
5. *No Professional Fees or Expenses* .................................................................................... 45
6. *Claim Estimation* .................................................................................................................. 45
7. *No Interest on Claims* .......................................................................................................... 45
8. *Withholding Taxes* ................................................................................................................ 45
9. *No De Minimis Distributions* .............................................................................................. 46
10. *Manner of Cash Payments* ................................................................................................ 46

IX.   CONDITIONS TO EFFECTIVE DATE ................................................................................... 46

A.   CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE ................................................................. 46
B.   WAIVER OF CONDITIONS ......................................................................................................... 46
C.   NON-OCCURRENCE OF EFFECTIVE DATE ................................................................................. 47

X.   EFFECT OF PLAN CONFIRMATION ..................................................................................... 47

A.   POSTPETITION TORT CLAIMS .................................................................................................. 48
B.   VESTING OF ASSETS ................................................................................................................ 48
C.   CONTINUED EXISTENCE OF REORGANIZED DEBTOR .................................................................. 48
D..   EXCULPATION AND LIMITATION OF LIABILITY .......................................................................... 48
E.   CHANNELING INJUNCTION ...................................................................................................... 49
F.   PROVINCE CHANNELING INJUNCTION....................................................................................... 50
G.   SUPPLEMENTAL INJUNCTION PREVENTING PROSECUTION OF CLAIMS AGAINST SETTLING INSURERS . 50
H.   INSURANCE SETTLEMENT AGREEMENT INJUNCTIONS ................................................................. 51
J.   TERMS OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH SETTLING INSURERS 51
K.   LIMITATION OF INJUNCTION AND DISCHARGE ........................................................................... 52
L.   DEBTOR WAIVER AND RELEASE OF CLAIMS AGAINST SETTLING INSURERS............................... 52

XI.   NON-MONETARY COMMITMENTS ..................................................................................... 52

XII.   CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN ......................................... 55

1. *Causes of Action/Avoidance Actions* ................................................................................. 55
2. *Retention of Jurisdiction* ...................................................................................................... 55

3. *Remand of Removed Actions* ................................................................ *56*
4. *Modification of the Plan* ...................................................................... *56*
5. *Severability* ......................................................................................... *56*
6. *Section 1146 Exemption* ....................................................................... *57*
7. *Management of the Reorganized Debtor* ............................................. *57*
8. *Dissolution of the Committee* .............................................................. *57*
9. *Insurance Neutrality* ............................................................................ *58*
10 . *Insurance Preservation* ........................................................................ *58*

**XIII.    CONFIRMATION PROCEDURES** ............................................................. **58**

    A.    SOLICITATION OF VOTES; ACCEPTANCE ................................................. 58
    B.    CONFIRMATION HEARING ......................................................................... 59
    C.    BEST INTERESTS OF CREDITORS TEST ...................................................... 60
    D.    FEASIBILITY ............................................................................................. 61
    E.    CRAM DOWN ............................................................................................ 61

**XIV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .................... **62**

    A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ................. 62
    B.    ALTERNATIVE CHAPTER 11 PLANS ......................................................... 62

**XV.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS** ................................ **63**

    A.    THE TRUST ............................................................................................... 63
    B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS. ............ 64

**XVI.    VOTING INSTRUCTIONS** ............................................................................. **65**

**XVII.    CONCLUSION** .............................................................................................. **66**

## EXHIBITS

Exhibit A:    First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Roman Catholic Bishop of Helena Montana. and the Official Committee of Unsecured Creditors (Filed as a Separate Document)

Exhibit B:    Order Approving the Disclosure Statement (Proposed)

Exhibit C:    Liquidation Analysis

## DISCLOSURE STATEMENT

On January 31, 2014 (the "**Petition Date**"), the Roman Catholic Bishop of Helena, Montana, a Montana Religious Corporation Sole (the "**Debtor**" or "**RCB**") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the District of Montana (the "**Bankruptcy Court**"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**"). The Debtor and The Official Committee of Unsecured Creditors of the Roman Catholic Bishop of Helena, Montana (the "**Committee**") seek confirmation of their *First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Roman Catholic Bishop of Helena, Montana and The Official Committee of Unsecured Creditors* (as it may hereafter be amended or modified, the "**Plan**"). The Committee and the Debtor are referred to herein collectively as the "**Plan Proponents**."

Pursuant to §1125 of the Bankruptcy Code, the Plan Proponents now submit this Disclosure Statement (the "**Disclosure Statement**") in connection with the Plan.

## I.

## INTRODUCTION

The Plan Proponents provide this Disclosure Statement to all of the Debtor's known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan. All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in its entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in its entirety by reference to the Plan (a copy of which accompanies this Disclosure Statement as **Exhibit A**).[1]

BY ORDER DATED _____ __, 2015 (THE "**DISCLOSURE STATEMENT ORDER**"), THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH INCLUDES AND DESCRIBES THE PLAN, AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE CREDITORS OF THE DEBTOR TO MAKE AN INFORMED DECISION ABOUT THE PLAN. A COPY OF THE DISCLOSURE STATEMENT ORDER IS ATTACHED HERETO AS **EXHIBIT B**. ONLY HOLDERS OF ALLOWED CLAIMS IN CLASS 4 (TORT CLAIMS OTHER THAN FUTURE TORT CLAIMS, CLASS 5 (FUTURE TORT CLAIMS), CLASS 6 (GENERAL UNSECURED CLAIMS), CLASS 10 (SHAELA EVENSON CLAIM), CLASS 11 (DEPOSIT AND LOAN FUND CLAIMS) AND CLASS 12 (PROVINCE CONTRIBUTION CLAIM) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE DEEMED ACCEPTING CLASS 1, CLASS 2, CLASS 3, AND CLASS 8 CLAIMS,

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to them in the Plan.

AND THE DEEMED REJECTING CLASS 7 AND 9 CLAIMS, THE PLAN PROPONENTS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTOR.   ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE ATTACHED DISCLOSURE STATEMENT ORDER. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, EXECUTED AND ACTUALLY RECEIVED BY THE DEBTOR BY 5:00 P.M. (PREVAILING MOUNTAIN TIME), ON FEBRUARY 25, 2015 (THE "VOTING DEADLINE").**

The Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan.  No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement.  All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for March 4, 2015 at 9:00 A.M. (Prevailing Pacific Time) (the "Confirmation Hearing") at the United States Bankruptcy Court, 6450 N. Mineral Drive, Coeur d'Alene, Idaho.  This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court will then also receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

## II.

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR ON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT AND ALL EXHIBITS THERETO WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE**

PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR ANY SUCH APPLICABLE DOCUMENT SHALL GOVERN. UNLESS OTHERWISE SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  THIS DISCLOSURE STATEMENT DOES NOT REFLECT EVENTS THAT MAY OCCUR AFTER THAT DATE AND MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ESTIMATED VALUE OF THE DEBTOR'S PROPERTY AND/OR THE ESTIMATED ASSETS TO BE GENERATED FROM THE LIQUIDATION OF THE DEBTOR'S ASSETS, ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PROPOSED PLAN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION AND BELIEF.  HOWEVER, THE PLAN PROPONENTS AND THEIR ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE PLAN PROPONENTS FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

**ALTHOUGH THE PLAN PROPONENTS' PROFESSIONALS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED ON THE FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE PLAN PROPONENTS' PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION.  SUCH PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.**

Each Holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all Exhibits and Schedules to the Plan and Disclosure Statement) in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  Except for the Plan Proponents (in their capacity as such) and certain of the Professionals each has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Plan Proponents.  You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

**After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan pursuant to the procedures set forth in the Solicitation Package, which will be sent under separate cover.**

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE PLAN PROPONENTS URGE ALL HOLDERS OF
IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

A.    **Overview of Chapter 11**

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its operations in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed.  Sections 1101, 1107, and

1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a "Debtor-in-Possession" unless the Bankruptcy Court orders the appointment of a trustee.  In the Debtor's Case, the Debtor remains as the Debtor-in-Possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against a debtor or otherwise interfere with its property or operations.  Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed Chapter 11 plan.

## B.    Chapter 11 Plan

The formulation of a Chapter 11 plan is the principal purpose of a Chapter 11 case.  A Chapter 11 plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate.  A Chapter 11 plan may provide anything from a complex restructuring of a debtor's operations and its related obligations to a simple liquidation of a debtor's assets.  In either event, upon confirmation of a plan, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.  The Plan incorporates a compromise reached among the Debtor and the Committee that the Plan Proponents believe provides a fair and equitable allocation of the Debtor's assets that will be distributed to creditors and treatment of all Claims against the Debtor.

After a Chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of a proposed plan, Section 1125 of the Bankruptcy Code requires the plan proponent(s) to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the Plan.  **This Disclosure Statement is presented to Holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code in connection with the Plan Proponents' solicitation of votes on the Plan.**

## C.    Confirmation of a Chapter 11 Plan

If all classes of Claims accept the Plan, the Bankruptcy Court may confirm the Plan if the Bankruptcy Court independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied.  **The Plan Proponents believe that the Plan satisfies all the applicable requirements of Section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or, where applicable, interest in a particular class vote in favor of a plan for the Bankruptcy Court to determine that such class has accepted the Plan.  Rather, a class of claims or interests will be deemed to have accepted a plan if the Bankruptcy Court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class.  **Only the Holders of Allowed Claims and Tort Claims and**

**Future Tort Claims who actually vote will be counted as either accepting or rejecting the Plan**.

In addition, classes of claims or equity interests that are not "impaired" under a plan are conclusively presumed to have accepted such plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under a plan are conclusively deemed to have rejected such plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.

**Classes 4 (Tort Claims other than Future Tort Claims), 5 (Future Tort Claims), 6 (General Unsecured Claims), 10 (Evenson Claim), 11 (Deposit and Loan Fund Claims) and 12 (Province Contribution Claim) are impaired under the Plan and entitled to vote on the Plan.**

**Classes 1 (Other Priority Claims), 2 (Secured Claims), 3 (General Unsecured Convenience Claims), and 8 (Annuitant Claims) are deemed unimpaired under the Plan and are deemed to accept the Plan.**

**Classes 7 (Penalty Claims), and 9 (Abuse Related Contingent Claims) are impaired and deemed to reject the Plan.**

In general, a Bankruptcy Court also may confirm a Chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a Chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, a plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent(s) of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that have not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class. **The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.**

**D.      Summary of Classification and Treatment of Claims**

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims, the relative allocations of property to Holders of such Claims, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan.  However, the Plan Proponents believe that a broad overview of what, in their opinion, the Debtor and  Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan and the proposed treatment of each such Class under the Plan.  This summary is qualified in its entirety by reference to the Plan:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 4 | Tort Claims (other than Future Tort Claims) | Impaired | Yes |
| 5 | Future Tort Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Penalty Claims | Impaired | Deemed to Reject |
| 8 | Annuitant Claims | Unimpaired | Deemed to Accept |
| 9 | Abuse Related Contingent Claims | Impaired | Deemed to Reject |
| 10 | Shaela Evenson Claim | Impaired | Yes |
| 11 | Deposit and Loan Fund Claims | Impaired | Yes |
| 12 | Province Contribution Claim | Impaired | Yes |

As discussed in the Liquidation Analysis attached hereto as **Exhibit C**, the Plan Proponents estimate that recoveries for Holders of Classes 4, 5, 6, 10, 11 and 12 will be greater than in a liquidation under Chapter 7 of the Bankruptcy Code because the total amount of property available for distribution is greater under the Plan than in a liquidation under Chapter 7. In addition, the Plan Proponents believe that distributions under a Chapter 7 case would likely be

delayed due to the time it will take a Chapter 7 trustee to assess the Debtor's assets, review and analyze claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

IV.

### QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**Why are the Plan Proponents sending me this Disclosure Statement?**

The Plan Proponents are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of the Plan, Section 1125 of the Bankruptcy Code requires the preparation and approval of a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

The Plan is based on two groups of settlements. One settlement is between the Diocese, the Diocese Parties and the Settling Insurers. This settlement is evidenced by the Insurance Settlement Agreements. In general terms, the Insurance Settlement Agreements provide for (a) the Settling Insurers' buy back of the Policies from the Diocese Parties and (b) injunctions which prohibit, amongst others, Tort Claimants and Future Tort Claimants from suing the Settling Insurers.

The other settlement, which is recommended by counsel for certain Tort Claimants, is between the Debtor, the Committee and the Province, including the Ursuline Western Province and evidenced by the Plan and the Term Sheet. In general terms, the Province will pay $4.45 million if the Province Settlement is approved by the Bankruptcy Court with the Province Channeling Injunction (which prohibits Province Channeled Claimants and Future Tort Claimants from suing the Province) and 85% or more of the Province Channeled Claimants accept the Province Settlement. The $4.45 million will be distributed as follows: $3.95 million to the Trust for the benefit of the Province Channeled Claimants and $500,000 for the legal fees and expenses associated with including the Province Settlement in the Plan and Disclosure Statement and the Future Tort Claimants with Tort Claims against the Province. Distributions from the Trust to a Province Channeled Claimant are conditioned on the execution of the Province Release and dismissal of such Claimant's State Court Litigation. The amount used for the Future Tort Claimants will be based on the recommendation of the Future Claim Representative. The balance remaining of the $500,000, if any, will be paid to the Trust for the benefit of the Province Channeled Claimants. The Province will withdraw its disputed Province Contribution Claim.

If the Province Settlement is approved without the Province Channeling Injunction (*i.e.,* the Alternate Settlement), the Province will pay $3.95 million to the Trust for the benefit of the Province Channeled Claimants upon 100% of the Province Channeled Claimants executing the

Province Release and dismissing the State Court Litigation against the Province. The parties may seek approval of the Province Settlement in the State Court Litigation. The Province will waive the Province Contribution Claim if the Province Settlement is approved with the Province Channeling Injunction. The Province will cap its disputed Province Contribution Claim at $500,000 if the Province Settlement is approved without the Province Channeling Injunction.

In consideration for the Province's contributions to the Plan and Claimants, including the Province's waiver of its right to object to the Court's approval of the Insurance Settlement Agreements, the Term Sheet states that counsel for Tort Claimants with Claims against the Province will recommend a $3.95 million settlement in the State Court Litigation if the Bankruptcy Court does not approve the Province Settlement. If the State Court Litigation is settled outside of the Plan, including the execution of the Province Release by all Province Channeled Claimants, the Province will cap its disputed Province Contribution Claim at $500,000.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

If the Plan is not confirmed, the Plan Proponents believe it is unlikely that the Debtor will be able to reorganize. The Plan memorializes a comprehensive settlement between the Debtor and the Committee, which allocates a substantial portion of the Debtor's assets to the Trust that will be established for the benefit of Tort Claimants and Future Tort Claimants. In addition, confirmation of the Plan is necessary to effectuate settlements with various of the Debtor's insurance carriers that will be used to fund the Plan and the Trust created pursuant to the Plan for the benefit of Holders of Tort Claims. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated in the Plan could be implemented and what Holders of Claims would ultimately receive on account of their Claims. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan on account of, among other things, the cost of negotiating, drafting and potentially litigating an alternative Plan, as well as complex litigation regarding Tort Claims and the potential loss of funds from insurance carriers pursuant to settlements. Moreover, non-confirmation of the Plan will likely result in either the voluntary conversion of the Case to a Case under Chapter 7 of the Bankruptcy Code or dismissal of the Case in its entirety. For a more detailed description of the consequences of these scenarios, *see* "Best Interests of Creditors Test," which begins on page 60 hereof, and the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

As noted above, the Term Sheet contemplates a settlement of the State Court Litigation against the Province if the Plan is not confirmed or does not go effective. If the Bankruptcy Court does not approve the Province Settlement, the Plan Proponents may seek confirmation of the Plan without the Province Settlement.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"[2]**

---

[2] The descriptions' capitalized terms in response to this question are qualified in their entirety by reference to the definitions in the Plan.

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective. References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated.  Distributions will only be made on the Effective Date or as soon as practicable thereafter, based on, among other things, the amount of cash available to satisfy Claims, the time that the Abuse Claims Reviewer requires to complete his analysis of certain Tort Claims, the amount of Claims outstanding against the Debtor, and the Trustee's business judgment.  The Abuse Claims Reviewer analyzes the Tort Claims and the Province Channeled Claims pursuant to the Allocation Plans.

**Where is the cash required to fund the Plan coming from?**

The cash required to fund the Trust, that will pay Holders of Class 4 and 5 Claims, will come from (i) $2.0 million or more of cash from the Debtor, (ii) $14,401,500.00 of cash from the Settling Insurers, (iii) $3.5 million from the Placid Enterprises, LLC Loan, and (iv) the proposed sale(s) of real property owned by the Debtor, both of which will be used to fund the Debtor's obligation.  If at least 85% of the Province Channeled Claimants vote in favor of the Plan, the Province will contribute an additional $4.45 million to fund the Plan.  If the Province Channeling Injunction is not approved, the Province will still contribute $3.95 million to fund the Province Alternate Settlement, subject to the 100% acceptance by the Province Channeled Claimants.  The cash required to fund payments for Professional Fees and costs of the Trust will come from the Debtor and/or the Reorganized Debtor.

**Will there be any releases granted to parties other than the Debtor as part of the Plan?**

Yes.  *See* "Exculpation and Limitation of Liability," which begins on page 48 and "Debtor Waiver and Release of Claims Against Settling Insurers," which begins on page 52.  A Tort Claimant's Distribution is conditioned upon the Tort Claimant delivering a general release to Protected Parties.  A Province Channeled Claimant's Distribution is conditioned upon Province Channeled Claimant delivering the Province Release and the dismissal of State Court Litigation.  The Ballots for the Tort Claimants and Province Channeled Claimants contain the releases.

**Will there be any injunctions entered pursuant to the Plan?**

Yes.  The Settling Insurers obtain the "Channeling Injunction," which begins on 48 and "Supplemental Injunction Preventing Prosecution of Claims against Settling Insurers," which begins on page 51.  Subject to the conditions of the Plan and the Term Sheet, the Province may obtain the "Province Channeling Injunction," which begins on page 49.  Each Channeling Injunction will preclude Claimants from pursuing Claims against the parties protected by such Channeling Injunction whether or not such Claimants receive a Distribution under the Plan.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a

Holder of a Claim in Classes 4, 5, 6, 10, 11 and 12 (collectively, the "**Voting Classes**"), you may vote for or against the Plan by completing the Ballot and returning it as set forth in the Solicitation Packages which will be mailed out. *See* "Voting Instructions," which begins on page 62. If you are a Province Channeled Claimant, your Ballot has special representations and certifications relating to the Province Settlement.

**What is the deadline to vote on the Plan?**

All Ballots must be actually received by the Debtor no later than 5:00 p.m. (Prevailing Mountain Time) on February 25, 2015 (the "**Voting Deadline**").

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for March 4, 2015 to take place at 9:00 a.m. (Prevailing Pacific Time) before the Honorable Judge Terry L. Myers, United States Bankruptcy Judge, in the United States Bankruptcy Court, 6450 N. MINERAL DRIVE, COEUR D'ALENE, IDAHO. The Confirmation Hearing may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served on the Plan Proponents and certain other parties, by no later than February 25, 2015 at 5:00 p.m. (Prevailing Mountain Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit B**, it might not be considered by the Bankruptcy Court.

**What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds a debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Case and the Plan. A detailed description of the Bankruptcy Court's post-confirmation jurisdiction is provided in Section 15.1 of the Plan.

**Do the Debtor and the Committee recommend voting in favor of the Plan?**

Yes. the Debtor and the Committee recommend voting for the Plan because the Plan provides for a larger distribution to the Debtor's unsecured creditors, including Holders of Tort Claims and Future Tort Claims, than would otherwise result from liquidation or any other reasonably available alternative. Accordingly, the Debtor and the Committee recommend that Holders of Claims in Voting Classes support Confirmation of the Plan and vote to accept the Plan. Under the Term Sheet, counsel for the Whalen and Does plaintiffs stated that they would recommend the Province Settlement.

**V.**

**VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN**

**A.     Manner of Voting on Plan**

Before voting, this Disclosure Statement, as well as the Plan, should be read in its entirety. You should only use the Ballot sent to you in the Solicitation Package to cast your vote for or against the Plan.

**Ballots must be completed, dated, signed and returned pursuant to the procedures set forth in the Solicitation Package.**

**B.     Claim Holders Entitled to Vote**

Under the Bankruptcy Code, any holder of a claim in a class that is "impaired" under the Plan is entitled to vote to accept or reject a plan, unless such class of claims neither receives nor retains any property under the plan (in which case such class is deemed to have rejected the plan). Bankruptcy Code §1124 provides generally that a Claim is impaired if the legal, equitable or contractual rights of the claim are altered.

Subject to the exceptions provided below, any Holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim Holder has filed a Proof of Claim with respect to a Disputed Claim. Pursuant to Federal Rule of Bankruptcy Procedure 3018(a), Class 4 Tort Claims shall be estimated at $1.00 for voting purposes only. The actual amount payable on account of Class 4 Tort Claims will be determined pursuant to the Allocation Plans.

A Holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Plan Proponents or by an Order of the Bankruptcy Court in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan. In other words, only Holders of Allowed Claims, Class 4 Claims (Tort Claims other than Future Tort Claims which are estimated for voting purposes only at $1.00 for each Claim), Class 5 Future Tort Claims (estimated for purposes only at $1.00 for each claim), Class 6 General Unsecured Claims, Class 10 Sheila Evenson Claim, Class 11 Deposit and Loan Fund Claims and Class 12 Province Contribution Claim that are not Disputed Claims may vote to accept or reject the Plan. A Claim to which an objection has been filed by the Debtor or any other party-in-

interest no later than [---------------], 2015, or a Claim (i) that is listed on the Debtor's schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding Proof of Claim has not been filed is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court allows the Claim (in whole or in part) by Final Order. Upon request of a party-in-interest, the Bankruptcy Court may temporarily allow or estimate a Disputed Claim for purpose of voting on the Plan. Ballots cast in respect of Claims other than Allowed Claims, Tort Claims and Future Tort Claims will not be counted. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.  Classes Impaired and Entitled to Vote on the Plan

Claim Holders in Classes 4, 5, 6, 10, 11 and 12 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan. Any controversy as to whether any Claim or Class of Claims is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

## D.  Vote Required for Class Acceptance

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of allowed claims in that class who cast ballots.[3] Class 4 Tort Claims and Class 5 Future Tort Claims shall be estimated at $1.00 each for voting purposes only. As such, if more than half of the number of Class 4 Tort Claimants and Class 5 Future Tort Claimants who vote cast Ballots in favor of the Plan, Classes 4 and 5 will be deemed to have accepted the Plan.

## VI.

## THE DEBTOR AND ITS OPERATIONS

## A.  General Background

### 1.  Pre-Petition

The Debtor is the civil entity formed under the corporation sole statute of the State of Montana in 1899 that holds and administers property for the benefit of all the religious entities and functions that exist within the Diocese of Helena and allows the Diocese, parishes, and other entities and programs to function according to civil law. The Debtor contends that it holds title to church properties in trust for the practice of the Roman Catholic religion and conducts the civil affairs of the Diocese.

---

[3] In the case of Tort Claims based on Sexual Abuse Proof of Claim Forms and Future Tort Claims, such claims will be deemed allowed in the amount of $1.00 claims for voting purposes only.

The Roman Catholic Church is comprised of territories, known as Dioceses, each of which is subject to the authority of a Bishop who is responsible for the spiritual and pastoral well-being of the people who live within that Diocese.

Jesuit priests established the first Catholic Church in Montana in 1841 – St. Mary's Mission in Stevensville. As time progressed and more Catholics moved to this mission territory that would become Montana, Churches were built in various locations.

The Diocese of Helena ("Diocese") was established by Pope Leo XIII in 1884, coterminous with the Territory of Montana (the same geographical area as the State of Montana, which was established in 1889). In 1904, a second diocese was established, the Diocese of Great Falls (now the Diocese of Great Falls-Billings), which encompasses some 94,000 square miles, roughly the eastern two-thirds of the State of Montana.

The Diocese is the ecclesiastical entity subject to the authority of the Bishop of Helena, currently Bishop George Leo Thomas, who was appointed as Bishop of Helena, effective June 4, 2004. Bishop Thomas is responsible to govern the Diocese, following the precepts of Canon Law, the ecclesiastical law for the Roman Catholic Church.

There are 57 parishes and 38 missions within the Diocese, which encompasses nearly 52,000 square miles, roughly the western one-third of the State of Montana. Fifty priests serve these parishes and missions, along with deacons, women religious, and lay ministers. The Diocese has policies relating to the financial affairs of the parishes and each parish is expected to operate in conformity with those policies. Beginning July 1, 2014, the assessment that each parish pays to fund the general operations of the Diocese, is set at twelve percent (12%) of the parish's ordinary income (principally the collections taken at Mass). Additionally, each parish promotes an annual appeal to the parishioners for support of the operations of the Diocese, including a Mission in Guatemala and the pastoral ministry of the Bishop.

Each Diocese is expected to fund the ministry of its Bishop, as well as the pastoral programs needed locally. The Diocese funds Bishop Thomas and his pastoral responsibilities (such as visiting people throughout Diocese, tending to correspondence, meeting with consultative groups, and other matters allowing him to provide episcopal ministry for the priests and people of the Diocese).

The Diocese pastoral offices include: a Chancery Services Director, who administers the services provided by the Bishop's Chancery and engages in pastoral planning; a Human Resources Director, who also has responsibilities for coordinating Diocese Safe Environment efforts, a Finance Officer, who carries out the financial requirements for the Debtor and the Diocese; a Development Director, who promotes life-long giving; a Stewardship Director, who coordinates the annual appeal, grants, and other current giving; a Communications Director, who also oversees the diocesan camp; a Religious Formation Director, who is principally responsible for youth and young adult ministry; an Archivist, who tends to records and historical documents; and a Chancellor, whose responsibilities include canon law research, and assisting the Bishop to assure the precepts of Canon law are appropriately observed. In response to the missionary goals of the Church, the Diocese supports a mission in Guatemala. Along with the second Diocese in Montana, the Diocese supports the Montana Catholic Conference, which represents the Church

in the civil forum and implements Catholic Social teaching, especially through education; Catholic Social Services of Montana, which provides adoption services and promotes pro-life activities, and a Superintendent of Schools, who is responsible for the operation of the Catholic Schools located in both Dioceses in Montana.  More specific information is available on the RCB website at http://www.diocesehelena.org.

The Debtor contends that each ecclesiastical entity (a Parish, for example) within the Diocese is a juridic person in canon (ecclesiastical) law.  The Pastor for each Parish is appointed by the Bishop, but in Canon law, the Pastor of each Parish is the steward of the property of the parish to which he is appointed.  The corporation sole seeks to maintain the ecclesiastical distinctions while observing the actualities of the Montana Statutes.[4]

## 2.    Need for Reorganization

For decades, at least 50 identified abusers sexually assaulted children within the bounds of the Diocese.  In September 2011, the RCB was served with two lawsuits asserting that claimants were sexually abused by various priests, sisters, brothers, and lay people serving specific parishes or institutions within the Diocese, generally within the 1940 to 1980 timeframe.  These cases were filed as *Does et al. v. Roman Catholic Diocese of Helena*, BDV 2011-936, Montana First Judicial District Court, Lewis and Clark County (the "**Does Case**"), and as Whalen *et al. v. Roman Catholic Diocese of Helena*, BDV 2011-925, Montana First Judicial District Court, Lewis and Clark County (the "**Whalen Case**").  As of their most recent filings there were 362 claimants in those two lawsuits.  Additionally, 26 other claimants have filed Tort Claims against the Debtor as of the Tort Claims Bar Date.

Prior to the Petition Date, the Diocese mediated with the plaintiffs  in the Whalen Case and Does Case and seven insurance carriers that provided or allegedly provided Policies covering the relevant time periods.  During the mediation, the parties negotiated regarding monetary compensation to certain Tort Claimants and non-monetary undertakings by the Diocese to assist with the healing of Tort Claimants and mitigate the risk of any abuse in the future.  The Debtor filed the bankruptcy anticipating that the results of the mediation would be included in a consensual reorganization plan.

The Province was named as a co-defendant in the Does Case.  The Does plaintiffs filed seven amended complaints.  The Does Seventh Amended Complaint was filed on or about January 29, 2014.  The Does Seventh Amended Complaint included the claims of 95 plaintiffs.  A large portion of the Does plaintiffs made allegations against the Province.

The Doesplaintiffs, the Diocese and the Province entered into a Pre-Mediation Protocol on June 7, 2012.  Pursuant to the Protocol, the Diocese conducted limited discovery, including recorded statements of the plaintiffs, in preparation for mediating the claims.  The Province attended several of the recorded statements.

The initial complaint in the Whalen Casewas filed on September 20, 2011.  The Province was not named as a defendant.  The Whalen plaintiffs added the Province as a Co-Defendant in

---

[4]  References to Canon law are made solely by the Debtor.  The Committee, as a Plan Proponent, expresses no view on and provides no advice regarding Cannon law.  Such disclosure is for informational, background purposes only.

their Second Amended Complaint which was served on the Diocese on March 21, 2012. The Whalen plaintiffs filed ten amended complaints. The Tenth Amended Complaint was filed on April 15, 2013. The Whalen Tenth Amended Complaint included the claims of 267 plaintiffs. A large portion of the Whalen plaintiffs made allegations against the Province.

The Whalen plaintiffs, the Diocese, and the Province entered into a Pre-Mediation Protocol on May 16, 2012. Pursuant to the Protocol, the Diocese conducted limited discovery, including recorded statements of the plaintiffs, in preparation for mediating the claims. The Province attended several of the recorded statements.

The Does and Whalen plaintiffs, the Diocese and the Province participated in a series of mediations between November 2012 and October 2013. The Diocese and the Whalen and Does plaintiffs negotiated a term sheet that was executed on December 23, 2013, which sought to resolve all of the plaintiffs' claims against the Diocese through a bankruptcy process. The Province was not a party to that term sheet. On January 31, 2014, the Diocese filed bankruptcy. On December 31, 2014, the Diocese, the Committee and the Province negotiated the Term Sheet.

In addition to utilizing the Chapter 11 process to resolve over 388 Tort Claims (233 of the Tort Claims also are Province Channeled Claims) and potential Future Tort Claims, the Diocese has operated with a substantial structural deficit for the past several years. The difficult financial situation was precipitated by a variety of factors, including: compensating survivors of clergy childhood sexual abuse depleted the Diocese's unrestricted reserves; the general financial "melt down" beginning in 2008, which dramatically impacted the Diocese's income from investments; a shift to self-funded medical insurance caused the Diocese to expend substantial funds in addition to those collected as premiums; decreased contributions by parishioners; a lack of timely financial reporting; and the determinations by financial institutions not to extend lines of credit or grant loans, due to Diocese's weakened financial condition.

The Diocese manages a Deposit and Loan Fund in which the Diocese, parishes, and related entities deposit money, which can be loaned for such things as parish building projects, and to fund diocesan operations. As described in greater detail below, the Diocese used funds from the Deposit and Loan Fund for Diocesan operations prior to the Petition Date. As of the Petition Date, the Deposit and Loan Fund was underfunded in that it had insufficient funds to repay all "deposits" to the fund. The Diocese estimates that approximately 75% of the fund's receivables (primarily consisting of money payable by the Diocese and related entities) are uncollectable. During the pendency of the Case, the Debtor ceased taking new deposits to the Deposit and Loan Fund. The Diocese will utilize the Deposit and Loan Fund's current assets to pay for certain operations of the Diocese, including its endowment and Guatemalan mission.

In the Spring of 2012, in response to a "going concern" letter from the Diocese auditors, Bishop Thomas appointed a "Blue Ribbon Committee" to "thoroughly review the finances of the Diocese of Helena and make appropriate recommendations to support the long-term financial stability of the Diocese." The Committee made initial recommendations regarding accounting department staffing, financial software, and timely financial reporting. Their next focus was to be the Deposit and Loan Fund, a project placed in abeyance with the filing of the bankruptcy.

The Diocese converted to new financial software on January 1, 2012. The conversion of data was never completed from the old system to the new system, making accurate financial reporting difficult. The Diocese hired Anderson ZurMuehlen during the course of the bankruptcy to complete the conversion of data from the old system to the new system to bring account balances current and to complete reconciliations. Reconciliations are now current through October 2014. Now it is anticipated that the Debtor will be able to prepare financial statements from the system from this time forward.

The Diocese has substantially cut payroll and other expenses and recognizes it must operate in a positive cash flow situation. Examples of cost cutting efforts already undertaken include: downsizing and eliminating 10 positions in the diocesan office; instituting thirteen unpaid furlough days each year, resulting in a 5% decrease in salary; re-defining the employee benefit package resulting in a reduction in benefits and costs; eliminating programs and services including but not limited to the Diocese newspaper publications, Diocese grants to parishes, missions and partnering agencies, travel and general operating costs.

The Diocese is creating operating budgets to minimize expenses while continuing to provide for pastoral and administrative programs required by Canon law. The goal for the annual appeal and the rate for the assessment to parishes have been raised. The Plan will include efforts to secure additional operating funds for the future.

### 3.     Response to Sexual Abuse

Beginning in 1993, the Diocese put into place a *Policy Regarding Abuse of Minors, Sexual Misconduct and Sexual Harassment*, and in 2003 added a specific *Code of Pastoral Conduct* (the *Policy* was amended in 2007 and currently is in the process of further amendment in order to accommodate modifications from the United States Conference of Catholic Bishops' *Charter for the Protection of Children and Young People*). Among other things, this *Policy* and *Code* makes it clear that childhood sexual abuse will not be tolerated within the Diocese, mandates reporting of violations from those involved in ministry within the Diocese, and requires all employees and volunteers in the Diocese to undergo training. The *Policy* and *Code* apply to "all priests and deacons incardinated in the Diocese of Helena, all seminarians affiliated with the Diocese of Helena; to women and men religious, lay men and women, employed by or utilized as volunteers by the Diocese of Helena, its parishes, schools, institutions, offices, or programs; and to all priests and deacons incardinated in a Diocese other than the Diocese of Helena serving in any capacity here, and to women and men religious serving in any capacity within the Diocese of Helena."

Examples of particular Diocese actions in this regard, include:

- Appointing a Victim Assistance Coordinator to receive complaints and assure that an abuse victim receives appropriate assistance.

- Participating in annual compliance audits as arranged by the Office for Child and Youth Protection of the United States Conference of Catholic Bishops.

- Establishing a Review Board, which reviews all allegations of child sexual abuse and sexual misconduct made against clergy; and reviews all policies and procedures related to child abuse (including: reporting, prevention, response to victims), and recommends methods for strengthening policies and procedures.

- Utilizing the *Virtus* Program to implement a Safe Environment Program which includes training sessions that must be completed by all Diocesan, parish, and school employees and volunteers; and establishing a protocol for assuring compliance with these policies and procedures to assure that all entities within the Diocese provide a safe environment for children.  Further detail of the Virtus Program and contacts is available at http://www.diocesehelena.org.

## VII.

## THE CHAPTER 11 CASE

### 1.     The Chapter 11 Filing

The Debtor commenced its Case on January 31, 2014 (the "**Petition Date**").  The Debtor's Case was assigned to the Honorable Terry L. Myers, United States Bankruptcy Judge. The Bankruptcy Court has entered several orders in this Chapter 11 Case, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the Bankruptcy Court's website: **www.mtb.uscourts.gov.**

### 2.     Retention of Counsel

Subsequent to the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its businesses as the Debtor-in-Possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  By order of the Court, Elsaesser Jarzabek Anderson Elliott & Macdonald, Chtd. was authorized to act as bankruptcy counsel for the Debtor for this Case.

### 3.     Appointment of Creditors' Committee

Pursuant to §§1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee appointed an Official Committee of Unsecured Creditors (as defined above, the "**Committee**") to serve in the Debtor's Case.  The Committee consists of seven (7) individuals who hold Tort Claims against the Debtor.  Some but not all of the individuals hold Tort Claims against other Entities, including the Province.

The Committee retained the law firm of Pachulski Stang Ziehl & Jones LLP to represent it throughout this Case.  Since its appointment, the Committee has taken an active role in the Debtor's Case and been involved in virtually every major event that transpired during the Chapter 11 process, including taking an active role in asset sales to maximize the value for the Estate, negotiating and memorializing the terms of the Plan with the Debtor and its insurers, and negotiating internally and with other similarly situated Claimants over the terms of the Plan and a Plan to allocate funds to Tort Claimants.

The Committee has also performed its investigatory function by reviewing information supplied by the Debtor and third parties, as well as conducting its preliminary investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other creditors. The Committee has also negotiated the terms of the Plan with the Debtor; and the Committee is a co-proponent of the Plan.

### 4.   Future Claims Representative

On April 9, 2014, U.S. District Judge Michael R. Hogan, retired, was appointed as Future Claims Representative for the Debtor-in-Possession. The Future Claims Representative is the legal representative for those Claimants filing Tort Claims as defined in Section 2.54 of the Plan, for which a claim was not timely filed on the Bar Date. The Future Claims Representative's responsibilities and duties include: (i) undertaking an investigation and analysis to assist the Bankruptcy Court in determining the estimated number of Future Tort Claims and claim amounts held by the Future Tort Claimants; (ii) filing Proofs of Claim on behalf of all Future Tort Claimants by the Bar Date or any Bankruptcy Court ordered extension thereof; (iii) negotiating with the Debtor and other appropriate parties the Plan provisions for the evaluation, determination, and amounts of Future Tort Claims and number of Future Tort Claimants; (iv) advocating the legal position of the Future Tort Claimants before the Bankruptcy Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Future Tort Claimants; (v) taking all other legal actions reasonably necessary to represent the interests of the Future Tort Claimants; and (vi) serving as an independent fiduciary acting on behalf of all Future Tort Claimants.

The Future Claims Representative has completed his analysis and issued his Report and Recommendation. See Docket #408. The number of Future Tort Claimants is estimated at 21. The treatment of Future Tort Claims is set forth below in the discussion of the treatment of Class 5 Claims.

Pursuant to the Province Settlement the Debtor intends to expand the Future Claims Representative's responsibilities to include Future Tort Claims against the Province. Under this expansion, the Future Claims Representative will submit a report as to the portion of the $500,000 paid in the Province Settlement with the Province Channeling Injunction that will be delivered to the Trust for the Future Tort Claimants Reserve.

### 5.   Adequate Protection Stipulations

On March 20, 2014, the Debtor entered into a Stipulation for Adequate Protection with First Interstate Bank (Docket #154) wherein the Debtor would continue its monthly payments to First Interstate Bank on secured debt in the amount of $20,636.62. On April 9, 2014, an Order was entered (Docket #185) allowing the monthly payments of $20,636.62 to be made to First Interstate Bank pursuant to the terms of the Stipulation.

On May 15, 2014, the Debtor and Bitterroot Valley Bank *dba* Ravalli County Bank entered into an Adequate Protection Stipulation, wherein the Debtor would continue making its regular monthly payment to Ravalli County Bank in the amount of $12,000.00 monthly (Docket

#257). On June 4, 2014, the Court entered an Order (Docket #273) allowing the $12,000.00 per month payments to be made pursuant to the Stipulation.

### 6.    Asset Sales and Other Dispositions; Planned Dispositions

As detailed on Schedule A of the Debtor's Schedules, as of the Petition Date, the Debtor owned approximately 11 parcels of real property, listed below.[5]  The Debtor has sold, or intends to sell or encumber the following property:

(a)    **Legendary Lodge**:  Physical address of 2127 Mt. Hwy 83 North, Seeley Lake, Mt, 59868.  It is anticipated that the Debtor shall encumber the Legendary Lodge property for purposes of securing a loan or loans, which proceeds will be used to fund the Debtor's obligation towards the Class 4 and Class 5 Claimants, and for administrative expenses.  Such loan shall be in the amount of $3.5 million, and it shall be partially secured by the Legendary Lodge, the Debtor's interest in the cemetery property, and the shopping center property.  As of today's date, the Debtor values the Legendary Lodge at roughly $3.585 million.  A preliminary agreement with the Foundation for the Diocese of Helena has been reached for the Diocese to sell the Legendary Lodge to the Foundation for $3.585 million.  The terms of such sale have been finalized and will be placed before the Court for approval.

(b)    **Cemetery Property**:  Physical address of 3700 N. Montana Ave., Helena, MT 59601.  It is anticipated that the Debtor shall encumber its interest in the cemetery property for purposes of securing a loan or loans, which proceeds will be used to fund the Debtor's obligation towards the Class 4 and Class 5 Claimants, and for administrative expenses.  Such loan shall be in the amount of $3.5 million, and it shall be partially secured by the Debtor's interest in the cemetery property, the Legendary Lodge property, and the shopping center property.  As of today's date, the Debtor values the current interest in the cemetery property at roughly $1.4 to $2.0 million, which is the Debtor's 25% interest, which is based on a promissory note from Resurrection Cemetery Association, Inc., and a participation agreement if the property is sold.  If this property were to be developed, values could increase.

(c)    **First Street Property**:  Physical address of 906 1st Street, Missoula, MT 59801.  It is anticipated that the Debtor will encumber the First Street property for purposes of securing a loan or loans, which proceeds will be used to fund the Debtor's obligation towards the Class 4 and Class 5 Claimants, and for administrative expenses.  Such loan shall be in the amount of $3.5 million, and it shall be partially secured by the shopping Center Property, the Legendary Lodge property, and the Debtor's interest in the cemetery property.  As of today's date, the Debtor values the First Street property at roughly $2,190,000.00.

(d)    **Residential Property**:  On March 19, 2014, the Debtor sold, with approval of the Court (Docket #142), property located at 520 S. Virginia, Conrad, Montana.  The property consisted of residential property and home, and was sold for

---

[5]  As described in the Schedules, the Debtor also holds title to various other pieces of real property, which the Debtor contends it holds in trust for its parishes and other Entities.  The Committee asserts that such properties may be property of the estate, but any dispute over such properties is resolved by the Plan.

$60,000.00. The net proceeds from such sale are on deposit in the Debtor-in-Possession's account and shall be used to support the Clergy Senior Status and Security Trust.

(e)    **Church and Property:** On April 22, 2014, the Debtor sold, with approval of the Court (Docket #222), property located at 4616 Gharrett, Missoula, Montana. The property consisted of a church, residence/rectory and approximately 3 acres of property, and was sold for $800,000.00. The net proceeds from such sale are on deposit in the Debtor-in-Possession's account and shall be used on behalf of the Blessed Trinity Parish that previously was served from this location.

(f)    **Cemetery Property:** Physical addresses of W. 7th Street, and W. 5th and Cottonwood Street in Anaconda, MT 59711. On May 6, 2014, the Debtor sold, with approval of the Court (Docket #240), 2 cemetery properties, Mount Carmel Cemetery and Mount Olivet Cemetery, located in Anaconda, Montana for $1.00. The properties consisted of burial grounds, and were deeded to Anaconda Deer Lodge County. While the transaction was structured as a sale, it was in reality an abandonment to formalize a many years old transfer for which title had not properly passed. Due to the operating expenses of the cemeteries, and lack of value or revenue, they were considered a liability to the estate.

### 7.    Placid Enterprises, LLC Loan

On November 11, 2014, the Debtor filed a motion with the Court to have a post-petition financing agreement approved with Placid Enterprises, LLC ("Placid"). Placid intends to loan $3.5 million dollars to the Debtor, fully secured by the Debtor's interest in various parcels of real property and personal property. The Placid loan is to be funded upon confirmation of a Plan of Reorganization, and is to be repaid in equal monthly installments of $14,583.33, bearing interest at 5% per annum, for five years at which time the loan will become due and payable in full. The Placid loan is secured by certain real property and personal property owned by the Debtor, which property is valued at roughly $5,300,000.00. In addition to the repayment terms, the loan agreement with Placid contains terms that require certain pay downs upon the sale or transfer of certain property, including a $1 million pay down from the sale of the Legendary Lodge. The Bankruptcy Court approved the motion on January 9, 2015.

The purpose of the loan is to provide the Debtor with necessary working capital to fund its obligations pursuant to a confirmed Plan of Reorganization, which include but are not limited to the Debtor's portion of the funding of the Settlement Trusts estimated at $2 million, the Debtor's funding of final administrative expenses estimated at $1 million, and for the Debtor's operating capital.

### 8.    Bar Dates and Objections to Claims

By Order dated May 6, 2014 (the "**Bar Order**"), the Bankruptcy Court set August 11, 2014 (the "**Bar Date**") as the last day for creditors, including Tort Claimants, to file a proof of claim. A notice of the Bar Date was sent to approximately 248 parties. In addition, publication

notice of the Bar Date was made in approximately 17 national and local newspapers on two (2) separate occasions.

The Debtor and the Committee's professionals have reviewed the Claims filed by creditors.  A total of 388 Tort Claims have been timely filed in the Debtor's Chapter 11 Case. The Tort Claims identify 26 parishes or missions where the abuser came into contact with the survivor within the Diocese.  The Tort Claims describe that the Claimants were all minors between three and seventeen years of age when the abuse began.  At least 50 priests, nuns and lay religious are identified as abusers.

In addition, 12 non-Tort Claims have been timely filed.

To the extent the Debtor has the right to object to Claims (only the Trust has the right to object to Tort Claims) and deems it prudent and/or cost effective to object to Claims, the Plan provides that the Debtor has sixty (60) days from the Effective Date to file objections to filed Claims.  If the Debtor fails to object to a properly filed Claim on or before sixty (60) days from the Effective Date, then such Claim will be deemed allowed if such Claim is a non-Tort Claim and will be entitled to the Distribution under the Plan applicable to the particular class in which such Claim is classified.  The Plan provides that Tort Claims will not be Allowed Claims, but treated as provided in the Plan.

### 9.    Plan Exclusivity

Pursuant to §1121 of the Bankruptcy Code, a debtor-in-Possession is granted a 120-day exclusive period from the Chapter 11 filing date to file a Plan of Reorganization.  During such time, only the Debtor can file a Plan of Reorganization.  However, the Bankruptcy Code provides that the Court can increase a debtor's exclusive period to file and confirm a Plan of Reorganization for cause shown up to eighteen (18) months after commencement of the case.  As of July 31, 2014, the Debtor's exclusive right to file a Plan terminated.

### 10.    Post-Petition Operations and Select Financial Information

Since the Petition Date, the Debtor has continued to operate its business.  During a typical month, the Debtor spends approximately $455,000.00.

Set forth below is a summary of the Debtor's remaining assets:

(a)    **Cash in Investment Account.**  As of December 2014, the Debtor had $51,000.00 on deposit with various investment brokers.

(b)    **Operating Cash.**  As of December 2014, the Debtor maintained approximately $2,659,998.59 in cash in its operating account, which includes approximately $860,000.00 of proceeds from the sale of real property described earlier.

(c)    **Real Estate.**  The Debtor currently owns eleven parcels of real property with a value of approximately $7,294,202.00, as follows, however, as set forth in paragraph 6 above, the Legendary Lodge and International Paper site may be

sold or encumbered prior to or concurrent with confirmation:

- Bishop's Residence, 1726 Lockey Avenue, Helena, MT, valued at $366,860.00;

- Chancery Building, 515 N. Ewing St., Helena, MT, valued at $80,775.00

- Clergy Senior Status Trust Building, 4307 Gharrett St., Missoula, MT, valued at $208,867.00;

- Clergy Senior Status Trust Building, 720 Missy's Way, Missoula, MT, valued at $200,400.00;

- Clergy Senior Status Trust Building, 520 S. Virginia St., Conrad, MT, valued at $44,000.00;

- Fr. Robertson's Residence, 512 N. Rodney St., Helena, MT, valued at $191,600.00;

- Burial Property, Indian Burial Ground, Stevensville, MT, valued at $74,100.00

- Legendary Lodge, 2127 Mt. Hwy 83 North, Seeley Lake, MT, valued at $3,585,000.00;

- Montana Catholic Conference, 1311 11th Avenue, Helena, MT, valued at $245,150.00;

- Catholic Social Services Building, 1301 11th Avenue, Helena, MT, valued at $228,450.00

- First Street Property, 906 1st St., West, Missoula, MT, valued at $2,190,000.00.

(d)    The Debtor currently owns personal property (Accounts Receivable, interest in Resurrection Cemetery, Deposit and Loan Fund Accounts Receivable, vehicles, office equipment) with a scheduled value of $9,859,100.48.  It is believed these assets are worth substantially less than as scheduled due to receivables that are uncollectible.

## 11.    Prepetition Mediation

Prior to this Case, the Debtor, its Settling Insurers and representatives of the plaintiffs in the Does Case and Whalen Case entered into mediation to resolve the  plaintiffs' claims and the disputes between the Debtor and the Settling Insurers.  The Debtor filed the Case to effectuate the results of the mediation.

### 12.    Deposit and Loan Fund

The Debtor's internal Deposit and Loan Fund is made up of deposits and loans to or from various parishes, programs and schools. Under Canon Law, such entities are not true creditors of the Diocese, as they are part of the Diocese. However, the Debtor proposes to create a Deposit and Loan Fund Restoration Trust, which will hold the Deposit and Loan Fund Receivables and other assets determined by the Debtor, for restoration of claims of parishes and programs in the Fund. It is anticipated that the Debtor will propose to dedicate certain assets to the Trust, including but not limited to its personal property interest in the Resurrection Cemetery Association, Inc. so long as such dedication does not affect any existing Plan obligations, any Loan obligations to Placid Enterprises, LLC, and only if such dedication shall not adversely affect the Debtor's ability to fulfill all terms and obligations of a confirmed Plan.

Prior to filing this Case, it was determined that the Deposit and Loan Fund had not been reconciled since January of 2011. The Debtor sought to hire the Anderson ZurMuehlen accounting firm to assist in the process of reconciling the Deposit and Loan Fund, and all of the Debtor's other cash funds that have a bearing on Deposit and Loan Fund. The reconciliation was completed in December 2014. The unaudited Deposit and Loan Fund shortfall is approximately $20.5 million based on estimated collectible debt and cash on hand.

The Diocese has discontinued taking deposits from the Deposit and Loan Fund members effective as of the Petition Date. The Diocese will continue efforts to collect receivables of the Deposit and Loan Fund and will use such proceeds consistent with the Diocese's obligations under Canon law. Upon confirmation, such receivables will be transferred to the Deposit and Loan Fund Restoration Trust.

The Endowment Fund, Annuity Fund, Latin American Fund, and the Guatemalan Fund[6] will continue to perform their charitable purposes. Funds earmarked for the Endowment Fund in the amount of $3,545,938.63, for the Annuity Fund in the amount of $1,260,519, for the Latin American Fund in the amount of $3,508.00, and for the Guatemalan Fund in the amount of $183,650.84, shall continue to be earmarked for the charitable purpose of the respective funds. Neither the Endowment Fund, Annuity Fund nor the Guatemalan Fund shall be separately classified, nor will they receive anything further as distributions under the Plan. However, Annuitants will receive their payments in full, without impairment.

### 13.    Real Property of Parishes, Programs and Schools

In its Bankruptcy petition and Schedules, the Debtor has, at Exhibit 1, disclosed $41,802,164 of real property belonging to Parishes and programs and being held in trust by the Debtor for such Parishes and programs. According to the Debtor, the Code of Canon Law of the Roman Catholic Church generally provides that each entity within the Diocese (e.g. parish, school, institution) is a separate entity within the Church. The Debtor may have title to property that is held in trust, or for the benefit of those separate entities. Therefore, the Debtor takes the position that the property listed on Exhibit 1 to the Bankruptcy petition and Schedules is held for

---

[6] The Endowment Fund, Annuity Fund, Latin American Fund and Guatemala Fund are charitable programs internal to the Debtor, thus are not true creditors.

the benefit of the parishes, schools, and institutions of the Diocese, and is not property of the Estate.

The Disclosure Statement herein is a joint Disclosure Statement filed by both the Debtor, and the Committee. The Committee reserves rights to challenge the position that the properties set forth in Exhibit 1 to the Bankruptcy petition and Schedules are not property of the Estate. However, the joint Plan represents a settlement of any dispute that could be raised regarding ownership.

## 14.   Foundation for the Diocese of Helena

The Foundation for the Diocese of Helena is an entity separate and distinct from the Debtor. However, it is related to the Debtor in the sense that it holds and manages endowments on behalf of the Diocese, administers programs on behalf of the Diocese, and conducts campaigns for giving on behalf of the Diocese and other Parishes and programs. An example would be the *Age to Age* campaign that solicits donors to make contributions and pledges, which once received, a portion would be permanently endowed and a portion would be utilized directly for Diocesan programs.

Fundraising performed by the Debtor has historically been used to fund endowments at the Foundation. Theoretically, transfers to the Foundation by the Debtor over the past ten years could be voidable as fraudulent conveyances. The Plan resolves any disputes that could be raised regarding fraudulent conveyances made by the Debtor to the Foundation.

The Foundation has pledged cooperation and assistance in assisting the Debtor in confirming a Plan of Reorganization. As an example, the Foundation shall be purchasing the Legendary Lodge from the Debtor for the sum of $3,585,000.00, which is the appraised value of the Legendary Lodge. The proceeds from the sale of the Legendary Lodge shall be used by the Debtor for administrative expenses, operations, and to assist in funding the trust used to pay the Tort Claims.

## 15.   Ursuline Western Province and Motions For Relief From the Automatic Stay

On February 27, 2014, Tort Claimants filed a Motion for Stay Relief (Docket #182) to pursue litigation in Montana State Court against the Ursuline Sisters of the Western Province (the "**Province**"), which is also a co-defendant in the Whalen and Does Cases. The Province opposed the Motion arguing, among other things, that the claims against the Debtor and the Province were intertwined and therefore the litigation could not proceed against the Province alone. On March 28, 2014, the Court entered an Order denying the Motion for Stay Relief as moot, in that there was no stay that needed to be terminated against the Province, since they were non- Debtor Defendants and were not subject to the stay.

On April 8, 2014, the Province filed a Motion for Stay Relief (Docket #182) to pursue litigation against the Debtor to assert claims for contribution, indemnification, fault allocation, and related defenses, among other things. The Debtor, with the Committee's support, vigorously opposed the Province's request, arguing there was no contribution or indemnification claim under

Montana State law, and that stay relief, if granted, would severely prejudice the Debtor's reorganization efforts. The Court issued an oral ruling on May 28, 2014, which denied the Province's Motion for Stay Relief.

### 16.   Insurance

#### A.   Background

Between 2012 and October of 2013, the Debtor, the Settling Insurers, and the plaintiffs in the Does Case and Whalen Case engaged in informal discovery involving hundreds of interviews of plaintiffs and the exchange of thousands of documents relating to the plaintiffs' claims, as well as four mediation sessions spanning a total of nine days between November 2012, and October 2013, under the supervision of Thomas V. Harris, Esq. of Washington Arbitration & Mediation Services. As of November 2013, however, the parties' settlement efforts proved unsuccessful.

The dates of these mediation sessions and parties involved are as follows: (1) mediation with the Diocese, the Settling Insurers, and counsel for plaintiffs in the Whalen Case and Does Case on November 13-14, 2012; (2) mediation with the Diocese, the Settling Insurers, and counsel for the plaintiffs in the Whalen Case from April 15-17, 2013; (3) mediation with the Diocese, the Settling Insurers, and counsel for the plaintiffs in the Does Case from April 18-19, 2013; (4) mediation with the Diocese and the Settling Insurers on July 22, 2013; and (5) mediation with the Diocese, the Settling Insurers, and counsel for the plaintiffs in the Whalen Case and Does Case on October 23, 2013. The parties spent approximately 72 total hours in mediation. These mediations included approximately 30 attorneys at each session.

Three lawsuits regarding the disputes over insurance coverage were filed, one in Montana state court (the "State Court Coverage Suit") and two in federal court. In the federal court cases, the district court declined to exercise jurisdiction and dismissed the cases. One of the Settling Insurers appealed one of those decisions, which appeal is pending and stayed before the Court of Appeals for the Ninth Circuit. In the State Court Coverage Suit, certain of the Settling Insurers filed motions for summary judgment regarding two of the most significant defenses raised by the Settling Insurers. First, the Debtor contended that the Policies are potentially implicated by any Tort Claim that alleges abuse during or before the effective periods of the Policies. The Settling Insurers disagreed and contended that, in cases involving sexual abuse, coverage under the Policies can be triggered, if at all, only if the abuse occurred during the policy period (the "Continuous Trigger Issue"). Second, several of the Settling Insurers contended that the Debtor released them from any liability with respect to any Tort Claims under numerous Policies (the "Release Issue"). In 1994, the Debtor entered into a Settlement & Release Agreements with several of the Settling Insurers (collectively, the "Allegedly Released Insurers"). The Allegedly Released Insurers contended that, pursuant to those Settlement & Release Agreements, the Debtor released the Allegedly Released Insurers with respect to any future liability from Tort Claims asserted against the Debtor and, further, agreed to indemnify the Allegedly Released Insurers with respect to any such claims. The Debtor disputes the Allegedly Released Insurers' interpretation of the Settlement & Release Agreements.

The Montana court in the State Court Coverage Suit granted the motions for partial summary judgment on the Release Issue and the Continuous Trigger Issue and held, among other

things, that: (i) the Allegedly Released Insurers have no duty to defend or indemnify the Debtor for any Tort Claims under the Policies identified in the Settlement & Release Agreements; and (ii) the Policies afford no coverage for claims that do not allege abuse during the effective periods of the Policies. The impact of the Montana court's ruling with respect to the Settling Insurers is discussed in more detail below. The Debtor disputes these rulings and, if litigated to completion, the Debtor would appeal these rulings. Another significant coverage defense raised by some of the Settling Insurers is that the Debtor failed to prove the existence and/ or terms and conditions of any Policies, including the amounts of any available limits.

In December 2013, shortly after the Montana court's rulings on the summary judgment motions in the State Court Coverage Suit, the Debtor reached a settlement agreement in principle with the plaintiffs in the Does Case and Whalen Case and the Settling Insurers. The Agreement was premised on the Debtor filing for bankruptcy and seeking approval of a plan of reorganization. The settlement between the Debtor and the Settling Insurers requires the Settling Insurers to buy back the Policies and the Debtor to use the money obtained from the Settling Insurers to fund its plan of reorganization. The amounts being paid by the Settling Insurers are as follows:

- American Home: $487,500
- Catholic Mutual: $3,800,000
- Great American: $3,500,000
- Fireman's Fund: $4,000,000
- MIGA: $500,000
- OneBeacon: $100,000
- Travelers: $2,000,000.

The Settling Insurers contend, for a variety of reasons, that the foregoing amounts far exceed the amounts they could conceivably be deemed obligated to pay pursuant to the Policies in connection with Tort Claims, including the claims of the plaintiffs in the Does Case and Whalen Case and any Future Tort Claims that might be asserted against the Debtor. The Debtor disagrees, but given the substantial time and financial resources it would take for the parties to litigate the insurance coverage issues to completion, the risks of litigation, and the potential for appeals to further delay recoveries to the Estate, it is in the Debtor's best interest to resolve the claims and disputes consensually.

If no settlement had been reached, it would have taken many years to try all of these cases. This does not factor in post-trial motions and appeals. The vast majority of the plaintiffs are at least 60 years old, and many are much older and/or sick. There is a very real possibility that those plaintiffs would never benefit without settlement because they would not live to see their trial.

The projected costs of taking all of these cases to trial would be in the tens of millions of dollars. This would include taking the depositions of all the plaintiffs, as well as other relevant damages and liability witnesses including, but not limited to, their family members, medical providers, and friends. Additionally, the plaintiffs would have to submit to an independent medical exam ("IME") and it is anticipated that both plaintiff and the defendants would have IME experts providing opinions as to the impact abuse has had on plaintiffs' physical and emotional states. With regard to liability, the Diocese would likely have to retain experts regarding standard of care.

The truncated, non-adversarial pre-mediation discovery process included the use of 10-20 attorneys representing all parties.  It is anticipated if this case proceeded through full litigation, that it would include a similar number.  The negotiated resolution of the numerous insurance coverage-related issues will result in a substantial recovery for the bankruptcy estate, which money will be available under a plan of reorganization for payment of Tort Claims.

**B.      Settlement Negotiations and Mediation.**

In light of (i) the significant costs to the Debtor's estate to litigate its coverage claims against its insurers; (ii) the considerable time it will take to obtain a final determination of the Debtor's rights and claims under the Policies; (iii) the risk that the Debtor may not prevail in litigation of the issues; (iv) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the disputes potentially for years; and (v) the desire to obtain promptly the maximum value from the Settling Insurers under the Policies to use toward the resolution of Tort Claims, the Debtor determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the disputes between the Settling Insurers and the Debtor.

As noted, the parties engaged in several mediated settlement negotiations under the supervision of Thomas V. Harris, Esq. between November 2012 and October 2013.  Under his supervision, extensive negotiations took place among the Debtor, its counsel, state-court counsel representing claimants, including those on the Committee, and the Settling Insurers' representatives and their counsel.  As noted above, the negotiations and mediation were extensive and intensive.  As a result of the mediation and further negotiations, the Debtor and Settling Insurers, with the support of the plaintiffs in the Whalen Case and Does Case, agreed in December 2013 on essential terms of a settlement and have negotiated the terms and details of the Insurance Settlement Agreements.

**C.      The Insurance Settlements.**

Principal terms of the Insurance Settlement Agreements include:

**Settlement Amount/Purchase Price**.  The Settling Insurers will pay a total of $14,401,500 to a post-confirmation Trust, upon agreed notice, within 10 days after the Bankruptcy Orders become Final Orders (*i.e.*, non-appealable) and 10 days after notice that such Order have become Final Orders is provided to the Settling Insurers by the Trustee.  Under the Insurance Settlement Agreements, the "Trust" is the entity to which all Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the Debtor, the Diocese Parties or the Settling Insurers.

**Releases**.  The Debtor and other releasing Diocese Parties, on the one hand, and the Settling Insurers, on the other, will grant complete mutual releases as to, among other things, any and all past, present, or future Claims in connection with, relating to, or arising out of, in any manner or fashion, the Tort Claims, the Policies and the Reorganization Case, as set forth in the Insurance Settlement Agreements.

**Sale and Buyback of Policies**.  The Debtor and other releasing Diocese Parties will sell all of their Interests in the Policies, free and clear of all liens, claims, encumbrances and other Interests pursuant to 11 U.S.C. § 363.

**Supplemental Injunction**.  The Settling Insurers will be entitled to receive the benefit of a Supplemental Injunction under the Plan and Order confirming such Plan pursuant to 11 U.S.C. §§ 105(a) and 363.  Any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Future Tort Claimants, Perpetrators, Non-Settling Insurers, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties, Insured Entities, or the Policies, which, directly or indirectly, relate to, any of the Policies, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, Insured Entities, and/or the Policies.

**Conditions to Settling Insurers' Payment**.  The Settling Insurers' payments are conditioned on, among other things entry of the Procedures Order, Approval Order and Confirmation Order, and such Order becoming Final Orders.  The Plan must be in all aspects consistent with the Insurance Settlement Agreements and contain no provisions that diminish or impair the benefits to which the Settling Insurers are entitled under the Insurance Settlement Agreements.

The Motion to Approve Settlement Agreement, Release and Policy Buybacks With The Settling Insurers, Including The Sale of Insurance Policies Free And Clear of Liens, Claims, Encumbrances, and Other Interests, filed on November 7, 2014 at Docket # 332 was approved on January 14, 2015. The Settlement Agreement, Buy Back of Policies, Release of Claims, and Covenant Not to Sue with Great American Insurance Company is set forth as Exhibit C to the Plan.

## 17.  Province

### A.  Background

Since the inclusion of the Province in the Does and Whalen cases, the Province and the plaintiffs in the Does and Whalen cases have been engaged in extensive negotiations, including negotiations under the supervision of Mr. Harris.  On December 31, 2014, the Debtor, Committee and the Province executed the Term Sheet.

The Province contends that it has a contribution and indemnity claim against the Diocese and that it is an insured under the Policies. The Province filed a Proof of Claim in the Debtor's Case, asserting monetary claims against the Debtor for contribution, indemnification, and damages arising from current or other, presently unknown tort claims involving the Debtor and the Province.

The Province alleges that as a result of the Debtor's filing and the Debtor's active resistance of the Stay Relief Motion, it will be unable to request in the Does and Whalen Cases that the court or a jury allocate fault as between the Debtor and the Province. Accordingly, the Province contends that it will suffer damages equal to the amount that is greater than the Province's individual and direct liability, if any, to the Tort Claimants plus additional damages, including attorneys fees and costs, the amount of which, as of the date the Province filed its claims, was unliquidated. This claim is alleged to be separate and distinct from a Contribution Claim.

Also, absent the Province Settlement, the Province intended to object to the Insurance Settlement Agreements on bases including that they violated the Province's rights as an insured and that the proceeds from the buyback of the Policies could not be used to compensate Tort Claimants if the Province's rights as an insured were not adequately protected. The Province also contends that the Plan could not be confirmed over its objection because the treatment of its claims was not fair and equitable. The Debtor disagrees, but given the substantial time and financial resources it would take for the parties to litigate the insurance coverage issues to completion, the risks of litigation, and the potential for appeals to further delay recoveries to the Estate, it is in the Debtor's best interest to resolve the claims and disputes consensually.

The projected costs of taking all of these disputes to trial would be substantial. The Province might have tried to have its contribution and indemnification claims estimated which would include taking the depositions of all the Province Channeled Claimants as well as other relevant damages and liability witnesses including, but not limited to, their family members, medical providers, and friends. Additionally, the Province Channeled Claimants would have to submit to an IME and it is anticipated that both plaintiffs and the defendants would have IME experts providing opinions as to the impact abuse has had on plaintiffs' physical and emotional states. With regard to liability, the Diocese would likely have to retain experts regarding standard of care. Funds that the Province could have used to pay Province Channeled Claimants would be depleted by attorneys' fees and costs relating to the Does and Whalen Cases.

The settlement evidenced in the Term Sheet provides compensation to the Province Channeled Claimants and Future Tort Claimants with Tort Claims against the Province and eliminates a substantial dispute regarding confirmation of the Plan and the Insurance Settlements. Moreover, the Province contends that it provides Province funds to the Province Channeled Claimants and Future Tort Claimants that would not otherwise be available.

## B.     Settlement Negotiations and Mediation.

In light of (i) the significant costs to the Debtor's estate to litigate the Province's coverage claims; (ii) the considerable time it will take to obtain a final determination of the Province's contribution and indemnification claims; (iii) the risk that the Debtor may not prevail in litigation of

the issues; (iv) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the disputes potentially for years; and (v) the desire to obtain promptly the maximum value from the Province to use toward the resolution of Province Channeled Claims, the Debtor and the Committee determined that it is in the best interest of its estate and its creditors to reach a negotiated resolution of the disputes between the Province and the Debtor.

As noted, the parties engaged in several settlement negotiations prior to and after the Diocese filed bankruptcy, including negotiations under the supervision of Mr. Harris. On December 31, 2014, the Debtor, Committee and the Province executed the Term Sheet.

## C.      The Province Settlement.

Principal terms of the Province Settlement are set forth in the Term Sheet, incorporated into the Plan as Exhibit G.    The Province Channeled Claimants are identified by claim number on Exhibit J to the Plan. In general terms, the Province will pay $4.45 million if the Province Settlement is approved by the Bankruptcy Court with the Province Channeling Injunction (which prohibits Tort Claimants and Future Tort Claimants from suing the Province) and 85% or more of the Province Channeled Claimants accept the Province Settlement. The $4.45 million will be distributed as follows:  $3.95 million to the Trust for the benefit of the Province Channeled Claimants and $500,000 for the legal fees and expenses associated with including the Province Settlement in the Plan and Disclosure Statement and the Future Tort Claimants with Tort Claims against the Province.    Distributions from the Trust will be made to Province Channeled Claimants who execute the Province Release and dismiss their State Court Litigation against the Province.  The amount used for the Future Tort Claimants will be based on the recommendation of the Future Claim Representative.  The balance remaining of the $500,000, if any, will be paid to the Trust for the benefit of the Province Channeled Claimants.  The Province will withdraw its disputed Province Contribution Claim.

If the Province Settlement is approved without the Province Channeling Injunction (*i.e.,* the Alternate Settlement), the Province will pay $3.95 million to the Trust for the benefit of the Province Channeled Claimants, provided that 100% of the Province Channeled Claimants execute the Province Release and dismiss the State Court Litigation against the Province.  The Province will waive the Province Contribution Claim if the Province Settlement is approved with the Province Channeling Injunction.  The Province will cap its disputed Province Contribution Claim at $500,000 if the Province Settlement is approved without the Province Channeling Injunction.

In consideration for the Province's contributions to the Plan and Claimants, including the Province's waiver of its right to object to the Court's approval of the Insurance Settlement Agreements, the Term Sheet states that counsel for Tort Claimants with Claims against the Province will recommend a $3.95 million settlement in the State Court Litigation if the Bankruptcy Court does not approve the Province Settlement.  If the State Court Litigation is settled outside of the Plan, including the execution of the Province Release by all Province Channeled Claimants, the Province will cap its disputed Province Contribution Claim at $500,000.

## VIII.

## SUMMARY OF THE PLAN

The Debtor and the Committee submit that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Case were converted to Chapter 7. Therefore, the Debtor and the Committee submit that the Plan is in the best interests of the Creditors and the Debtor and the Committee recommend acceptance of the Plan by holders of Claims in Classes 4, 5, 6, 10, 11 and 12.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

A.   **General**

1.   **Brief Explanation of Chapter 11**

Chapter 11 is the principal business or operations reorganization chapter of the Bankruptcy Code.   Under Chapter 11, a debtor is authorized to reorganize its business or operations for the benefit of itself and its creditors.   Upon the filing of a petition for reorganization under Chapter 11 and during the pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect claims or enforce liens against the Debtor, including the commencement of any sexual abuse litigation.

Confirmation and consummation of a plan of reorganization is the principal objective of a Chapter 11 case.   In general, a plan divides the claims against a debtor into separate classes and allocates plan distributions among those classes.   If the legal, equitable and contractual rights of a class are unaffected by a plan, such class is considered "unimpaired".   All unimpaired classes are deemed to have accepted a plan and therefore are not entitled to vote thereon.   Bankruptcy Code §1126(g), on the other hand, provides that all classes of claims that do not receive or retain any property under a plan on account of such claims are deemed to have rejected such plan.   All classes of claims that are considered "impaired" are entitled to vote on a plan.

Under the Bankruptcy Code, acceptance of a plan is determined by class; therefore, it is not required that each holder of a claim in an impaired class vote in favor of a plan in order for the Bankruptcy Court to confirm a plan.   Generally, each impaired class must vote to accept a plan; however, the Bankruptcy Court may confirm a plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept a plan and certain other statutory tests are satisfied.   Many of these tests are designed to protect the interests of creditors who either do not vote or vote to reject such plan but who will nonetheless be bound by such plan if it is confirmed by the Bankruptcy Court.

2.   **Acceptance of the Plan**

As a condition to confirmation, Bankruptcy Code §1129(a) requires that: (a) each impaired class of claims votes to accept the plan; and (b) the plan meets the other requirements of §1129(a).   As explained above, classes that are unimpaired are deemed to have accepted the

plan and therefore are not entitled to vote thereon, and classes that do not receive or retain any property under the plan are deemed to have rejected the Plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims classified in impaired Classes that are to receive distributions under the Plan.

An impaired class of claims will be deemed to have accepted a plan if holders of at least two-thirds in dollar amount and a majority in number of claims in such class who cast timely ballots vote to accept the plan.

### 3. Classification of Claims Generally

Bankruptcy Code Section 101(5) defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code Section 1123 provides that a plan of reorganization shall designate classes of claims against a debtor. Bankruptcy Code Section 1122 further requires that each class of claims contain only claims that are "substantially similar" to each other. The Plan Proponents believe that they have classified all Claims in compliance with the requirements of Sections 1122 and 1123. However, it is possible that a Holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Plan Proponents would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims may necessitate a re-solicitation.

### B. Classification and Treatment of Claims Under the Plan

The following describes the classification of Claims under the Plan and the treatment that Holders of Claims, whether Tort Claims or otherwise, are to receive if the Plan is confirmed and becomes effective. A Claim is classified in a particular Class only to the extent that the Claim fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim fits within the description of such different Class.

### 1. Unclassified Claims

The Plan does not classify Administrative Claims, statutory fees due to the United States Trustee, or Priority Tax Claims, but does provide for the following treatment of such Claims.

        **(a)**     **United States Trustee Fees.** All fees payable by the Debtor

under Section 1930 of Title 28 of the United States Code that have not been paid prior to the Effective Date shall be paid by the Debtor or the Reorganized Debtor on or before the Effective Date. In addition, the Debtor, or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, shall be liable for and shall pay such fees until the entry of a final decree in this Case or until the Case is converted or dismissed. The Reorganized Debtor shall file post-confirmation operating reports with the Bankruptcy Court and the United States Trustee until a final decree is entered.

        **(b)**     **Administrative Claims.**     An "Administrative Claim" is a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the Estate or operating the Debtor's businesses after the commencement of a Chapter 11 case, loans and advances made to the Debtor after the Petition Date, compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331 or 503, certain retiree benefits, certain reclamation Claims, and all fees and charges against the Estate pursuant to Chapter 123 of Title 28 of the United States Code.

       The Plan provides that each holder of an Allowed Administrative Claim (including, without limitation, the professionals' fees and expenses incurred by the Professionals and allowed in a Final Order of the Bankruptcy Court) shall be paid in full, in Cash, by the Reorganized Debtor (i) on the later to occur on the Effective Date or the date the Order allowing such Administrative Claim becomes a Final Order; (ii) upon such other terms as may exist in the ordinary course of business of the Debtor; or (iii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such Holder of an Allowed Administrative Claim and the Debtor.

       The Debtor estimates that the aggregate final amounts due to professionals shall total approximately $1 million. This includes the professional fees of Elsaesser Jarzabek Anderson Elliott & Macdonald, Chtd., bankruptcy counsel for the Debtor, and Pachulski, Stang, Ziehl & Jones LLP, counsel for the Creditors' Committee. It also includes the fees of Anderson ZurMuehlen Accountants; Galusha Higgins and Galusha Accountants; Gough, Shanahan, Johnson & Waterman, PLLP; Patterson Buchanan Fobes & Leitch, Inc., P.S.; Franz & Driscoll, PLLC; and Dickstein Shapiro, LLP, counsel to the Debtor. The $1 million in professional fees represents the Debtor's best estimate of the unpaid fees due through the Effective Date. The Debtor has entered into an agreement with Catholic Mutual wherein Catholic Mutual shall contribute $450,000.00 towards the administrative expenses of the Debtor. Such contribution of $450,000.00 shall assist in defraying the estimated $1 million of professional fees, and such contribution shall be paid on or before the Effective Date.

       With respect to the trade Claims arising after the Petition Date representing obligations incurred by the Debtor in the ordinary course of its businesses consistent with past practice, such trade Claims shall be paid in the ordinary course of business. The Debtor estimates that post-petition ordinary course payables as of the Effective Date will be approximately $100,000.00. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, the Plan provides that each Holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Debtor on the Effective Date or the date the Order allowing such Administrative

Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, cash equal to the amount thereof, unless the Holder agrees to less favorable treatment of such Allowed Administrative Claim.

The Plan further provides that Professional Persons with Claims for services rendered during this Chapter 11 Case, must file requests for payment within forty-five (45) days after notice of the Effective Date is filed with the Bankruptcy Court.

Administrative Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order (including, without limitation, Claims for professionals' fees and expenses) shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. After the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of the Professional Persons employed by the Debtor in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.

Administrative Claims representing fees and expenses of Professionals that are employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan may be paid by the Debtor or the Reorganized Debtor, after notice and a hearing, or by the Trust from contributions by the Debtor or the Reorganized Debtor in addition to the amounts payable to Tort Claimants under the Plan.

Administrative Claims representing fees and expenses of Professionals that are employed by the Debtor prior to the Effective Date of the Plan shall not be paid by the Trust.

### 2.      Priority Tax Claims

A "Priority Tax Claim" is an Unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of the Bankruptcy Code §507(a)(8). The Debtor has no pre-petition tax claims entitled to priority.

### 3.      Class 1 – Other Priority Claims

Class 1 consists of Other Priority Claims. These are claims entitled to priority under Section 507(a)(3) – (a)(7) and 507(a)(9) – (a)(10). These are claims for unpaid wages, employee benefit Plan contributions and the like. The Debtor does not believe that any such Claims exist. However, in the event a Claim is allowed as an Other Priority Claim, such Claim shall receive either (a) payment from the Reorganized Debtor in the full amount of its Allowed Claim in cash, of the Effective Date or when such Claim becomes an Allowed Claim or (b) payment upon such terms as may be agreed in writing between the Holder of such Other Priority Claim and the Reorganized Debtor.

### 4.      Class 2 – Secured Claims

Class 2 consists of Holders of Secured Claims.  Based upon the Debtor's Schedules and the Proof of Claims filed in this Chapter 11 Case, the Debtor believes there are only three (3) Holders of Secured Claims.  First Interstate Bank filed a proof of claim based upon a loan in the amount of $2,940,980.54, which is secured by real property.  The Debtor believes that the current amount due to First Interstate Bank is approximately $2,890,489.14.  Ravalli Bank filed a proof of claim based upon a loan in the amount of $926,992.72, which is secured by real property, and for which the Debtor believes the current balance due is $868,715.20.  The Foundation for the Diocese of Helena has a Claim based upon a loan in the current amount of $813,714.63, which is secured by real property.  All Secured Claims are fully secured by property that the Debtor contends is held for the benefit of the Good Samaritan Ministries, Holy Rosary Parish and St. Francis of Assisi Parish, valued at $2,528,300, $3,179,657 and $3,579,015 respectively.

With respect to the Secured Claims, the Plan provides for certain alternative treatments.  The Debtor may abandon or surrender the collateral, pay the Secured Claim upon sale of the collateral or leave the rights of the secured creditor unimpaired, which election will be made within 60 days of the Effective Date.  Nothing in the Plan modifies the obligations of any co-obligor or guarantor.

### 5.      Class 3 - General Unsecured Convenience Claims

Class 3 consists of the Holders of General Unsecured Convenience Claims against the Debtor or Holders of Unsecured Claims who elect to be treated as a General Unsecured Convenience Claim.  These Claims are unsecured creditors of Claims of $500.00 or less or who voluntarily reduce their Unsecured Claim to $500.00.  Class 3 Claims total $2,706.38.  The Plan provides that all Holders of Allowed Class 3 Claims will receive either (a) payment from the Reorganized Debtor in the amount of $500.00 or less in cash on the Effective Date or when such Claim becomes an Allowed Class 3 Claim, or payment of the Allowed Class 3 Claim upon such terms as may be agreed in writing by the Holder of such Allowed Class 3 Claim and the Reorganized Debtor.  Class 3 is unimpaired under the Plan and Holders of Class 3 Claims are not entitled to vote under the Plan.

### 6.      Class 4 – Tort Claims

Class 4 consists of Holders of Tort Claims other than Future Tort Claims.  The Plan establishes the Trust to resolve the Class 4 Claims.  Class 4 Tort Claimants shall have their Claims treated pursuant to the Allocation Plans and such Claims will be reviewed by the Abuse Claims Reviewer.  The Tort Claimants are bound by all of the injunctions in the Plan.  The Honorable William L. Bettinelli has been retained as the Abuse Claims Reviewer pursuant to an Order of the Bankruptcy Court.  The Abuse Claims Reviewer will review proofs of claim filed by the Class 4 Claimants and any other information which the Abuse Claim Reviewer requests from such Claimants.  The Abuse Claim Reviewer will then assign a certain number of points to the Class 4 Claimants' Tort Claims based upon various factors such as the nature of the abuse and the effect of the abuse on the survivor.  Upon completion of the Abuse Claim Reviewer's review of each Class 4 Claimant's Claim, the Abuse Claim Reviewer shall provide written

notification to the Trustee of the Trust of the points awarded to each Class 4 Claimant. The Trustee shall calculate the average value of each awarded point based upon the net funds in the Trust's Reserve available for distribution to the Tort Claimants who are beneficiaries of that Reserve. Under the Allocation Protocol, distributions will be made by the Trust to all Tort Allocation Claimants who are beneficiaries of the Reserve simultaneously, except that the Trust will hold any Claims subject to an objection in reserve until such time that the objection is resolved with respect to a Claim. Upon making such determination the Trustee shall distribute the monetary award to the Class 4 Claimant in accordance with the Plan and the Trust documents. The Trust will initially be funded with $16,401,500.00 of which at least $2,000,000.00 shall come from the Debtor's cash and $14,401,500.00 shall be contributed by the Settling Insurers in exchange for full policy releases and other protections afforded in the Plan. The Trust will not receive any additional funding for distribution to Tort Claimants. The sole additional funding will be from the Reorganized Debtor for the fees and costs of the Trust and its professionals. The Trust will establish separate reserves for the plaintiffs in the Whalen Case ($10,714,285.71), the plaintiffs in the Does Case ($4,285,714.59) and the Tort Claimants who are not part of either group (funded per capita with the average amount payable to the Whalen and Does plaintiffs). A copy of the Allocation Plans are attached as **Exhibit A-1 and A-2** to the Plan.

Province Channeled Claims are Class 4 Tort Claims. The Debtor and the Committee have determined that Province Channeled Claims will be paid from a separate reserve within the Trust. The separate reserve will be distributed according to the Allocation Plan attached as **Exhibit A-2**. Distributions from the Trust to Province Channeled Claimants are conditioned on delivery of the Province Release to the Province and dismissal of the State Court Litigation.

On the Effective Date, the Trust shall assume all liability for and will pay all Tort Claims pursuant to the provisions of the Plan and the Trust Documents. The Debtor will receive a discharge as set forth in Section XII of the Plan.

### 7.    Class 5 - Future Tort Claims

Class 5 consists of Holders of Future Tort Claims. The Future Tort Claims Representative is responsible for negotiating the treatment of Future Tort Claims, including the amount of a reserve of monies to be set aside to be paid to Holders of Future Tort Claims. The reserve will be held by the Trust, separate and apart from the reserves for Class 4 Tort Claims and any other Entity entitled to payment or compensation by the Trust. The Plan will provide that in exchange for the funding of any Future Tort Claims reserve, Holders of Future Tort Claims will be channeled to the Future Tort Claims Reserve Fund and will not be entitled to pursue Claims against the Protected Parties. The Future Tort Claimants are bound by all of the injunctions in the Plan. Any Future Tort Claimant receiving payment from the Trust must execute a written release of any and all past, present and future Claims, and shall be entitled to no further payment from the Trust or the Protected Parties. The Debtor has moved the Court to enlarge the Future Claim Representative's duty to include Entities asserting a Future Tort Claim against the Province. Any Tort Claimant who (a) is not a Province Claimant described on Exhibit J to the Plan and (b) asserts that he or she is a holder of a Province Channeled Claim after the Confirmation Date shall have their Tort Claim treated as a Future Tort Claim.

The Future Claims Representative has completed his analysis and issued his Report and Recommendation. See Docket #408. The number of Future Tort Claimants is estimated at 21. The Future Claims Reserve Fund will be funded in the amount of $870,165.75.

### 8.    Class 6 – General Unsecured Claims

Class 6 consists of Holders of General Unsecured Claims that are not Class 3 General Unsecured Convenience Claims.  These are Claims not secured by any interest in the Debtor's property and consist of any Claim against the Debtor that is not a Tort Claim, Future Tort Claim, Annuitant Claim, Deposit and Loan Fund Claim, Administrative Claim, Abuse Related Contingent Claim, Penalty Claim, Priority Tax Claim, Evenson Claim, Annuity Fund Claim, Endowment Fund Claim, Guatemalan Fund Claim, Latin American Claim, or Secured Claim. Based upon a review of the Debtor's Schedules, as well as filed Proofs of Claim, the Debtor estimates that Class 6 Unsecured Claims total approximately $1,294,635.03, however it is anticipated that the claim objection process, more particularly, as to the Montana DEQ claim, will result in a reduction of this amount to the $850,000.00 range.  In addition, it is anticipated that certain Parishes will contribute to payment of certain claims as appropriate reducing the Debtor's ultimate monetary responsibility for these claims.  The Plan provides that all Holders of Allowed Class 6 Claims will be paid, without interest, as soon as reasonably practicable after all Class 6 Claims have either been Allowed or Disallowed.   The Holders of Class 6 General Unsecured Claims are as follows:

> Mountain West Bank - $684,816.42
> Montana Pro Audio - $8,059.25
> Flint Creek Catholic Community - $611.00
> Jerry and Jan Cashman - $100,000.00
> Reverend Frank McCormick - $518.96
> Reverend Richard Sodja - $629.40
> Montana DEQ - $500,000.00

Nothing in the Plan modifies the obligations of any co-obligor or guarantor.

### 9.    Class 7 – Penalty Claims

These Claims are based upon a fine, penalty, forfeiture, punitive damages, or similar award not meant to compensate the Claimant for actual damages.  The Debtor is unaware of any such Penalty Claims.  It is possible that Class 4 Tort Claimants may have included some type of Penalty Claim in their proofs of claim.   The Plan provides that Penalty Claims will be subordinated to all other Allowed Claims and receive no distribution under the Plan.

### 10.   Class 8 – Annuitant Claims

Class 8 consists of Holders of Claims against the Annuitants who are the current or future Annuitants receiving payments from such fund.   These Claims are backed by Annuitant investments of $1,260,519.00, which will be used to fund an estimated liability of $771,000.00. The Plan provides that Class 8 Annuitants' Claims shall be paid in full.

11.     **Class 9 – Abuse Related Contingent Claims**

Class 9 consists of Abuse Related Contingent Claims.  These are Claims by an Entity against the Debtor for contribution, indemnity, or reimbursement arising as a result of such Entity's  liability for paying or defending against any Tort Claim, including, but not limited to, a joint tortfeasor or the like.  Consistent with Section 502(e)(1) of the Bankruptcy Code, Holders of Class 9 Claims held by any Entity shall be Disallowed and shall receive no distribution under the Plan.  Under the Plan, the Province Contribution Claim is not a Class 9 Claim.

12.     **Class 10 – Shaela Evenson Claim**

Class 10 consists of the claim of Shaela Evenson for wrongful termination.  The Shaela Evenson Claim will be allowed to the extent determined in the litigation at *Evenson v. Butte Central Catholic Schools*, Case No. CV 14-55-BU-BWM-JCL, pending in the U.S. District Court for the District of Montana, Butte Division, subject to the limits of the policy of insurance that may be liable for such claim.  The Plan provides that such claim shall only be paid through applicable insurance coverage, and as allowed.  The Evenson Claimant shall receive no distribution from the Debtor under the Plan.  Any insurance deductible to be paid by the Debtor would be allowed as reasonable and necessary business expense and will be capped at $25,000.00.

13.     **Class 11 – Deposit and Loan Fund Claim**

Class 11 consists of Deposit and Loan Fund Claims, a list of which claims are set forth in Schedule 2.38(b) to the Plan.  Upon the effective date, the Deposit and Loan Fund Transferred Assets and Liabilities shall be transferred to the Deposit and Loan Fund Restoration Trust, which will be created upon the Effective Date.  Each Holder of a Deposit and Loan Fund Claim shall receive a *pro rata* beneficial interest in the Deposit and Loan Fund Restoration Trust.  The Holder of such claims shall receive no other distributions from the Debtor under the Plan.

The Debtor may transfer additional assets into the Deposit and Loan Fund Restoration Trust upon the Effective Date, including but not limited to its interest in the Resurrection Cemetery Association, Inc. personal property.  However, no such transfer shall be made if not approved by the Court, the interested parties, and after determination by the Debtor that any such transfer will not have any adverse effect on its obligations under the Plan, and to Placid Enterprises, LLC.

14.     **Class 12 – Province Contribution Claim**

Class 12 consists of the Province Contribution Claim.  If the Province Settlement with the Province Channeling Injunction is approved and all conditions are satisfied, the Province Contribution Claim will be disallowed and withdrawn with prejudice.  If the Province Settlement is approved without the Province Channeling Injunction, the Province Contribution Claim will be subject to a $500,000 cap and subject to objection by the Debtor.  If the Province Contribution Claim is allowed, the allowed claim, subject to the $500,000 cap, is payable over three years form the date of allowance.  If the Bankruptcy Court does not approve the Province Settlement and the State Court Litigation is settled pursuant to the Alternate Settlement, the Province Contribution Claim is treated in the same manner.

**C.     Means for Execution of the Plan**

1.     **Establishment of Trust**

On the Confirmation Date, the Trust will established in accordance with the Trust Documents.  The Trust shall qualify as a Qualified Settlement Fund pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  Omni Management Acquisition Corp. ("Omni") will be the Trustee.  Omni has served as Trustee of trusts created for the benefit of Tort Claimants in the Chapter 11 Cases of Diocese of Davenport, Society of Jesus, Oregon Province, Catholic Bishop of Northern Alaska and The Christian Brothers of Ireland, Inc. and The Christian Brothers Institute.

2.     **Funding of Trust**

(a)     Within ten (10) days after the Settling Insurers receive written notice from the Trustee that the Conditions to Effectiveness set forth in Section 11.1 (a), (b), and (c) have occurred, the Settling Insurers will make payments to their respective attorneys' trust accounts as follows:

American Home:  Four Hundred Eighty Seven Thousand Five Hundred Dollars ($487,500);

Catholic Mutual:  Three Million Eight Hundred Thousand Dollars ($3,800,000);

Fireman's Fund:  Four Million Dollars ($4,000,000);

Great American Insurance:   Three Million Five Hundred Thousand Dollars ($3,500,000);

MIGA:  Five Hundred Thousand Dollars ($500,000);

OneBeacon:  One Hundred Thousand Dollars ($100,000); and

Travelers: Two Million Dollars ($2,000,000).

(b)     Within ten (10) days after the Settling Insurers receive written notice from the Trustee that all of the Conditions to Effectiveness set forth in Section 11.1 have occurred, the Settling Insurers shall cause their respective attorneys to pay to the Trust the amounts deposited in the attorneys' respective trust accounts pursuant to Section 9.2.2.

(c)     Except as provided herein, within 10 (ten) days after the Conditions to Effectiveness set forth in Section 11.1(a), (b) and (c) have occurred and the Confirmation Order includes the Province Channeling Injunction, the Province will make the Province Contribution in the amount of Four Million Four Hundred Fifty Thousand Dollars ($4,450,000) in cash to the Province Escrow, which will release to the Trust of so much of the Province Contribution as the Debtor and the Committee have allocated to the Trust, but not less than $3,950,000. The Debtor and the Committee have determined that Five Hundred Thousand Dollars ($500,000) of the $4.45 million Province Contribution shall be used for administrative expenses related to incorporation of the Province Settlement into the Plan and Disclosure Statement and the additional funding of the Future Tort Claims Reserve Fund by the Province. Any remainder shall be delivered to the Trust for payment of Class 4 Claims. The $500,000 may not be used for any other purpose. Notwithstanding the foregoing, if the Confirmation Order does not include the Province Channeling Injunction and the Province Alternate Settlement is effective, the Province will make the Province Contribution in the amount $3,950,000 in cash to the Reorganized Debtor for distribution to the Trust.

(d)     The Debtor will be funded in the amount of $450,000.00 from Catholic Mutual and $14,000.00 from OneBeacon. Such amounts will not be paid to the Trust, but will be paid directly to the Debtor.

**3.     Establishment of Reserve Accounts**

As set forth in the Trust Agreement and Article IX of the Plan, the Trustee shall establish Reserves for various purposes, including the payment of the Tort Claims. There are 267 Whalen Case Tort Claimants, 95 Does Case Tort Claimants and 26 unrelated Tort Claimants. There are 232 Province Channeled Claimants.

**4.     Liquidation and Payment of Tort Claims**

(a)     The Trust shall pay Tort Claims in accordance with the terms of the Plan, Confirmation Order and Trust Documents.

(b)     Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estate or any Settling Insurer or the Province relating to the treatment of Tort Claims, except that the Reorganized Debtor shall be liable for all fees and expenses of the Trust; or (ii) otherwise modify the rights or obligations of the Estate as otherwise set forth in the Plan.

(c)     Effect of No Award On Tort Claims. If a Tort Claimant is denied payment pursuant to the Allocation Plans, the Holder of such Tort Claim will have no further rights against the Trust, Trustee or the Protected Parties.

(d)     Treatment of Attorneys' Fees and Costs of Tort Claimants.

Subject to the treatment of Qualified Counsel Fees and Qualified Counsel Costs pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive payment from the Trust will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. The Protected Parties will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions relating to Qualified Counsel Fees and Qualified Counsel Costs.

(e)     Treatment of Punitive Damages.  Claims for punitive or exemplary damages in connection with any of the Tort Claims will be treated as Penalty Claims and will receive no distribution under the Plan.

(f)     Withdrawal of Tort Claims.  A Tort Claimant may withdraw the Claim at any time on written notice to the Trustee.  If withdrawn, the Claim will be withdrawn with prejudice and may not be reasserted.

(g)     Before the Trustee will pay a Tort Claim to any Tort Claimant, the Trust and the Tort Claimant must comply with Section 9.5.3 of the Plan and its subsections.

(h)     The failure by one or more Medicare Beneficiaries or other Tort Claimants to comply with Section 9.5.3 of the Plan and its subsections shall not delay or impair the payment by the Trustee to any other Medicare Beneficiary or other Tort Claimant complying with these provisions.

(i)     If the Tort Claimant is an estate of a Tort Claimant, then the letters or documentation required pursuant to Section 9.5.3.2 and 9.5.3.3 of the Plan need not be dated within 90 days of the date of payment by the Trustee to such Claimant.

## 5.     Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtor that have not been rejected by Order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor.  In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.  The contracts which will be assumed by the Debtor, shown in their total amount, are as follows:

Wells Fargo Bank- $10,159.20, equipment lease
American Honda Finance - $21,315.14, vehicle lease
Great American Financial - $8,474.00, equipment lease

**D.  Procedure for Determination of Claims Other than Tort Claims Based on the Sexual Abuse Proof of Claim Form.**

**1.  Objection to Claims.**

Notwithstanding the occurrence of the Effective Date and except as to any Claim that has been Allowed prior to the Effective Date or any Tort Claim, the Reorganized Debtor may object to the Allowance of any Claim against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an objection within sixty (60) days after the Effective Date.

**2.  Disputed Claims.**

Except as to any Tort Claim, no payments or other distributions will be made to Holders of Disputed Claims until such Claims are Allowed Claims pursuant to Final Order.

**3.  Treatment of Contingent Claims.**

Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.

**E.  Provisions Governing Distributions**

**1.  Distribution Only to Holders of Allowed Claims.**

Except as otherwise provided in the Plan, distributions under the Plan and the Plan Documents will be made only to the Holders of Allowed Claims and in the case of Tort Claims, only pursuant to the Plan and the Trust Documents and after delivery of appropriate releases. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any distribution otherwise provided to the Claimants under the Plan or the Plan Documents.  If necessary in determining the amount of a *pro rata* distribution due to the Holders of Allowed Claims in any Class, the Reorganized Debtor or the Trustee, as applicable, will make the *pro rata* calculation as if all Unresolved Claims were Allowed Claims in the full amount Claimed or in the Estimated Amount.  When an Unresolved Claim in any Class becomes an Allowed Claim, the Reorganized Debtor or the Trustee, as applicable, will make full or partial distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the Order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

**2.  Transmittal of Distributions.**

Except as otherwise provided in the Plan, in the Plan Documents, or in an Order of the Bankruptcy Court, distributions to be made under the Plan, Confirmation Order or Trust

Documents to Tort Claimants will be made by the Trustee and Distributions to all other Claimants will be made by the Reorganized Debtor. Distributions to Tort Claimants will be made (a) to the client trust account for attorneys of record of Tort Claimants, (b) if the Tort Claimant does not have an attorney of record, to the latest mailing address set forth in a Proof of Claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor or Trustee, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor or Trustee, as applicable, to the mailing address set forth in the Schedules filed by the Debtor in this Case. Distributions to other Claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the Claimant, (b) if the Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, to the mailing address set forth in the Schedules filed by the Debtor in this Case. If a Claimant's Distribution is not mailed or is returned to the Reorganized Debtor or Trustee because of the absence of a proper mailing address, the Reorganized Debtor or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Tort Claimant on account of Distributions made to the client trust account of a Tort Claimant's attorney.

3. **Timing of Distributions.**

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a business day, such payment will instead be made on the next business day, with interest to the extent expressly contemplated by the Plan or any applicable agreement or instrument. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Trustee as undeliverable or is deemed to be an undeliverable Distribution, provide the Trustee with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtor, the Trust, the Trustee or its property. Any undeliverable Distributions that are not claimed under this Section will become available to distribute to other Claimants or be retained by the Reorganized Debtor in accordance with the Plan. Nothing in the Plan requires the Reorganized Debtor, the Trust or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable. If an instrument delivered as a Distribution to a Claimant is not negotiated within one hundred and twenty (120) days after such instrument was sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and it shall become Available Cash.

4.      **Form of Distributions.**

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions will be made, at the option of the Reorganized Debtor or Trustee, by a check by first class mail, postage prepaid, or wire transfer.

5.      **No Professional Fees or Expenses.**

No professional fees or expenses incurred by a Claimant will be paid by the Debtor, the Reorganized Debtor, the Province or the Trustee with respect to any Claim except as specified in the Plan or the Trust Documents.

6.      **Claim Estimation.**

In order to effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting, on account of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate an Tort Claim.

7.      **No Interest on Claims.**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

8.      **Withholding Taxes.**

The Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtor may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information

and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**9.     No *De Minimis* Distributions.**

No cash payment of less than $100 will be made by the Reorganized Debtor or the Trustee to any Holder of an Allowed Claim.  No consideration will be provided in lieu of the *de minimis* distribution that is not made under this Article.  Allowed Claims that are entitled to a *pro rata* distribution of less than $100 shall continue to accrue until such time as the *pro rata* distribution on account of such Claim will be $100 or more.

**10.     Manner of Cash Payments.**

Cash payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or, at the Trustee's option, by wire transfer from a domestic bank.  Cash payments to foreign Claimants may be paid, at the Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

## IX.

## CONDITIONS TO EFFECTIVE DATE

**A.     Conditions to Occurrence of Effective Date**

The Effective Date will occur when each of the following conditions have been satisfied or waived in accordance with Section 11.1 of the Plan:

(1)     The Bankruptcy Court shall have entered a Final Order or Final Orders approving all Insurance Settlement Agreements and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to each of those parties, and no stay of such Orders is in effect;

(2)     The Bankruptcy Court shall (i) have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor, the Committee, and the Settling Insurers; and (ii) the Confirmation Order shall be a Final Order and no stay of such Order shall be in effect;

(3)     The Trustee and Reorganized Debtor have signed the Trust Agreement; and

(4)     The Debtor and the Settling Insurers have made the payments to the Trust described in Section 9.2.1 and 9.2.2 of the Plan.

**B.     Waiver of Conditions**

The Plan Proponents, and the Settling Insurers may waive any of the conditions to the occurrence of the Effective Date.

## C.     Non-Occurrence of Effective Date

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of a Final Order, or Final Orders confirming the Plan and approving all Insurance Settlement Agreements, the Plan shall become null and void.   A statement shall be filed with the Bankruptcy Court within three (3) Business Days regarding the occurrence of the Effective Date.

## X.

## EFFECT OF PLAN CONFIRMATION

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE DISCLOSURE STATEMENT, NOTHING CONTAINED IN THE PLAN SHALL CONSTITUTE A RELEASE OF ANY TORT CLAIM OR CONSTITUTE AN INJUNCTION AGAINST PROSECUTION OF A TORT CLAIM AGAINST (A)   A PERSON THAT BECOMES A SUCCESSOR OF THE DEBTOR AFTER THE EFFECTIVE DATE, TO THE EXTENT SUCH SUCCESSOR'S   LIABILITY FOR AN ACT OR ACTS OF ABUSE, IS INDEPENDENT OF THE DEBTOR'S LIABILITY AND (B) A PERPETRATOR.   THE DISCHARGE AND INJUNCTION PROVISIONS OF THE PLAN DO NOT APPLY TO (A) THE OBLIGATIONS ARISING UNDER THE INSURANCE SETTLEMENT AGREEMENTS APPROVED BY THE BANKRUPTCY COURT, WHICH ARE NOT AND WILL NOT BE DISCHARGED; (B) A PERPETRATOR; (C) AN ENTITY THAT BECOMES A SUCCESSOR TO THE DEBTOR AFTER THE EFFECTIVE DATE, TO THE EXTENT SUCH SUCCESSOR'S LIABILITY FOR AN ACT OR ACTS OF ABUSE IS INDEPENDENT OF THE DEBTOR'S LIABILITY AND (D) THE OBLIGATIONS ARISING UNDER THE PROVINCE SETTLEMENT APPROVED BY THE BANKRUPTCY COURT, WHICH ARE NOT AND WILL NOT BE DISCHARGED.   TORT CLAIMS BASED ON ABUSE THAT HAPPENED AFTER THE PETITION DATE WILL NOT BE DISCHARGED, RELEASED OR IMPAIRED, WITH THE EXCEPTION OF ANY SUCH CLAIMS AGAINST THE SETTLING INSURERS, OR THE PROVINCE IF THE PROVINCE SETTLEMENT AGREEMENT IS APPROVED WITH THE PROVINCE CHANNELING INJUNCTION.

On the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor will be discharged from all liability for any and all Claims that arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of this Case, including all Tort Claims (except as provided in Section 12.2 of the Plan) and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; or (c) the holder of such Claim has accepted this Plan. Nothing contained in this paragraph shall affect, impair or diminish the Debtor's indemnification obligations under the Insurance Settlement Agreements, which obligations are excepted from the Debtor's discharge.

### A. Postpetition Tort Claims

Notwithstanding Section 12.1 of the Plan, Tort Claims against the Debtor based on Abuse that happened after the Petition Date will not be discharged, released or impaired. To the extent any such Claim is against a Settling Insurer, such Claim shall be enjoined pursuant to the injunctions in Section XII of the Plan.

### B. Vesting of Assets

In accordance with §§ 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Revested Assets shall revest in the Reorganized Debtor on the Effective Date free and clear of all Interests of any Entity, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Entity, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### C. Continued Existence of Reorganized Debtor

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as A separate Entity in accordance with the applicable laws of the States of Montana, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501I(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

### D. Exculpation and Limitation of Liability

**Except as expressly provided in this Plan, none of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any Claimant, any other party in interest, or any of their respective Representatives, financial advisors, or Affiliates, or any of their successors or assigns, for any act or omission in or relating to this Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the Trust, except liability for their willful misconduct or gross negligence (provided, however, the Debtor and Reorganized Debtor will be discharged from any such liability for such acts or omissions occurring prior to the Effective Date) and in all respects, such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Case. Without limiting the generality of the foregoing, the Debtor and its members, financial advisors, and other professionals shall be entitled to and granted the benefits of § 1125(e) of the Bankruptcy Code.**

**Settling Insurers, the Province, the Reorganized Debtor, the Trust, the Trustee and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental entity or insurer, on account of payments made to a Tort Claimant, including any liability under the Medicare Secondary Payer Act.**

### E.  Channeling Injunction

In consideration of the undertakings of the Protected Parties pursuant to their respective settlements with the Debtor, the funding of the Trust, and other consideration, and to further preserve and promote the agreements between and among the Protected Parties and the protections afforded the Protected Parties and pursuant to Section 105 of the Bankruptcy Code:

(a)  any and all Channeled Claims, excluding Claims against the Province, are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims, excluding Claims against the Province; and

(b)  all Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any of the Protected Parties, excluding the Province, including:

    (i)  commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties (excluding the Province) or against the property of any of the Protected Parties (excluding the Province);

    (ii)  enforcing, attaching, collecting or recovering, by any manner or means, from any Protected Parties, (excluding the Province), or from the property of any Protected Parties, excluding the Province, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Protected Parties (excluding the Province), or other Entity;

    (iii)  creating, perfecting or enforcing any lien of any kind against any Protected Parties (excluding the Province), or the property of any Protected Parties (excluding the Province) with respect to any such Channeled Claim; and

    (iv)  asserting, implementing or effectuating any Channeled Claim of any kind against:
        (1)  any obligation due any Protected Parties (excluding the Province);
        (2)  any Protected Parties (excluding the Province); or
        (3)  the property of any Protected Parties (excluding the Province).

    (v)  taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and

    (vi)  asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties (excluding the Province) or the property of the Protected Parties (excluding the Province).

**F.**     **Province Channeling Injunction**

In consideration of the undertakings of the Province pursuant to its respective settlements with the Debtor, the funding of the Trust, and other consideration, and to further preserve and promote the agreements between and among the Province and the Plan Proponents and the protections afforded the Province, and pursuant to Section 105 of the Bankruptcy Code:

(a)     any and all Province Channeled Claims against the Province are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Documents as the sole and exclusive remedy for all holders of Province Channeled Claims against the Province; and

(b)     all Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Province Channeled Claim against the Province or any of the other Diocese Parties, whether or not such Entity has received or will receive any Distribution under the Plan,  are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Province Channeled Claim against the Province, including:

(i)     commencing or continuing in any manner any action or other proceeding of any kind with respect to any Province Channeled Claim against the Province, or against the property of any of the Province;

(ii)     enforcing, attaching, collecting, or recovering, by any manner or means, from the Province, or from the property of the Province, with respect to any such Province Channeled Claim, any judgment, award, decree, or order against Province;

(iii)     creating, perfecting or enforcing any lien of any kind against the Province, or the property of the Province, with respect to any such Province Channeled Claim; and

(iv)     asserting, implementing or effectuating any Province Channeled Claim of any kind against:

(1)     any obligation due the Province;
(2)     the Province; or
(3)     the property of the Province.

(v)     taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan;

(vi)     asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Province or the property of the Province.

**G.**     **Supplemental Injunction Preventing Prosecution Of Claims Against Settling Insurers**

Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement

Agreements, including any of the Settling Insurers' purchases of Policies from the Diocese Parties free and clear of all Interests pursuant to Section 363(f) of the Bankruptcy Code, any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Future Tort Claimants, Perpetrators, Non-Settling Insurers, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties, Insured Entities, or the Policies, which, directly or indirectly, relates to, any of the Policies, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, Insured Entities, and/or the Policies, including:

(a)     Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

(b)     Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

(c)     Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

(d)     Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities; and,

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

H.  Insurance Settlement Agreement Injunctions

Any injunction contained in an Insurance Settlement Agreement is incorporated into the Plan by reference, is deemed fully set forth in this Plan, is approved and is in addition to the injunctions expressly set forth in this Plan.

J.  Term of Injunctions or Stays and Confirmation of Settlements With Settling Insurers

On the Effective Date, the injunctions provided for in this Plan shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable.   All injunctions and/or stays provided for in this Plan, the injunctive provisions of Sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased its Policies in a Section 363 Sale, are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.   The Insurance Settlement Agreements previously authorized by the Bankruptcy Court are hereby affirmed and any obligations of Debtor with respect to such Insurance Settlement Agreements are excepted from the Debtor's discharge and shall be assumed by the Reorganized Debtor and Trust, as applicable, on the Effective Date.

### K. Limitation of Injunction and Discharge

Notwithstanding any provision of this Plan, the foregoing injunctions and discharge preventing prosecution of Tort Claims against Protected Parties provides absolutely no protection to a Perpetrator.

### L. Debtor Waiver and Release of Claims Against Settling Insurers

In consideration  of the contributions paid and other consideration to be provided by each Settling Insurer, the Debtor irrevocably and unconditionally, without limitation, shall release, acquit, and forever discharge all Settling Insurers from any and all Claims and/or Causes of Action against any Settling Insurer, or the property thereof, except that the Debtor and Catholic Mutual shall retain all rights and obligations under any claims-made certificates or Policies issued or allegedly issued by Catholic Mutual to the Diocese Parties for a policy period July 1, 2014 through July 1, 2015 and the two immediately prior policy periods, *i.e.*, July 1, 2012 through July 1, 2013, and July 1, 2013 through July 1, 2014.

## XI.

## NON-MONETARY COMMITMENTS

In order to further promote healing and reconciliation, and in order to continue the Plan Proponents' efforts to prevent sexual abuse from occurring in the Diocese of Helena, the Debtor and Reorganized Debtor agree that beginning thirty (30) days after the Effective Date (unless a different date is provided below):

For a period of not less than ten (10) years from the Effective Date, the Diocese will post on its website home page the names of all known past and present alleged perpetrators of the Diocese who are identified in the Sexual Abuse Claims or the complaints filed in the Whalen and Does Cases as child sexual abusers between the 1930's and 1970's, including Joseph Balfe, James Barry, Brynes (first name unknown), Callan (first name unknown), Thomas Connolly, John Delane, Farther Delaney, M.A. (first name unknown), Harper (first name unknown), Bernard Harris, Robert Hartman, John (last name unknown), Paul Kirchen, Larson (first name unknown), Emmett Lowney, Egon Mallman, McCarthy (first name unknown), James McCormick, Gabriel Menager, Joseph Obersinner, O'Brien (first name unknown), Martin Phillipsen, Peter Pritzl, Edmund Robinson,

Wilson Smart, Sorisio (first name unknown), Leonard Spraycar, Patrick Stimatz, Sullinger (first name unknown) Sullivan (first name unknown), Louis Taelman, Rufina Karges "Mother Loyola," Frances Seymor "Mother Cecelia," Sister John (last name unknown), Sister Marion (last name unknown), Sister Monica (last name unknown), Sister Glennyatoss (last name unknown), Sister Margaret (last name unknown), Sister Rita (last name unknown), Sister Henrietta (last name unknown), Sister Mary Laurence (last name unknown), Sister Camilla (last name unknown);

      The Ursulines reserve the right to file a statement of position that in substance provides:  The Province understands the Debtor has committed for itself to publish the foregoing names as past and present alleged perpetrators of the Diocese.  The Province, in settling the state court litigation to avoid further expense, has not had the opportunity to evaluate claims against any of these individuals to determine whether the allegations of abuse claims are credible.  The Province notes that the foregoing list includes some individuals who, to the best of the Province's collective knowledge, were never members of the Province and/or were never assigned to St. Ignatius Mission.   Publication of this list should not be construed as an admission of liability by the Province or any of its members.   For purposes of clarity, this statement of position does not create or address any dispute between the Province and the Diocese which may be based upon Canon Law or the First Amendment rights of the parties. This statement of position is not an objection to plan confirmation.

      The Debtor will work with the Ursulines and the Committee to refine the above-list to add last names wherever possible and other identifying information;

      The Diocese (including its parishes and missions) will never seek to, direct, pay or hire any agent or employee or third party to retract, oppose or challenge the constitutionality or legitimacy of any reform of a civil or criminal statute of limitations; or to eliminate the Montana existing mandatory child abuse reporting statutory requirements or other laws which serve to shield child sexual abusers from investigation, apprehension, prosecution and conviction in Montana or similar legislation or law in any other state or jurisdiction;

      The Diocese shall provide, through a prominent link on its website, a phone number and email address to which anonymous abuse complaints can be made.  If a report of abuse is made to anyone in the Diocese or any parish or mission of the Diocese or through the phone number, email address or direct report to the Diocese, parish or mission, then the Diocese, parish or mission will encourage the survivor to report the information to law enforcement and the Diocese, parish or mission will promptly report the information to law enforcement, as well;

      The Diocese will adopt a whistle-blower policy concerning the method by which a report concerning abuse within the Diocese (including its parishes and missions) can be made and expressly providing that the Diocese, as well as its parishes, missions, clergy and/or employees, will not take any retaliatory actions against persons who report such information in good faith;

      The Bishop of Helena will be available upon reasonable notice to have a private conference with any survivor of sexual abuse, including survivors who did not file a claim in this case;

The Bishop of Helena will personally visit each deanery in which abuse occurred or where Identified Abusers (as defined below) served, specifically the Bozeman Deanery, Butte Deanery, Conrad Deanery, Missoula Deanery, Helena Deanery and Kalispell Deanery, with a schedule to be published at least thirty (30) days in advance of each meeting (including by posting on the Diocese's website, posting in the parishes, publishing in The Montana Catholic Monthly, and by reasonable notice to all Sexual Abuse Claimants), inviting all known survivors of abuse in that parish or geographical area to attend and shall provide a forum/discussion during his visit to address questions and comments;

The Diocese will publish in The Montana Catholic Monthly magazine four times per year a prominent statement urging persons sexually abused by clergy, employees, volunteers or any other individual serving within the Diocese, its parishes or missions to come forward and contact law enforcement;

The Diocese will produce to Sexual Abuse Claimants or to anyone who has alleged to be a survivor of sexual or physical abuse or their designee any and all personal records of the survivor, including but not limited to school records and sacramental records within thirty (30) days of request, and such documents shall not redact the identity of the requesting sexual abuse survivor's identity;

All documents produced to plaintiffs' counsel in the State Court Litigation regarding the Abuse of a Tort Claimant may be disclosed to the Tort Claimant regardless of any orders or agreements in the State Court Litigation, subject to redaction of identifying information regarding any other Tort Claimant. The deadline for disposition of any documents produced in the State Court Litigation to plaintiffs' counsel shall be one year from the Effective Date. Upon thirty (30) day notice by written request, the Diocese shall provide any Tort Claimant whose claim is not the subject of a pending objection (other than the Whalen and Does plaintiffs) with all documents related to the Abuse of such Tort Claimant, subject to: (a) a confidentiality agreement on the same terms and conditions of the protective order in the State Court Litigation, (b) the redaction of any identifying information regarding any other Tort Claimant and (c) the Tort Claimant's agreement that the documents will be returned or destroyed within one year of receipt of the documents from the Diocese.

The Diocese will make available reasonable space, but not more than one printable page per quarter on the Diocese's website, www.diocesehelena.org, for two (2) years after resolution of the case to allow survivors to tell their stories of abuse, if they desire to publish their stories;

Within thirty (30) days after the Effective Date, the Diocese will send letters of apology to all Sexual Abuse Claimants. Letter of apology will state that survivors were not at fault for the abuse and that the Diocese takes responsibility for the abuse. The Bishop of Helena will personally sign the letters of apology and an original signed letter of apology shall be sent to any requesting claimant;

The Diocese will publicly announce and post on its website, www.diocesehelena.org, the full and complete release of all sexual abuse survivors from any confidentiality requirement in the sex abuse settlements that they have previously signed as a condition of settlement with the Diocese. No survivor's identity may be released or revealed without his or her permission. The

Diocese shall contact each previously settling sexual abuse survivor who has previously entered into such a confidentiality agreement with the Diocese to notify them of the full and complete release of their covenant of confidentiality as to the Diocese. Such release of confidentiality obligations shall apply to any documents in the depository described above. Any future settlement related to sexual abuse entered into by the Diocese shall not contain any confidentiality provision except at the written request of the settling survivor;

The Diocese will continue the protection of children initiatives it is currently implementing including the VIRTUS training program, background checks, and psychological evaluations for seminarians;

The Diocese shall take all reasonable steps to ensure that any Roman Catholic religious institute or similar organization not operated by the Diocese has a program reasonably equivalent to the Diocese's initiatives for the protection of children;

The Diocese will make every effort to require that its clergy, employees, representatives, agents and spokespersons, not refer either verbally or in print to Sexual Abuse Claimants or plaintiffs as "alleged" claimants or plaintiffs, "alleged" victims or "alleged" survivors; and,

The Bankruptcy Court shall retain jurisdiction to adjudicate disputes that arise with respect to these non-monetary undertakings. The Trust shall have standing and shall be authorized, but not directed, to seek enforcement of any of the terms of these non-monetary undertakings.

## XII.

## CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN

The Plan contains other provisions consistent with the requirements of Chapter 11 of the Bankruptcy Code as set forth below:

### 1.   Causes of Action/Avoidance Actions

Except as otherwise provided in the Plan, the Reorganized Debtor shall retain and exclusively enforce the Debtor's Causes of Action, whether arising before or after the Petition Date, in any Court or other tribunal, including without limitation, an adversary proceeding filed in this Case.

### 2.   Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date:

Except as otherwise set forth in the Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with the Plan, including, but not limited to, the following:

a)   The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled

thereto;

b)     The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

c)     The granting of relief in aid of this Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Protected Parties from actions prohibited under this Plan or the Plan Documents;

d)     Amendments to and modifications of this Plan;

e)     Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date and;

f)     The closing of the Case.

**3.     Remand of Removed Actions**

On the Effective Date, all actions removed by the Debtor or any other Co-Defendant during this Case shall be remanded to the court from which they were removed and can continue against the Debtor and any other Entity who is not a Protected Party, only to the extent set forth in the Plan.  Any party to the removed action may submit an order, with notice only to the other parties to the removed action, providing for remand of the action.

**4.     Modification of the Plan**

The Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify or withdraw this Plan prior to the entry of the Confirmation Order, provided, however, that any such amendment or modification that involves directly or indirectly the Province Settlement and the rights and obligations of the Province under the Province Settlement shall not be effective unless consented to by the Province.  After the entry of the Confirmation Order, the Proponents may, upon order, amend or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  If the Province Settlement is not approved, the Plan Proponents may move for confirmation of an Amended Plan that excludes the Province Settlement, provided, however, confirmation of an Amended Plan that excludes the Province Settlement shall not affect the enforceability of the Province Alternative Settlement between the Province and the Tort Claimants.

**5.     Severability**

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.  That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of any of the

Plan Proponents, in which case the term or provision may be unilaterally withdrawn by such Plan Proponent.  Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Article, is valid and enforceable under its terms.  In the event of a successful collateral attack on any provision of the Plan (*i.e.*, an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of the Plan will remain binding on the Debtor, the Reorganized Debtor, the Settling Insurers, the Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

### 6.        Section 1146 Exemption

Pursuant to Bankruptcy Code Section 1146(c) any transfer of property pursuant to the Plan will not be subject to any document, recording tax, stamp tax, or similar tax, mortgage tax, real estate transfer tax, or other governmental assessment in the United States, and the Confirmation Order will direct the appropriate state or local governmental officials and/or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 7.        Management of the Reorganized Debtor

The Reorganized Debtor shall continue to be managed by current management.  Most of these individuals have been involved in the Debtor's affairs for many years and are well suited to continue the Debtor's mission.  Those managers, their titles and salaries consist of:

> Most Reverend Bishop George Leo Thomas, salary $63,600
> Reverend Monsignor Kevin S. O'Neill – Vicar General, salary $29,448
> Reverend John W. Robertson – Chancellor, salary $20,800,
> James Carney - Financial Services Director, salary $95,000
> Moe Wosepka – Development Services Director, salary $85,000
> Sister Rita McGinnis, SCL – Chancery Services Director, salary $57,100
> Dan Bartleson – Communication Services Director; Legendary Lodge Director, salary $57,000
> Carmae Fawaz – Human Services Director, salary $46,100
> Glenda Seipp – Stewardship Services Director, salary $51,800
> Douglas Tooke – Formation Services Director, salary $53,900
> Timothy Uhl – Education Services Director (Superintendent of Schools), salary $50,000

### 8.        Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest

agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses pursuant to § 503(b) of the Bankruptcy Code for making a substantial contribution in the Chapter 11 Case.

### 9.      Insurance Neutrality

Except as set forth below in Section 10.18 of the Plan, nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to impair or diminish, or have the effect of impairing or diminishing, the Settling Insurers' legal, equitable or contractual rights, if any, in any respect, including any rights under the Policies, if applicable, and the Insurance Settlement Agreements, as applicable; *provided, however*, Section 10.18 of the Plan shall not preclude the entry or effectiveness of the injunctions set forth in Section XII of the Plan or the judgment reduction provisions in Section 10.17 of the Plan. Nothing in Section 10.18 of the Plan shall impair or diminish, or have the effect of impairing or diminishing, any of the Settling Insurers' rights under the Confirmation Order or the Plan.

### 10.      Insurance Preservation

Nothing in the Plan or in the Confirmation Order is intended to impair or modify the Debtor's rights under (a) any policy of insurance issued by a Non-Settling Insurer or (b) any Claims-made certificates or policies of insurance issued or allegedly issued by Catholic Mutual to the Diocese Parties for a policy period of July 1, 2014 through July 1, 2015 and the two immediately prior policy periods, i.e., July 1, 2012 through July 1, 2013, and July 1, 2013 through July 1, 2014, other than with respect to Tort Claims, for which the Debtor has waived coverage and released Catholic Mutual. To the extent the Diocese has obligations on such policies of insurance, the Diocese shall assume such obligations as executory contracts.

## XIII.

## CONFIRMATION PROCEDURES

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code §1129 must be met. This includes, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of Holders of Claims in each impaired Class.

### A.      Solicitation of Votes; Acceptance

The Plan Proponents are soliciting the acceptance of the Plan from all Holders of Claims in Classes that are impaired under the Plan and receiving Distributions thereunder. Using this criteria, Holders of only Claims in Classes 4, 5, 6, 10, 11 and 12 are entitled to vote on the Plan. In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Classes 4, 5, 6, 10, 11 and 12 will be deemed to have accepted the Plan if the Plan is accepted by Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that has cast Ballots on the Plan and that are eligible to vote for or against the Plan. The Plan Proponents intend to file a motion to estimate each Class 4 Claim at $1.00 each for voting purposes only. The actual amount payable to Holders of Allowed Class 4 Claims will exceed $1.00. This is consistent with the procedure followed in other mass tort bankruptcy cases and the Tort Proof of Claim forms intentionally did not provide for a dollar amount for the Claims as the Claims are unliquidated tort claims.

## B.    Confirmation Hearing

Bankruptcy Code §1128(a) requires the Bankruptcy Court, after notice, to hold the **Confirmation Hearing** after the period for submission of Ballots has expired. The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any party in interest may object to confirmation of the Plan. Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules. Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable Terry L. Meyers, and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement on or before the time and date designated in such Order and Notice. **FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable.

5.      The Debtor has disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and with public policy; and (b) the Debtor has disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtor and the nature of any proposed compensation for such insider(s).

6.     Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See "Best Interests of Creditors Test" below.

7.     Unless the Debtor is required to seek nonconsensual confirmation of the Plan, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

8.     Except to the extent that the Holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over five (5) years.

9.     At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtor or the Reorganized Debtor.

11.     The Debtor believes that the Plan has been submitted in good faith and that, upon acceptance of the Plan by the voting Class, the Plan will satisfy all of the foregoing statutory requirements.

## C.     Best Interests of Creditors Test

As mentioned above, confirmation of the Plan requires that each Holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Plan Proponents believe that in a hypothetical liquidation all creditors will receive less than they will likely receive under the Plan.  Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1.     The Plan incorporates the Allocation Plans, which were negotiated by counsel representing in excess of 75% of Tort Claimants.   There is likelihood that a Chapter 7 Trustee will be unable to implement the Allocation Plans or a similar Plan in the absence of a confirmed Chapter 11 Plan.   As such, substantial estate resources would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

2.     A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtor, pursuant to 11 U.S.C. § 326.   Any such payment would dilute the amount of funds available to pay creditors.

3.     The Settling Insurers would not get the Channeling Injunctions and/or

releases provided in the Plan, nor would they make the substantial contributions they are making under the Plan without such injunctions and/or releases.

4.    The Province would not get the Channeling Injunctions and/or releases provided in the Plan, nor would it make the substantial contributions it is making under the Plan without such injunctions and/or releases.

In addition, it is unlikely that the Settling Insurers or the Province would voluntarily contribute without the corresponding benefit of final resolution of Tort Claims. Annexed hereto as **Exhibit C** is a Liquidation Analysis. The Liquidation Analysis indicates that in a liquidation, Holders of Unsecured Claims would receive a lesser distribution than provided under the Plan.

## D.    Feasibility

The Bankruptcy Code requires that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization. Because (i) all the Tort Claims will be resolved pursuant to the Plan, (ii) the Reorganized Debtor will not be financially liable on account of any Tort Claims that occurred prior to the Petition Date except as provided in the Plan, and (iii) distributions will be made only to the extent of existing assets or future recoveries, the Reorganized Debtor and the Plan Proponents believe the Plan is feasible.

## E.    Cram Down

The Bankruptcy Code provides a mechanism by which a Plan may be confirmed even if it has been rejected by an impaired Class of Claims. Under the "cram down" provisions of the Bankruptcy Code (§1129(b)), the proponent of the Plan (in this case the Debtor and the Creditors' Committee) may request that it be confirmed despite its rejection by an impaired Class, and the court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired Class and (ii) is fair and equitable with respect to such Class.

The Bankruptcy Code sets forth specific guidelines for determining whether a Plan is fair and equitable with respect to a particular Class of Claims. For unsecured Claims, as are those in Classes 4, 5, 6, 10, 11 and 12, a Plan must provide that equity interest Holders do not receive or retain any property on account of their interest. The Debtor submits that this test which is applied to traditional corporations is inapplicable to not-for-profit corporations as there are no equity interests or junior creditors or the Holders of Claims that are junior to Claims of a non-accepting Class are not receiving any property under the Plan. For secured Claims, as are in Class 2, a Plan must provide that the Holders of such secured Claims retain the liens securing such Claims to the extent of the allowed amount of such Claims and that the Holders of such Claims receive on account of such Claims of a value, as of the Effective Date of the Plan, of at least the value of such Holder's interest in the Estate's interest in the property securing the lien. In other words, the secured creditor must receive the present value of the Allowed Amount of its Secured Claim which Allowed Amount is dependent upon the value of the property securing the Claim.

Under the Plan, all secured creditors in Class 2, will retain their liens to secure the full amount of their Allowed Secured Claim and receive payments over time equal to the present

value of the Allowed Amount of their Secured Claim as of the Effective Date of the Plan. In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting Class unless certain modifications are made to the terms and conditions of such non-consenting Class' treatment under the Plan, the Plan Proponents reserve the right, without re-solicitation, to propose such modification to such non-consenting Class' treatment and to confirm the Plan, provided such modification does not result in total extinguishment of the non-consenting Class' Claim or is inconsistent with the Province Settlement.

**XIV.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Plan Proponents have evaluated numerous alternatives to the Plan, including, without limitation, proposing competing Plans by the Debtor and the Committee, and the conversion of the Case to Case under Chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtor by a Chapter 7 Trustee. After studying these alternatives, the Plan Proponents have concluded that the Plan is the best alternative and will maximize recoveries of Holders of Claims. The following discussion provides a summary of the analysis of the Plan Proponents supporting its conclusion that a Chapter 7 liquidation of the Debtor or an alternative Chapter 11 Plan for the Debtor will not provide higher value to Holders of Claims.

**A.     Liquidation Under Chapter 7 of the Bankruptcy Code**

If no Chapter 11 Plan can be confirmed, the Case of the Debtor may be converted to a case under Chapter 7 (assuming the Debtor consents), in which event a Trustee would be elected or appointed to liquidate the Debtor's assets for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. In addition to the factors discussed above, the Plan Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Trustee for bankruptcy and professional advisors to such Trustee and (2) the erosion in value of assets in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" environment in which such a liquidation would likely occur. Accordingly, the Plan Proponents have determined that confirmation of the Plan will provide each Holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under Chapter 7.

A discussion of the effects that a Chapter 7 liquidation would have on the Holders of Claims is set out in the Liquidation Analysis, attached as **Exhibit C** hereto.

**B.     Alternative Chapter 11 Plans**

If the Plan is not confirmed, any other party in interest could undertake to formulate a different Chapter 11 Plan. Such a Chapter 11 Plan might involve either a reorganization and continuation of the business of the Debtor or an orderly liquidation of the properties and interests in property of the Debtor. With respect to an alternative Chapter 11 Plan, the Plan Proponents have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Plan Proponents believe that the Plan, as

described herein, enables Holders of Claims to realize the best recoveries under the present circumstances.

**XV.**

**CERTAIN FEDERAL INCOME TAX CONSIDERATIONS**

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in this Case.

**A.  The Trust**

The Trust is a "qualified settlement fund" ("**QSF**") within the meaning Treasury Regulations enacted under the Internal Revenue Code at 26 U.S.C. § 468B(g).  The Trust is characterized as a QSF because:

1.  The Trust is established pursuant to an Order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.  The Trust is established to resolve or satisfy one or more contested or uncontested claims that has resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to sexual abuse (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relate to: a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and,

3.  The Trust is a trust under state law.

The primary tax consequences of the Trust being characterized as a QSF are the following:

1.  The Trust must use a calendar taxable year and the accrual method of accounting.

2.      If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

3.      The Trust takes a fair market value basis in property contributed to it by the Debtor.

4.      The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and Estate (currently 35%). The Debtor's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.      The Trust may deduct from its gross income a limited number of administrative expenses; the Trust in not entitled to deduct distributions paid to its beneficiaries.

6.      The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to Claimants.

## B. Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a Distribution to a Claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a Distribution in repayment of the principal amount of a loan is generally not included in the Claimant's gross income. Distributions to Tort Claimants may not be taxable as it may be considered compensation for personal injuries.

The federal income tax consequences of a Distribution to a Claimant may also depend on whether the item to which the Distribution relates has previously been included in the Claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a Distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the Distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss. Conversely, if the Claimant had previously claimed a loss or bad debt deduction

with respect to the item previously included in income, the Claimant generally would be required to include the amount of the Distribution in income when received.

A Claimant receiving a Distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim.  For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  This income or loss may be ordinary income or loss if the Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Claimant's trade or business for the performance of services or for the sale of goods or merchandise.  In addition, if a Claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the Claimant as a result of receiving a Distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Claimant's hands.

## XVI.

## VOTING INSTRUCTIONS

Solicitation Packages which will include copies of (i) the Disclosure Statement Approval Order, (ii) the Notice of Disclosure Statement Approval and Confirmation Hearing, (iii) the approved Form of Disclosure Statement (together with the Plan annexed thereto), and (iv) the form of Ballot shall be sent to creditors by the Balloting Agent.  Procedures and deadlines for submitting the Ballot shall be included in such Solicitation Package.

## XVII.

### CONCLUSION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any other alternative. Accordingly, the Plan Proponents urge Holders of Claims to vote to accept the Plan by so indicating on its Ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Dated: January _16_, 2015

ELSAESSER JARZABEK ANDERSON
ELLIOTT & MACDONALD, CHTD.

**THE ROMAN CATHOLIC BISHOP OF
HELENA, MONTANA.**
*Debtor and Debtor-in-Possession*

By: _____
Ford Elsaesser, Esq.
Bruce Anderson, Esq.
Katie Elsaesser, Esq.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815

By: _____
Most Reverend
Bishop George Leo Thomas

Attorneys for The Roman Catholic Bishop of
Helena, Montana

PACHULSKI STANG ZIEHL & JONES LLP

_____
James I. Stang, Esq.
Ilan D. Scharf, Esq.
10100 Santa Monica Boulevard, Suite 1300
Los Angeles, California 90067
(310) 277-6910

Attorneys for the Official Committee of
Unsecured Creditors