UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re:<br><br>Roman Catholic Bishop of Helena, Montana,<br>a Montana Religious Corporation Sole,<br><br>_____ Debtor-In-Possession | Chapter 11<br><br>Case No. 14-60074 |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE ROMAN CATHOLIC BISHOP OF HELENA, MONTANA AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

ELSAESSER JARZABEK ANDERSON
ELLIOTT & MACDONALD, CHTD.
J. Ford Elsaesser, Esq.
Bruce A. Anderson, Esq.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Telephone: 208-667-2900
Facsimile: 208-667-2150

*Attorneys for the Debtor and Debtor In Possession*

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq.
Ilan D. Scharf, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4100
Telephone: 310-277-6910
Facsimile: 310-201-0760

*Attorneys for the Official Committee of Unsecured Claimants*

Dated: Helena, Montana
March 4, 2015

## Table of Contents

SECTION I RULES OF INTERPRETATION .......................................................... 1
SECTION II DEFINITIONS ............................................................................. 2
SECTION III PLAN OBJECTIVES..................................................................... 18
SECTION IV TREATMENT OF UNCLASSIFIED CLAIMS ................................... 19
SECTION V CLASSIFICATION OF CLAIMS ...................................................... 21
SECTION VI TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS.................... 23
SECTION VII TREATMENT OF IMPAIRED CLASSES OF CLAIMS ....................... 25
SECTION VIII ACCEPTANCE OR REJECTION OF PLAN .................................... 30
SECTION IX TRUST..................................................................................... 30
SECTION X MEANS FOR IMPLEMENTATION OF THE PLAN ............................. 38
SECTION XI CONDITIONS PRECEDENT.......................................................... 47
SECTION XII EFFECTS OF PLAN CONFIRMATION AND DISCHARGE.................. 48
SECTION XIII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES........................................................................................ 53
SECTION XIV COMMITMENTS ...................................................................... 53
SECTION XV MISCELLANEOUS PROVISIONS................................................... 56
SECTION XVI RECOMMENDATIONS AND CONCLUSION .................................. 64

The Roman Catholic Bishop of Helena, Montana, a Montana Religious Corporation Sole, and the Official Committee of Unsecured Claimants of the Roman Catholic Bishop of Helena, Montana propose the following Plan[1] pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

Reference is made to the Disclosure Statement for this Plan for a discussion of the Debtor's history, businesses, assets, Case, risk factors, summary and analysis of the Plan, and certain other related matters.

Subject to the provisions of Section 1127 of the Bankruptcy Code and those restrictions on modification set forth in Sections 15.2, 15.15 and 15.18 of the Plan, the Debtor and the Committee reserve the right to amend, alter or modify the Plan one or more times before its substantial consummation; provided, however, that the Debtor and the Committee shall not have the right to amend, alter or modify any provision of the Plan that specifically affects any of the Protected Parties  (defined below) or the rights and obligations of any of the Protected Parties under the Plan without prior written consent of the Protected Parties and any such amendment, alteration or modification without such written consent shall be void.

## SECTION I
## RULES OF INTERPRETATION

1.1      The rules of construction in Bankruptcy Code Section 102 apply to this Plan to the extent not inconsistent with any other provision in this Section I.

1.2      In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. If any act under the Plan is required to be performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

1.3      Terms that are not defined in Section II of the Plan may be defined elsewhere in the Plan, provided however, that such definitions shall apply only within the Section that such term is defined.  A term that is used in this Plan and that is not defined in this Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules.

1.4      The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement or the Trust Agreement.

1.5      Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural. Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.  No material change to the form

---

[1] Capitalized terms used but not defined in this preamble shall have the meanings and definitions ascribed to them in Section II of the Plan.

or terms may be made after the Confirmation Date without the consent of any party materially affected.

     **1.6**    Unless otherwise specified, any reference to an existing document means the document as it has been, or may be, amended or supplemented.

     **1.7**    Unless otherwise indicated, the phrase "under the Plan" and the words "herein" and "hereto" and similar words or phrases refer to this Plan in its entirety rather than to only a particular portion of the Plan.

     **1.8**    Unless otherwise specified, all references to Sections, clauses or exhibits are references to this Plan's Sections, clauses or exhibits.

     **1.9**    Section captions and headings are used only as convenient references and do not affect the Plan's meaning.

     **1.10**    All definitions in the Bankruptcy Code and below will be subject to the rules of construction set forth in Section 102 of the Bankruptcy Code. In addition, the use of the words "includes" or "including" is not limiting, and means "including but not limited to" and "including without limitation;" "and/or" means either or both, and the words "related to," "relates to," or "relating to" mean with regard to, by reason of, based on, arising out of, or in any way connected with.

     **1.11**    Any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions. Any specific references to promissory notes, deeds of trust or other debt instruments or security documents include any amendments, modifications and extensions thereto.

     **1.12**    Nothing contained in this Plan constitutes an admission or denial by any Entity of liability for, or the validity, priority, amount, or extent of any Claim, lien, or security interest asserted against the Debtor or against any third party.

**SECTION II**
**DEFINITIONS**

     **2.1**    **"Abuse"** means any (a) act of sexual conduct, misconduct, abuse, or molestation; any other sexually related act, contact, or interaction; indecent assault and/or battery; rape; lascivious behavior; undue familiarity; pedophilia; or ephebophilia; (b) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a nonconsenting adult and another adult; (c) assault; battery; corporal punishment; or any other act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation; or (d) fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, or any other tort relating to the acts and/or omissions listed in subparts (a)-(c) of this sentence. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the person.

**2.2** **"Abuse Claims Reviewer"** means the Entity, including the designee of such Entity, who will assess Tort Claims pursuant to the Allocation Plans. Subject to the Plan's provisions for replacement of the Abuse Claims Reviewer, the Abuse Claims Reviewer is Hon. William B. Bettinelli (retired).

**2.3** **"Abuse Related Contingent Claim"** means any Entity's Claim for contribution, indemnity, or reimbursement arising as a result of such Entity's liability to pay or defend any Tort Claim.

**2.4** **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in Section 503(b) of the Bankruptcy Code and referred to in Section 507(a)(2) of the Bankruptcy Code including the actual, necessary costs and expenses of preserving the Debtor's estate and operating the Debtor's businesses, compensation for professional services and reimbursement of expenses awarded under Sections 330(a) or 331 of the Bankruptcy Code, and all fees and charges assessed against the Debtor's estate under chapter 123 of Title 28, United States Code.

**2.5** **"Affiliate"** shall have the meaning ascribed to it under 11 U.S.C. § 101(2) and shall include an Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the other Entity. "Affiliate" includes Subsidiary and Parent.

**2.6** **"Allocation Plans"** means the General Allocation Plan set forth as Exhibit A-1 and Province Allocation Plan set forth as Exhibit A-2.

**2.7** **"Allowance Date"** means, with respect to a Claim, the date such Claim becomes Allowed.

**2.8** **"Allowed"** means, (i) any Claim against the Debtor which has been listed by the Debtor in the Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any timely filed Claim as to which no objection to allowance has been interposed in accordance with Section 12.9 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (iii) any Claim tardily filed with leave of the Bankruptcy Court; or (iv) any Claim expressly allowed by a Final Order or hereunder. Tort Claims are not Allowed Claims except as specifically provided in this Plan.

**2.9** **"Award"** means the amount payable to a Tort Claimant as determined in accordance with the terms of this Plan.

**2.10** **"Ballot"** means the ballot that is used by a Claimant to accept or reject the Plan, and pursuant to which Claimants will make certain elections regarding the treatment of their Claims as provided in the Plan, including releases of the Protected Parties as set forth in the Insurance Settlement Agreements, the Province Settlement and the Plan.

**2.11** **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and any amendments thereto.

Second Amended Plan of Reorganization     3

**2.12** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Montana, or such other court having jurisdiction over this Case or any proceeding within.

**2.13** **"Bankruptcy Notice"** means notice as required under Bankruptcy Rule 2002, 6004(a) and (c) and applicable local rules, sent to (a) all known holders of Claims against any Diocese Party, including Tort Claims, and their attorneys, if any; (b) the Future Claims Representative; (c) the Committee; (d) all Insurers; (e) the Secretary of the Department of Health and Human Services; (f) the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244-1850; (g) the United States Attorney for the District of Montana; (h) the Province); (i) all Entities who, in the opinion of any Protected Party, might reasonably be expected to be affected by the sale; (j) each of the Diocese Parties; and (k) all other Entities as required by the Bankruptcy Code or as directed by the Court. Notice shall also be given by (a) national publication; and (b) local publication within Montana and the surrounding areas, including every county in which a Diocese Party or an Entity enumerated in subparagraphs (h), (i) or (j) is located.

**2.14** **"Bankruptcy Rules"** means the Rules and Forms of Practice and Procedures in Bankruptcy promulgated under 28 U.S.C. § 2075, as amended, and the local rules and general orders of the Bankruptcy Court, as applicable to Chapter 11 Case, together with all amendments and modifications thereto.

**2.15** **"Business Day"** means any day other than Saturday, Sunday, or a "legal holiday," as that term is defined in Bankruptcy Rule 9006(a).

**2.16** **"Case" or "Chapter 11 Case"** means the case under Chapter 11 of the Bankruptcy Code commenced by the Roman Catholic Bishop of Helena, Montana, a Montana Religious Corporation Sole, on January 31, 2014, Case No. 14-60074.

**2.17** **"Cash"** means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

**2.18** **"Causes of Action"** means any and all Claims, whether arising prior to, on or after the Petition Date, of the Estate, including (1) rights of setoff, counterclaim or recoupment, and Claims on contracts or for breaches of duties imposed by law; (2) the right to object to Claims; (3) Claims pursuant to Section 362 of the Bankruptcy Code; (4) such Claims and defenses as fraud, negligence, breach of fiduciary duty, corporate waste, unlawful dividends, mistake, duress and usury; (5) all Claims under Sections including those arising under Sections 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any law of similar effect; (6) Claims for tax refunds; and (7) any other Claims that may be asserted against third parties or insiders.

**2.19** **"Channeled Claim"** means (i) any Tort Claim, or any Related Insurance Claim, or (ii) any Claim against an Insured Entity that, directly or indirectly, relates to any Tort Claim or any Related Insurance Claim. Nothing in this Section 2.19 shall be construed to include the Province Contribution Claim.

**2.20** **"Channeling Injunction"** means the injunction provided under Section 12.6 of the Plan.

**2.21** **"Chapter 11 Professionals"** means, collectively, the Debtor's Professionals and, the Committee's Professionals.

**2.22** **"Claim"** means any past, present or future claim, assertion of right, complaint, cross-complaint, counterclaim, liabilities, rights, request, allegation, arbitration, mediation, litigation, direct action, administrative proceeding, demand, action, request, cause of action, suit, action, lawsuit, proceeding, lien, debt, bill, indemnity, equitable indemnity, subrogation, equitable subrogation, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, recoupment, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or action, settlement, and/or any liability whatsoever, or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or unasserted, suspected or not suspected, anticipated or unanticipated, accrued or unaccrued, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty or otherwise, whether currently known or unknown, whether compromised, settled or reduced to a consent judgment, which may exist now or hereinafter for property damage, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, exemplary damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, which has been or may be asserted by or on behalf of any Entity in any jurisdiction, whether seeking damages or equitable, mandatory, injunctive, or any other type of relief, including any other claim within the definition of Section 101(5) of the Bankruptcy Code.  For the avoidance of doubt, "**Claim**" includes, any "**Contribution Claim**", any "**Related Insurance Claim**", any "**Channeled Claim**", any "**Extra-Contractual Claim**", any "**Tort Claim**" and any "**Direct Action Claim**."

**2.23** **"Claimant"** means a holder of a Claim.

**2.24** **"Claims Bar Date"** means August 11, 2014, which was the last date for filing Claims against the Estate pursuant to the Bankruptcy Court's Order entered on May 6, 2014 [Docket No. 242].

**2.25** **"Claims Objection Bar Date"** means, unless extended by the Court, the first Business Day that follows the 60th day after the Effective Date, by which any objection to a Claim (excluding Tort Claims) must be filed with the Bankruptcy Court or such objection will be forever barred.

**2.26** **"Closing"** means the payments and transfers to the Trust of those assets required to be paid and transferred in accordance with Section 10.5 of the Plan.

**2.27** **"Co-Defendant"** means an Entity that is named or could be named as a defendant in a lawsuit in which the Debtor is also named or could be named as a defendant and/or who is alleged to be fully, partially or jointly responsible for a Claim asserted or that could be asserted in the future against both such Entity and the Debtor, including a co-Debtor as described in

Section 509 of the Bankruptcy Code.  For purposes of the Plan, none of the Protected Parties is or shall be deemed to be a Co-Defendant.

**2.28   "Committee"** means the Official Committee of Unsecured Claimants appointed by the United States Trustee in the Case, as such committee may be reconstituted from time to time.

**2.29   "Committee's Professionals"** means Pachulski Stang Ziehl & Jones LLP; and all other professionals, if any, which the Committee has retained or may retain to provide professional services in accordance with Section 1103(a) of the Bankruptcy Code and as approved by the Bankruptcy Court.

**2.30   "Confirmation Date"** means the date of the entry of the Confirmation Order.

**2.31   "Confirmation Hearing"** means the hearing held by the Bankruptcy Court regarding confirmation of the Plan, as such may be continued from time to time.

**2.32   "Confirmation Order"** means a court order that has not been stayed confirming the Plan after a hearing upon Bankruptcy Notice.  The Confirmation Order shall be mutually acceptable to the Debtor, the Committee, and the Settling Insurers.  The Confirmation Order shall be reasonably acceptable to the Province.  The Confirmation Order shall contain all of the following provisions, but no provision that is contrary to or inconsistent with the Insurance Settlement Agreements or the Term Sheet:

2.32.1  Specifically and individually ordering all Entities as set forth in the Plan to act or refrain from acting as specified in the Plan;

2.32.2  Incorporating the terms and provisions of the injunctions in the Plan and the Insurance Settlement Agreements as though fully set forth therein;

2.32.3  Ordering that the Debtor is discharged from all Claims;

2.32.4  Identifying the Diocese Parties (except for Perpetrators) and the Settling Insurers, by name, as Entities to be protected by the injunctions set forth in the Plan;

2.32.5  Ordering that the Claims, if any, that CMS might have against the Settling Insurers relating to Claims paid by the Trust from the proceeds of the Insurance Settlement Agreements or the Province Contribution shall be paid solely by the Trust;

2.32.6  Including the judgment reduction provisions of the same form and content as those in Sections **10.17.1 and 10.17.2** hereof, applicable to all Settling Insurers, and ordering the Diocese Parties and the Trust to reduce any judgments or settlements accordingly; and

2.32.7  Incorporating the separately entered findings of fact and conclusions of law, which are required under Bankruptcy Code Sections 1129(a), and, if applicable, 105(a) and 1129(b), to confirm the Plan and as necessary to dismiss with prejudice the Coverage Litigation, and making the following findings:

2.32.7.1 There are unique circumstances in this Case requiring the imposition of the injunctions in the Plan;

2.32.7.2 The Policies are property of the Estate and are therefore subject to the core jurisdiction of the Court;

2.32.7.3 The Tort Claims and associated litigation were the primary cause for the Debtor's filing of the Case;

2.32.7.4 The Channeled Claims against the Diocese Parties (other than the Diocese) are within the jurisdiction of the Court because the Diocese Parties (other than the Diocese) might also assert, and the Province has asserted, in some instances that they are insured under the same Policies as the Debtor[2];

2.32.7.5 The Claims against the Policies are within the jurisdiction of the Court because the Policies are property of the Estate;

2.32.7.6 Each of the payments by the Settling Insurers pursuant to the Insurance Settlement Agreements constitutes a critical contribution to the success of the Plan, and the Plan would not be feasible without such contributions;

2.32.7.7 Because it would be impractical to divide the Policies between the Diocese Parties, it was necessary for the Debtor to obtain the participation of the Diocese Parties signatories to the Insurance Settlement Agreements;

2.32.7.8 The Diocese Parties who are signatories to the Insurance Settlement Agreements would not release their Interests under the Policies unless they obtained the benefits of the injunctions under the Plan, because to do so would have left them exposed to Channeled Claims, whether or not such Claims be valid and whether or not coverage exists under the Policies for such Claims;

2.32.7.9 The payments by the Settling Insurers pursuant to the Insurance Settlement Agreements provide good and valuable consideration to the Trust, and enable unsecured creditors such as the Tort Claimants to realize increased Distributions on their Claims;

2.32.7.10 The Insurance Settlement Agreements are therefore an essential component of the Plan;

2.32.7.11 As a condition for the buy-back set forth in the Insurance Settlement Agreements, the Settling Insurers required the Debtor to indemnify them from any and all Claims relating to the Policies;

2.32.7.12 The indemnifications by the Debtor in the Insurance Settlement Agreements are an essential component of each of the Insurance Settlement Agreements;

---

[2] This paragraph is without prejudice to any Tort Claimant's entitlement to a jury trial.

Second Amended Plan of Reorganization     7

2.32.7.13 The injunctions in the Plan will ensure that the indemnifications by the Debtor do not prevent the Debtor from obtaining a fresh start in the Case, and therefore such injunctions are necessary to the Plan;

2.32.7.14 The Insurance Settlement Agreements are necessary to the Plan because they provide significant funding for the Plan, therefore, the injunctions in the Plan are an essential component of the Plan;

2.32.7.15 The Settling Insurers repurchased the Policies pursuant to the Insurance Settlement Agreements. The Settling Insurers did not purchase any other assets of the Debtor and are not a continuation of the Debtor or engaging in a continuation of the Debtor's business. The Settling Insurers shall  not have any responsibility or liability with respect to any of the Debtor's other assets; and,

2.32.7.16   The Settling Insurers are not, and shall not be deemed to be, successors to the Debtor by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in the Insurance Settlement Agreements, the Plan, the Plan Documents or otherwise. The Settling Insurers shall not assume, or be deemed to have assumed, any liabilities or other obligations of the Debtor.

2.32.8  If the Confirmation Order includes the Province Channeling Injunction, in addition to the foregoing, which shall be applicable to the Province, the Confirmation Order shall include the following:

2.32.8.1   Each of the payments by the Province pursuant to the Province contribution constitutes a critical contribution to the success of the Plan, and the Plan would not be feasible without such contributions because, among other things, if the Province Contribution Claim was Allowed in the full amount that the Province contends, the Debtor would be unable to pay the Province Contribution Claim;

2.32.8.2  The Province would not accept the proposed treatment of its Claims against the Debtor, waive its alleged rights under the Policies, or waive its right to object to the Insurance Settlement Agreements, among other things, unless the Debtor, the Committee and certain counsel to the Tort Claimants signed the Term Sheet and agreed to the include and support the Province Channeling Injunction in the Plan;

2.32.8.3  The Province Contribution provides good and valuable consideration to the Trust, and enables Province Claimants to realize increased Distributions on their Claims.

2.32.8.4  The Province Settlement is therefore an essential component of the Plan;

2.32.8.5  The Province Settlement in the amount of $4.45 million is necessary to the Plan because it  provides significant funding for the Plan, therefore the injunction in the Plan is a significant component of the Plan;

2.32.8.6  The Province is not, and shall not be deemed to be, a successor to the Debtor by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in the Province Settlement, the Plan, the Plan Documents

Second Amended Plan of Reorganization    8

or otherwise. The Province shall not assume, or be deemed to have assumed, any liabilities or other obligations of the Debtor.

**2.33** **"Contingent"** means, with respect to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which or the obligation to make payment on which is dependent upon a future event that may or may not occur.

**2.34** **"Contribution Claim"** means any Claim by any Insurer against any other Insurer seeking contribution, equitable contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, "other insurance" clauses rights, or pursuant to any other theory under law or in equity relating to the defense or payment by such paying insurer of all or any part of any Claim (a) asserted against a Diocese Party; (b) relating to the Policies; (c) relating to the Coverage Litigation; or (d) channeled to or paid, in whole or in part, by the Trust.

**2.35** **"Coverage Litigation"** means the litigation entitled *William C. Whalen, et. al. v. Roman Catholic Bishop of Helena, et. al.* (and related Claims), being Case No. BDV-2012-976 of the Montana First Judicial District Court for Lewis and Clark County, Montana.

**2.36** **"Debtor"** means the Diocese, as defined in Section 2.39.

**2.37** **"Debtor's Professionals"** means Elsaesser Jarzabek Anderson Elliott & Macdonald, Chtd; Patterson Buchanan Fobes & Leitch, Inc., P.S.; Franz & Driscoll PLLP; Dickstein Schapiro LLP; Gough, Shanahan, Johnson & Waterman, PLLP; Anderson ZurMuehlen & Co, PC; and all other professionals, if any, which the Debtor has retained or may retain to provide professional services in accordance with Sections 327(a) and 327(e) of the Bankruptcy Code.

**2.38** **(i) "Deposit and Loan Fund"** means the fund described in the "Diocese of Helena Deposit and Loan Fund Policy, effective May 25, 2011".

**(ii) "Deposit and Loan Transferred Assets and Liabilities"** means those powers, rights, assets and liabilities itemized on Schedules 2.38(a) and (b).

**(iii) "Deposit and Loan Fund Restoration Trust"** means the Trust established as of the Effective Date pursuant to the Deposit and Loan Fund Trust Agreement, a form of which will be supplemented at a later date as Exhibit F.

**2.39** **"Diocese"** means the Roman Catholic Bishop of Helena, Montana, a Montana Religious Corporation Sole, including those schools, parishes, and other Entities listed on Schedule 2.39.

**2.40** **"Diocese Parties"** means collectively the Reorganized Debtor, the Diocese and: (i) the Entities listed on Schedule 2.40 to this Plan; (ii) any and all named insureds, insureds and additional insureds and any Entity alleged to be an insured under the Policies with respect to whom the Diocese has authority to release the Claims released pursuant to the Insurance Settlement Agreements, including those Entities listed on Schedule 2.40 to this Plan; (iii) each of the past, present and future Affiliates, holding companies, merged companies, related companies, divisions and acquired companies of the Diocese and the Entities listed on Section 2.40(i) and (ii) above, each of their respective past, present, present and future Affiliates, holding companies,

merged companies, related companies, divisions and acquired companies, and each of their respective predecessors, successors (except to the extent their liability is independent of any liability of the Diocese and the Entities listed on Section 2.40(i) and (ii) above) and assigns; and (iv) any and all past and present shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, and Representatives of Diocese and the Entities listed on Section 2.40(i)-(iii) above, in their capacity as such; and (v) the Province.

2.41    **"Direct Action Claim"** means any Claim by any Entity against a Settling Insurer identical or similar to, or relating to, any Tort Claim, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurer.

2.42    **"Disallowed Claim"** means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

2.43    **"Disclosure Statement"** means the Disclosure Statement relating to this Plan, as it may be amended from time to time.

2.44    **"Disclosure Statement Order"** means the Order entered by the Bankruptcy Court approving the Disclosure Statement.

2.45    **"Disputed Claim"** means a Claim: (a) is listed as disputed in the Debtor's Schedules filed with the Bankruptcy Court; or (b) as to which a proof of Claim is filed or is deemed filed under Bankruptcy Rule 3003(b) (1) and as to which a timely objection has been filed and not been withdrawn or resolved by consensual agreement or by a Final Order of the Bankruptcy Court.

2.46    **"Distribution"** means any transfer of Cash or other property or instruments to either a Claimant by the Reorganized Debtor or the Trustee.

2.47    **"Entity"** means an individual, any corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "person" within the definition of Section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in Section 101(15) of the Bankruptcy Code.

2.48    **"Effective Date"** means the first Business Day after the Confirmation Date on which all conditions to effectiveness specified in Section 11.1 of this Plan have been satisfied or waived.

2.49   **"Estate"** means the bankruptcy estate of the Debtor as created under Section 541 of the Bankruptcy Code.

2.50   **"Estimated Amount"** means the amount at which the Bankruptcy Court or the U.S. District Court for the District of Montana, pursuant to 28 U.S.C. §157(b)(2)(B), Section 502(c) of the Bankruptcy Code, and Bankruptcy Rule 3018(a) as the case may be, estimates any Claim or class of Claims that is Contingent, unliquidated, or disputed, including any Tort Claim or class thereof, for the purpose of (a) allowance, (b) Distribution, (c) confirming this Plan pursuant to Section 1129 of the Bankruptcy Code, (d) voting to accept or reject this Plan pursuant to Section 1126 of the Bankruptcy Code, or (e) any other purpose.

2.51   **"Estimation Order"** means an order of the Bankruptcy Court or the U.S. District Court for the District of Montana, as applicable, that determines the Estimated Amount of any Claim or Claims for any purpose, whether individually or as part of an aggregate.

2.52   **"Exculpated Parties"** means the Debtor and the Committee and all of their respective present or former members, counsel for such members, managers, and Representatives, acting in such capacity. "Exculpated Parties" shall not include a Perpetrator.

2.53   **"Extra-Contractual Claim"** means any Claim against any Settling Insurer relating to (a) allegations that any Settling Insurer acted in bad faith or in breach of any express or implied duty, obligation or covenant, contractual, statutory or otherwise, including any Claim on account of alleged bad faith; (b) failure to act in good faith; (c) failure to provide insurance coverage under any Policy; (d) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied or otherwise; (e) violation of any statute, regulation or code governing unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising, including any violation of any unfair Claims practices act or similar statute, regulation, or code; failure to investigate or provide a defense or an adequate defense; any type of alleged misconduct; (f) or any other act or omission of any Settling Insurer of any type for which the Claimant seeks relief other than coverage or benefits under a policy of insurance. Extra-Contractual Claim include: (i) any Claim that relates to any Settling Insurer's handling of any Claim or any request for insurance coverage, including any request for coverage for and/or defense of any Claim, including any Tort Claim; (ii) any Claim that, directly or indirectly relates to any of the Policies and any contractual duties arising therefrom, including any contractual duty to defend any of the Diocese Parties against any Tort Claims; and (iii) the conduct of the parties with respect to the negotiation of any Insurance Settlement Agreement.

2.54   **"Final Order"** means an order, judgment, or other decree (including any modification of amendment thereof) of the Bankruptcy Court, a U.S. District Court, or any other court having jurisdiction that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such appeal or review has been taken, (i) it has been resolved and no longer remains pending or (ii) the Debtor and the Committee, or the Trustee (after the Effective Date), the Settling Insurers, and the Province (only to the extent that the Province Settlement is approved) have mutually agreed in writing that the order from which such appeal or review is taken should be deemed to be a Final Order.

2.55   **"Future Tort Claim"** means a Tort Claim relating to Abuse that happened before the Petition Date for which (a) no proof of Claim is filed or deemed filed on or before the Claims

Bar Date; (b) a proof of Claim is filed after the Claims Bar Date, if the Entity asserting the Tort Claim (i) is under eighteen years of age on the Claims Bar Date; (ii) neither discovered nor reasonably should have discovered before the Claims Bar Date that his or her injury was caused by Abuse; or (iii) has a Tort Claim that was barred by the applicable statute of limitations as of the Claims Bar Date but is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claims; or (c) is asserted against the Province as provided in Section 7.2 of the Plan.

     2.56   **"Future Tort Claimant"** means the holder of a Future Tort Claim.

     2.57   **"Future Claim Representative"** means the Honorable Michael R. Hogan, U.S.D.J. (retired), who was appointed in the Reorganization Case as the legal representative of Entities holding Future Tort Claims by Order dated April 9, 2014 and as contemplated by Debtor's motion enlarging his duties to include Entities asserting a Future Tort Claim against the Province, or any other Entity appointed by the Bankruptcy Court or District Court, as applicable, as the Future Claims Representative. Pursuant thereto, and subject to the Provision of this Plan and Confirmation Order, the Future Claim Representative's responsibilities and duties include the following: undertaking an investigation and analysis to assist the Court in determining the estimated number of Claims and Claim amounts held by the Future Tort Claimants; filing proofs of Claim on behalf of all Future Tort Claimants by the Claims Bar Date or any Court-ordered extension thereof; negotiating with the Debtor and other appropriate parties the provisions within the Plan for the evaluation, determination, and amounts of Future Tort Claims; advocating the legal position of the Future Tort Claimants before this Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Future Tort Claimants; and taking all other legal actions reasonably necessary to represent the interests of the Future Tort Claimants.

     2.58   **"General Allocation Plan"** means the Allocation Protocol for Tort Claims filed in the Chapter 11 Case of the Roman Catholic Bishop of Helena, Montana, attached as Exhibit A-1 ot the Plan.

     2.59   **"Future Tort Claims Reserve Fund"** means a fund in the initial amount of $870,165.75 to be paid to the Trust by the Debtor on account of payment of allowed Future Tort Claims. An additional amount will be paid from the Province Contribution of $4,450,000 based on, in part, the recommendation of the Future Claim Representative. Such fund shall be administered by the Trust pursuant to the terms of the Plan and the Trust Documents.

     2.60   **"General Unsecured Claim"** means any Claim against the Debtor that is not a Tort Claim, Administrative Claim, Priority Tax Claim or a Claim that is otherwise classified under the Plan.

     2.61   **"General Unsecured Convenience Claim"** means any General Unsecured Claim in an amount of $500 or less, or voluntarily reduced to $500 by the holder of such Claim.

     2.62   **"Insurance Settlement Agreements"** means, collectively or separately as the case may be, the agreements attached hereto as Exhibits B and C.

     2.63   **"Insured Entity"** means any Entity insured by any Settling Insurer.

2.64   **"Insurer"** means (a) any Entity that during any period of time either (i) provided insurance coverage to the Debtor and/or a Diocese Party, or any of their predecessors, successors, or assigns, or (ii) issued or allegedly issued a binder, certificate, or policy of insurance to any of the Diocese Parties, or any of their predecessors, successors, or assigns; and (b) any Entity owing or allegedly owing a duty to defend and/or indemnify any of the Diocese Parties under any binder, certificate, or policy of insurance.

2.65   **"Interest"** means all Claims, liens, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

2.66   **"Non-Settling Insurer"** means any Insurer that is not a Settling Insurer.

2.67   **"Parent"** means any Entity that owns the majority of the shares, membership interests, or other equity interests in the other Entity.

2.68   **"Penalty Claim"** means a Claim for a fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages, including any Claim not meant to compensate the Claimant for actual pecuniary loss.

2.69   **"Perpetrator"** means any individual who personally committed an act of Abuse causing a Tort Claim.

2.70   **"Petition Date"** means January 31, 2014, the date the Debtor filed its voluntary petition commencing this Case.

2.71   **"Placid Enterprises, LLC Loan"** means the loan between Placid Enterprises, LLC and the Debtor evidenced by Schedule 2.71.   For purposes of showing Debtor's ability to repay such loan, and for general future financial operations, Debtor's Pro-Forma financial statements are set forth as Exhibit D.

2.72   **"Plan"** means this Plan of Reorganization (and all exhibits annexed thereto), Plan Documents and any and all modifications and/or amendments thereto.

2.73   **"Plan Documents"** means the Insurance Settlement Agreements and all other agreements, documents and exhibits, as the same may be amended, modified, supplemented, or restated from time to time, that are necessary or appropriate to implement the Plan and the Trust, including the Trust Documents, provided that (i) the Committee shall have approved each of said agreements, documents and exhibits as to form and content, such approval not to be unreasonably withheld; and (ii) the Province shall have approved each of the agreements, documents, and exhibits which specifically pertain to or affect the Province or Province Settlement as to form and content, such approval not to be unreasonably withheld.

2.74   **"Policies"** means any and all known and unknown binders, certificates, or policies of insurance issued or allegedly issued by any of the Settling Insurers to any of the Diocese Parties, except any Claims-made certificates or policies of insurance issued or allegedly issued by Catholic Mutual to the Diocese Parties for a policy period July 1, 2014 through July 1, 2015 and the two immediately prior policy periods, *i.e.*, July 1, 2012 through July 1, 2013, and July 1, 2013 through July 1, 2014.

**2.75** **"Post-Confirmation Notice Parties"** means the Reorganized Debtor, the Trust, the Province, the Office of the U.S. Trustee and any Entity that files a request to be a Post-Confirmation Notice Party.

**2.76** **"Priority Claim"** means any Claim which, if Allowed, would be entitled to priority under Section 507 of the Bankruptcy Code.

**2.77** **"Priority Claimant"** means the holder of a Priority Claim.

**2.78** **"Professional"** means any Entity employed by the Debtor or the Committee pursuant to Sections 327 or 1103 of the Bankruptcy Code.

**2.79** **"Professional Fee Claim"** means a Claim under Bankruptcy Code Sections 326, 327, 328, 330, 331, 503(b), 1103, or 1104 for compensation for services rendered or expenses incurred by any of the Professionals prior to the Effective Date.

**2.80** **"Pro Rata"** means proportionate, and when applied to a Claim means the ratio of the amount distributed on account of an Allowed Claim in a Class to the amount distributed on account of all Allowed Claims in such class.

**2.81** **"Proponents"** means the Debtor and the Committee.

**2.82** **"Protected Parties"** means the Settling Insurers, the Province and the Diocese Parties, excluding Perpetrators.

**2.83** **"Province"** means, collectively, the Ursuline Western Province, Ursuline Convent of the Holy Family, and Ursuline Convent of Our Lady or Santa Rosa Ursuline Corporation, and all related or affiliated Entities, its Representatives, and any and all past and present members, shareholders, principals, teachers, staff, boards, administrators, sisters, nuns, or religious volunteers, and their Representatives, in their capacity as such.  Province, as defined herein, does not include Perpetrators.

**2.84** **"Province Allocation Plan"** means the Allocation Protocol for the Province Channeled Claims filed in the Chapter 11 Case of the Roman Catholic Bishop of Helena, Montana, attached as Exhibit A-2 to the Plan.

**2.85** **"Province Alternate Settlement"** means the settlement of the Province Litigation pursuant to the Term Sheet if the Province Channeling Injunction is not issued.

**2.86** **"Province Channeled Claims"** means any Claim against the Province (or any Entity related or connected with the Province) to the extent such claim directly or indirectly, relates to, the injury or damages asserted as a Tort Claim against any of the Diocese Parties (excluding the Province), including any Tort Claimant who asserts that he or she should have been included as a Province Claimant.  A claim by a perpetrator is not a Province Channeled Claim.

**2.87** **"Province Channeling Injunction"** means the injunction provided under Section 12.6B of the Plan.

**2.88**  **"Province Claimants"** means Holders of Tort Claims that are also Holders of Province Channeled Claims filed as of the Claims Bar Date. All Province Claimants are listed on Exhibit J to the Plan (by claim number). Exhibit J may be amended or modified before the Effective Date of the Plan upon written consent of the Debtor, the Committee and counsel to holders of claims within a Province Claimant Pool (as defined in the Province Allocation—Exhibit A-2 to the Plan).

**2.89**  **"Province Contribution"** means the payment by the Province to the Province Escrow in the amount of $4.45 million that shall be made only if: (i) the Province Settlement has been approved by the Bankruptcy Court; (ii) a Confirmation Order is entered that, among other things, (x) grants and orders the Province Channeling Injunction set forth in Section 12.6B of the Plan, (y) contains other provisions that the Province deems reasonably necessary in order to implement the Province Settlement, and (z) is otherwise reasonably approved by the Province as to both form and content; and (iii) the Province Litigation has been dismissed with prejudice. To the extent the conditions or any of them triggering the Province Contribution do not occur, the Province Contribution shall not be applicable, unless the Province in its sole discretion waives such condition(s). If the foregoing conditions are satisfied with the exception of the issuance of the Province Channeling Injunction, the Province Contribution shall be $3.95 million. The Province Contribution will be paid by the Province to the Province Escrow. Upon receipt by the Province Escrow of the requisite releases and dismissals of the Province Litigation, the escrow agent (to be named) of the Province Escrow shall release the Province Contribution to the Trust, deliver the Province Releases to the Province, and deliver the Province Dismissals for filing in the Province Litigation.

**2.90**  **"Province Contribution Claim"** means the Proof of Claim No. 387 filed in the Chapter 11 Case by the Province asserting Claims for indemnity, contribution, allocation of fault and other Claims against the Debtor. The Settling Insureres shall have no liability whatsoever to pay any amounts for the Province Contribution Claim.

**2.91**  **"Province Contribution Claim Cap"** means an amount, not to exceed $500,000, which will be paid to the Province by the Debtor if: (i) the Province Settlement is not approved and the Province Alternate Settlement of $3.95 million is effective; (ii) the Province Contribution Claim is Allowed after the claim objection process; and (iii) the Allowed amount of the Province Contribution Claim exceeds $500,000. The Settling Insurers shall have no liability whatsoever to pay any amounts for the Province's Contribution Claim.

**2.92**  **"Province Dismissals"** means the dismissals with prejudice dismissing the Province Litigation with prejudice to be executed by counsel in the Province Litigation and placed in the Province Escrow prior to the Confirmation Hearing.

**2.93**  **"Province Escrow"** means the escrow to be established pursuant to an escrow agreement to be entered into between the Province and the Trustee prior to the Confirmation Hearing. The terms of the Province Escrow shall be acceptable in all respects to the Province.

**2.94**  **"Province Litigation"** means the litigation entitled *Whalen, et al. v. Roman Catholic Diocese of Helena, et al.*, Montana First Judicial District Court, Lewis and Clark County, Cause No. BDV2011-925 and *Does, et al. v. Roman Catholic Diocese of Helena, et al.,* Montana First Judicial District Court, Lewis and Clark County, Cause No. BVD2011-936, in

Second Amended Plan of Reorganization     15

which certain Tort Claims were alleged jointly and severally against the Debtor and the Province as Co-Defendants, which shall be dismissed with prejudice pursuant to the terms of the Province Settlement regardless of whether the Channeling Injunction in favor of the Province pursuant to Section XII of the Plan is approved.

2.95   **"Province Release"** means that certain release of Claims against the Province, the language of which is set forth in Exhibit I hereto and may be contained in a ballot or in a separate document.

2.96   **"Province Settlement"** means the settlement evidenced by the Term Sheet attached hereto as Exhibit H, and incorporated herein by reference for all purposes.   The Province Contribution will be paid by the Province to the Province Escrow.  Upon the Province Escrow's receipt of the Province Releases and Province Dismissals, the Province Escrow shall release the Province Contribution to the Trust, the Province Releases to the Province and file the Province Dismissals in the Province Litigation or deliver the Province Dismissals in accordance with instructions from the Province and state court counsel in the Province Litigation.

2.97   **"Qualified Counsel"** means those attorneys representing Tort Claimants who have entered into a written retainer or fee agreements with such Claimant(s) on or before the Effective Date; provided that such attorney agrees that its attorney's receipt of Qualified Counsel Fees is credited against the fees owed by such Tort Claimant(s).

2.98   **"Qualified Counsel Fees"** means the total fees payable to Qualified Counsel by the beneficiaries of a Trust subaccount based on the reserves or Distributions calculated under the Allocation Plans in accordance with written retainer or fee agreements with those beneficiaries.

2.99   **"Qualified Counsel Costs"** means the amount equal to the unpaid reimbursable expenses (prepetition and postpetition through the Effective Date) payable to Qualified Counsel by the beneficiaries of a Trust subaccount in accordance with written retainer or fee agreement with those beneficiaries and who are utilizing the Allocation Plans.

2.100   **"Related Insurance Claim"** means (i) any Claim against any Settling Insurer for defense, indemnity, reimbursement, contribution, subrogation, or similar relief that, directly or indirectly, relates to a Tort Claim; (ii) any Extra Contractual Claim that, directly or indirectly, relates to any Tort Claim, including any Claim that, directly or indirectly, relates to any of the Settling Insurers handling of any Tort Claim; (iii) any Direct Action Claim; and (iv) any Contribution Claim.

2.101   **"Reorganized Debtor"** means the Debtor on and after the Effective Date; provided that any successor to the Diocese, Debtor or the Reorganized Debtor through a merger or suppression of the Diocese shall not have any rights or remedies by virtue of the Plan or Confirmation Order on account of Tort Claims for which the successor was independently liable.

2.102   **"Representatives"** means the current and former officers, directors, agents, attorneys, employees, financial advisors and legal representatives of an Entity.

2.103   **"Revested Assets"** means all assets and or property, real or personal, owned by the Debtor which are not transferred to the Trust.

**2.104 "S/A/P Claims"** means, collectively, Secured Claims, Administrative Claims (including Professional Fee Claims), Priority Claims, and Priority Tax Claims.

**2.105 "S/A/P Claims Reserve"** means the reserve to be established by the Reorganized Debtor for Administrative Claims (including Professional Fee Claims), Priority Claims, and Priority Tax Claims.

**2.106 "Schedules"** means the Schedules of Assets and Liabilities and Statement of Financial Affairs of each of the Debtor filed pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, including any supplements or amendments thereto through the Confirmation Date.

**2.107 "Section 363 Sale"** means a sale of property pursuant to the provisions of Section 363 of the Bankruptcy Code.

**2.108 "Settled"** means, with respect to a Claim, a Claim that has been resolved by agreement, and if required, approved by Final Order of the Bankruptcy Court or a U.S. District Court, as applicable.

**2.109 "Settling Insurer"** means American Home Assurance Company ("American Home"); Catholic Mutual Relief Society of America ("Catholic Mutual"); Fireman's Fund Insurance Company and Fireman's Fund Indemnity Company ("Fireman's Fund"); Montana Insurance Guaranty Association, as the limited statutory successor in interest to Reliance Insurance Company, in liquidation under and subject to all limitations and restrictions imposed by the Montana Insurance Guaranty Act, MCA §33-10-101. *et seq.* ("MIGA"); OneBeacon Insurance Company, Resolute Management, Incorporated, Commercial Union Insurance Companies, and American Employers' Insurance Company ("OneBeacon"); Travelers Casualty and Surety Company (formerly known as Aetna Casualty and Surety Company), United States Fidelity and Guaranty Company, Standard Fire Insurance Company, St. Paul Mercury Insurance Company, and St. Paul Fire and Marine Insurance Company ("Travelers"); Great American Insurance Company and the Parents of Great American Insurance Company (collectively, "Great American"); and, each of their past, present and future Affiliates, and divisions, each of their respective past, present, present and future Affiliates, holding companies, merged companies, related companies, divisions and acquired companies, each of their respective past, present and future shareholders, members, managers, employees, subrogees, partners, principals, joint ventures, joint venturers, Representatives and Claims handling administrators, and each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Entities acting on behalf of, by, through or in concert with them.

**2.110 "Subsidiary"** of an Entity means a corporation or limited liability company as to which the Entity possesses shares of common stock, membership interests, or other equity interests and exercises control through the voting of such stock or interests

**2.111 "Supplemental Injunction"** means the injunction provided for the benefit of the Settling Insurers under Section 12.7 of the Plan.

**2.112 "Temporarily Allowed"** with reference to a Claim means such Claim as temporarily allowed for any purpose other than Distribution on a Claim pursuant to Bankruptcy Rule 3018(a) or otherwise.

**2.113** **"Term Sheet"** means the terms of the Province Settlement set forth in Exhibit H.

**2.114** **"Tort Claim"** means any Claim against any of the Diocese Parties relating to, in whole or in part, directly or indirectly, any Abuse or any other misconduct, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese Parties or any other Entity whom any of the Diocese Parties are allegedly responsible for, including any such Claim asserted against any of the Diocese Parties in connection with the Case, and any Claim of any Entity who is, has been, or may be represented by the Future Claim Representative.  Notwithstanding the foregoing, nothing in this Section 2.107 shall be construed to include the Class 10 Claim.

**2.115** **"Tort Claimant"** means the holder of a Tort Claim, the estate of a deceased individual who held a Tort Claim, or the personal executor or personal representative of the estate of a deceased individual who held a Tort Claim, as the case may be.

**2.116** **"Trust"** means the trust to be established pursuant to the Plan and the Trust Agreement.

**2.117** **"Trust Agreement"** means the agreement attached as Exhibit E to the Plan.

**2.118** **"Trust Assets"** means all real and personal property funded to the Trust.

**2.119** **"Trust Documents"** means the Trust Agreement, Allocation Plans, instruments, and other documents that are reasonably necessary or desirable in order to implement the provisions of the Plan that relate to the creation, administration and funding of the Trust.

**2.120** **"Trustee"** means Omni Management Group, LLC, the trustee of the Trust, and any successor trustee appointed pursuant to the terms of this Plan and the Trust Agreement.

**2.121** **"U.S. District Court"** means a United States District Court.

**2.122** **"Unclaimed Property"** means any Cash or other property which is unclaimed for one hundred and eighty (180) days after the Distribution.

**2.123** **"U.S. Trustee"** means the Office of the United States Trustee for Region 18.

**2.124** **"Unresolved"** means, with respect to a Claim, a Claim that has neither been Allowed or Disallowed nor liquidated.

## SECTION III
## PLAN OBJECTIVES

### 3.1 Objectives

The Plan provides the means for settling and paying all Claims asserted against the Debtor.  The Plan provides for the creation of a Trust and channeling of all Channeled Claims to the Trust for allowance and Distribution to Tort Claimants.  The Trust's assets will consist of Cash from the Debtor, contributions by Settling Insurers, and the portion of the Province

Contribution allocated to the Trust.  Trust assets will be used to fund certain of the Trust's costs and expenses and payments to Tort Claimants.  Distributions and reserves from the Trust to Tort Claimants will be determined by application of the Allocation Plans and, where applicable, the Trustee's business judgment.  Annuitants are unimpaired.  Many scheduled claimants are not true creditors of the Diocese, as they are part of the Diocese.  Such liabilities shall be administered pursuant to Canon Law.  Deposit and Loan Fund Claimants will receive nothing through this Plan.  However, such Claimants shall be separately classified, and a Deposit and Loan Fund Restoration Trust shall be created on the Effective Date for purposes of administering Deposit and Loan Fund Accounts Receivable and future assets yet to be determined, which will be dedicated to the Deposit and Loan Fund Trust, which beneficiaries shall be with Deposit and Loan Fund Claimants.  The Endowment Fund, Annuity Fund, Latin American Fund and the Guatemala Fund[3] shall retain their investments and continue to serve their charitable purposes, but will receive nothing through this Plan.  Allowed General Unsecured Claimants will receive their Pro Rata share of $1,294,635.03, based on known amounts.  This figure may change after the conclusion of the Claims objection process, depending on the allowance or disallowance of certain Claims.  If the Confirmation Order does not include the Province Channeling Injunction, and the Province Alternate Settlement of $3.95 million is approved, the Province Contribution Claim, if and to the extent Allowed, shall be subject to the Province Contribution Claim Cap.  Such Claim, if and to the extent Allowed, will be paid over three (3) years from the date of allowance.  The Debtor will receive the benefit of a Section 1141(d) discharge.  Settling Insurers will receive the benefit of injunctions provided under the Plan and their particular Insurance Settlement Agreement.  The Province, if the Court so orders and the $4.45 million settlement is approved, shall receive the benefit of the Province Channeling Injunction.  Nothing in this Plan is intended to replace and does not affect, diminish or impair the liabilities of any Co-Defendant or guarantor under applicable non-bankruptcy law, including any laws governing joint and several liabilities.

## SECTION IV
## TREATMENT OF UNCLASSIFIED CLAIMS

### 4.1    Administrative Claims

Each holder of an Allowed Administrative Claim against the Debtor shall receive, in full satisfaction, settlement, release and extinguishment of such Claim, Cash equal to the Allowed amount of such Administrative Claim, either (a) on or as soon as practicable following the Effective Date; or, if later, the Allowance Date; or (b) upon such terms as may be agreed to in writing by the Holder of an Administrative Claim.  Provided, however, that any Administrative Claim incurred postpetition by the Debtor in the ordinary course of its operations or arising pursuant to one or more postpetition agreements or transactions entered into by the Debtor with Bankruptcy Court approval, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the Debtor (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), on the one hand, and the holder of such Administrative Claim, on the other.  Debtor has entered into an agreement with Catholic Mutual wherein Catholic Mutual shall contribute $450,000.00 towards the administrative expenses of Debtor.  Debtor has also entered

---

[3] The Endowment Fund, Annuity Fund, Latin American Fund and Guatemala Fund are charitable programs internal to the Debtor, thus are not true creditors.

into an agreement with OneBeacon wherein OneBeacon will contribute $14,000.00 towards administrative expenses of Debtor. Such contribution of $450,000.00 and $14,000.00 shall assist in defraying professional fees, and such contributions shall be paid on or before the Effective Date.

### 4.2    Professional Claims

#### 4.2.1    Bar Dates for Professional Claims

All Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to any of §§ 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Case) shall file and serve on the Post-Confirmation Notice Parties an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than (A) forty-five (45) days after a notice of the Effective Date is filed with the Bankruptcy Court and served on such Professional or other Entities, or (B) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 45-day period (the "**Professional Claims Bar Date**").

#### 4.2.2    Objections to Professional Claims

Objections to Professional Claims or Claims of other Entities for compensation or reimbursement of expenses must be filed and served on the Post-Confirmation Notice Parties and the Professionals or other Entities to whose application the objections are addressed on or before (A) forty-five (45) days after the Professional Claims Bar Date or (B) such later date as (i) the Bankruptcy Court shall order upon application made prior to the end of such 45-day period or (ii) is agreed between the Debtor (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), as applicable, and the affected Professional or other Entity.

4.2.3    Notwithstanding anything contained in Section 4.2, the allowance of a Professional Claim shall not affect, impair, diminish or be an adjudication of any Claim that is excepted from the exculpation contained in Section 12.5.

### 4.3    U.S. Trustee Fees

All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Case is closed, and a Final Decree is entered. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and Debtor's Estate.

### 4.4    Priority Tax Claims

With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (i) pay such Claim in Cash as soon as practicable after the Effective Date, or (ii) provide such other treatment agreed to by the holder of such Allowed Priority Tax

Claim and the Debtor (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), as applicable, in writing, provided such treatment is no less favorable to the Debtor or the Reorganized Debtor than the treatment set forth in clause (i) of this sentence.

## SECTION V
## CLASSIFICATION OF CLAIMS

**5.1**     All Claims except Administrative Claims and Priority Tax Claims are placed in the following classes for all purposes including voting, confirmation of the Plan and Distribution pursuant to the Plan. A Claim is classified in a particular class only to the extent the Claim qualifies within the description of that class and is classified in a different class to the extent the Claim qualifies within the description of that different class. If a Claim is acquired or transferred, the Claim will be placed in the class where it would have been placed if it were owned by the original holder of such Claim. If a Claimant has more than one Claim in the same class, such Claims will be aggregated and treated as a single Claim. If a Claimant has Claims in different classes, such Claims will be aggregated only within the same class and not between classes.

5.1.1   Class 1 consists of Other Priority Claims. These are Claims entitled to priority under Section 507(a) (3) – (a) (7) and 507(a) (9) – (a) (10). These are Claims for unpaid wages, employee benefits Plan contributions and the like.

5.1.2   Class 2 consists of Holders of Secured Claims. Based upon the Debtor's Schedules and the proof of Claims filed in this Chapter 11 Case, the Debtor believes there are only three (3) Holders of Secured Claims. First Interstate Bank filed a proof of Claim based upon a loan in the amount of $2,940,980.54, which is secured by real property. The Debtor believes that the current amount due to First Interstate Bank is approximately $2,890,489.14. Ravalli Bank filed a proof of Claim based upon a loan in the amount of $926,992.72, which is secured by real property, and for which Debtor believes the current balance due is $868,715.20. The Foundation for the Diocese of Helena has a Claim based upon a loan in the current amount of $813,714.63, which is secured by real property. All Secured Claims are fully secured by property that the Debtor contends is held for the benefit of the Good Samaritan Ministries, Holy Rosary Parish and St. Francis of Assisi Parish, valued at $2,528,300, $3,179,657 and $3,579,015 respectively.

5.1.3   Class 3 consists of the Holders of General Unsecured Convenience Claims against the Debtor or Holders of Unsecured Claims who elect to be treated as a General Unsecured Convenience Claim. These Claims are unsecured creditors of Claims of $500.00 or less or who voluntarily reduce their Unsecured Claim to $500.00. Class 3 Claims total $2,706.38.

5.1.4   Class 4 consists of Tort Claimants.

5.1.5   Class 5 consists of Future Tort Claimants.

5.1.6   Class 6 consists of Holders of General Unsecured Claims that are not Class 3 General Unsecured Convenience Claims. These are Claims not secured by any interest in the Debtor's property and consist of any Claim against the Debtor that is not a Tort Claim, Future Tort Claim, Annuitant Claim, Administrative Claim, Abuse Related Contingent Claim,

Penalty Claim, Priority Tax Claim, Shaela Evenson Claim or Secured Claim or related to any fund set forth in footnote 3.. Based upon a review of the Debtor's Schedules, as well as filed proofs of Claim, the Debtor estimates that Class 6 Unsecured Claims total approximately $1,294,635.03, however it is anticipated that the Claim objection process, more particularly as to the Montana DEQ Claim, will result in a reduction of this amount to $850,000.00 range.  The Holders of Class 6 General Unsecured Claims are as follows:

> First Interstate Bank - $684,816.42
> Montana Pro Audio - $8,059.25
> Flint Creek Catholic Community - $611.00
> Jerry and Jan Cashman - $100,000.00
> Reverend Frank McCormick - $518.96
> Reverend Richard Sodja - $629.40
> Montana DEQ - $500,000.00

     5.1.7   Class 7 consists of Claims based upon a fine, penalty, forfeiture, punitive damages, or the like, not meant to compensate the Claimant for actual pecuniary loss.  The Debtor is unaware of any such Penalty Claims.  It is possible that Class 4 Tort Claimants may have included some type of Penalty Claim in their proofs of Claim.

     5.1.8   Class 8 consists of Holders of Claims against the Annuity Fund who are the current or future Annuitants receiving payments from such fund.  These Claims are backed by Annuity Fund investments of $1,260,519.00, which will be used to fund an estimated liability of $771,000.00.

     5.1.9   Class 9 consists of Abuse Related Contingent Claims.  These are Claims by an Entity against the Debtor for contribution, indemnity, or reimbursement arising as a result of such Entity's liability for paying or defending against any Tort Claim, including a joint tortfeasor or the like.

     5.1.10  Class 10 consists of the Claim of Shaela Evenson for wrongful termination. The Shaela Evenson Claim will be allowed to the extent determined in the litigation at Evenson v. Butte Central Catholic Schools, Case No. CV 14-55-BU-BWM-JCL, U.S. District Court for the District of Montana, Butte Division, subject to the limits of the policy of insurance that may be liable for such Claim.

     5.1.11  Class 11 consists of Deposit and Loan Fund Claims, which are listed on Schedule 2.38(b).

     5.1.12  Class 12 consists of Province Contribution Claim.  If the Province Settlement of $4.45 million is approved, the Class 12 Claim will be Disallowed in full.  If the Confirmation Order does not include the Province Channeling Injunction and the Province Alternate Settlement is effective, the Province Contribution Claim will be subject to the Province Contribution Claim Cap.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |

Second Amended Plan of Reorganization     22

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|:---:|---|---|---|
| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 4 | Tort Claims (Other than Future Tort Claims) | Impaired | Yes |
| 5 | Future Tort Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Penalty Claims | Impaired | Deemed to Reject |
| 8 | Annuitant Claims | Unimpaired | Deemed to Accept |
| 9 | Abuse Related Contingent Claims | Impaired | Deemed to Reject |
| 10 | Shaela Evenson Claim | Impaired | Yes |
| 11 | Deposit and Loan Fund Claims | Impaired | Yes |
| 12 | Province Contribution Claim | Impaired | Yes |

**5.2**      Except as provided in this Plan, the treatment in this Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Claimant may have against the Debtor or its property.  This treatment supersedes and replaces any agreements or rights those Claimants have in or against the Debtor or its property.  All Distributions under the Plan will be tendered to the Entity holding the Claim.  **EXCEPT AS SET FORTH IN THIS PLAN, NO DISTRIBUTIONS WILL BE MADE FROM AND NO RIGHTS WILL BE RETAINED AGAINST THE DEBTOR OR ITS PROPERTY ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

## SECTION VI
## TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS

### 6.1    Class 1: Other Priority Claims

The holders of Allowed Other Priority Claims, if any are determined to exist, will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed Claims in Cash, without interest on or as soon as practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed Claims upon such terms as may be agreed in writing by the Claimant and the Reorganized Debtor.

### 6.2    Class 2: Secured Claims

#### 6.2.1    Impairment and Voting

Class 2 is unimpaired under the Plan.  Holders of Secured Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.  For purposes of Distributions under the Plan, each holder of a Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2 (*i.e.*, Class 2-1, Class 2-2, *etc.*), and each such subclass is deemed to be a separate Class for purposes of the Plan.

#### 6.2.2    Alternative Treatment

On or as soon as practicable following the Effective Date, the Reorganized Debtor shall select, in its discretion, one of the following alternative treatments for each Allowed Secured Claim in Class 2, which treatment shall be in full and final satisfaction, settlement and release of, and in exchange for, such Allowed Secured Claim:

6.2.2.1    Abandonment or Surrender. The Reorganized Debtor shall abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim.

6.2.2.2    Cash Payment.  The Reorganized Debtor shall pay to the holder of such Claim Cash equal to the Allowed amount of such Claim upon the sale of the collateral, or such lesser amount to which the holder of such Claim and the Reorganized Debtor shall agree, in full satisfaction and release of such Claim.

6.2.2.3    Unimpairment.  The Reorganized Debtor may leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the requirements of the Bankruptcy Code.

#### 6.2.3    Unsecured Deficiency Claim

Any unsecured deficiency Claim asserted by a holder of an Allowed Secured Claim in Class 2 shall be filed with the Bankruptcy Court within thirty (30) days following the date of the abandonment or surrender of such Claimant's collateral or such Claimant's receipt of its Distribution.  Any Allowed unsecured deficiency Claim shall be treated in accordance with Section 7.3 of the Plan.  As of the date of this Plan no Unsecured Deficiency Claims exist.

### 6.3    Class 3: General Unsecured Convenience Claims

Each holder of Allowed General Unsecured Convenience Claims will receive either (a) payment from the Reorganized Debtor of the full amount of its Allowed General Unsecured Convenience Claim in Cash, on or as soon as reasonably practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of its Allowed General Unsecured Convenience Claim upon such terms as may be agreed in writing by the Claimant and the Reorganized Debtor.

### 6.4    Class 8: Annuitant Claims

Class 8 is unimpaired under the Plan.  Holders of Annuitant Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

## SECTION VII
## TREATMENT OF IMPAIRED CLASSES OF CLAIMS

### 7.1    Class 4:  Tort Claims (Other than Future Tort Claims)

7.1.1   On the Effective Date, (a) the Trust shall assume all liability for and the Trust will pay all Tort Claims (Other than Future Tort Claims) ("Class 4 Claims"); and each of the Tort Claimants shall assign his or her claims against the Protected Parties to the Trust, pursuant to the provisions of the Plan, Plan Documents, Confirmation Order and Trust Documents.  Tort Claimants shall have their Class 4 Claims treated pursuant to the General Allocation Plan, including review of such Claims by the Abuse Claim Reviewer in accordance with the General Allocation Plan.  If the Province Settlement is approved, Tort Claimants whose Claims are also Province Channeled Claims shall have such Province Channeled Claims treated pursuant to the Province Allocation Plan and will receive an additional distribution on account of such Province Channeled Claim from the Province Contribution.  Tort Claimants' awards under the General Allocation Plan shall not be diminished on account of any additional award such Claimants receive pursuant to the Province Allocation Plan.

7.1.2   Nothing in this Plan is intended to affect, diminish or impair any Tort Claimant's rights against any Co-Defendant, including that Co-Defendant's joint and several liability for Abuse, if any.

7.1.3   Debtor, the Reorganized Debtor and their counsel shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee as requested by the Abuse Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Allocation Plans.

7.1.4   No Tort Claimant may challenge the merit, validity, or amount of any Class 4 Claim.  Any objection to a Class 4 Claim pending as of the Effective Date is deemed withdrawn with prejudice.  The Trustee shall have the sole and exclusive right to object to a Class 4 Claim.  The Reorganized Debtor shall not have the right to object to a Class 4 Claim.

7.1.5   The Trust shall pay Class 4 Claims and any Province Channeled Claim that are also Class 4 Claims in accordance with the terms of the Plan, Plan Documents, Confirmation Order, Allocation Plans and Trust Documents.  The Trust shall not pay Class 4 Claims prior to the Effective Date.

7.1.6   The Distributions from the Trust are in full settlement of the Tort Claims, including the Province Channeled Claims if applicable, against the Protected Parties only.

7.1.7   If a Tort Claim or Province Channeled Claim is denied payment pursuant to the Allocation Plans, the holder of such Tort Claim or Province Channeled Claim will have no

further rights against the Debtor, Reorganized Debtor, the Trust, Trustee, or Protected Parties relating to such Tort Claim or Province Channeled Claim.

7.1.8   Before any Distribution(s) to Tort Claimants on account of their Tort Claims or Province Channeled Claims, the Trustee will subtract all Qualified Counsel Fees from the balance in a Trust subaccount in an amount equal to the total fees payable to Qualified Counsel by the beneficiaries of that Trust subaccount based on the reserves or Distributions calculated under the Allocation Plans.  The Trust shall pay such fees to Qualified Counsel as and when the Tort Claimant receives a Distribution from the Trust.

7.1.9   Before any Distribution(s) to Tort Claimants from a Trust subaccount (including a subaccount established with respect to such Tort Claimants' Province Channeled Claim) the Trustee will subtract all Qualified Counsel Costs from the balance in the applicable Trust subaccount in an amount equal to the unpaid reimbursable expenses (prepetition and postpetition through the Effective Date) payable to Qualified Counsel by the beneficiaries of that Trust subaccount.

7.1.10  Subject to the treatment of Qualified Counsel Fees and Qualified Counsel Costs pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive Distributions will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. The Protected Parties will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants.  The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions herein relating to Qualified Counsel Fees and Qualified Counsel Costs.

7.1.11  A Tort Claimant may withdraw a Tort Claim at any time on written notice to the Trustee.  If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, (b) as a condition to withdrawal of the Tort Claim, any funds paid to the Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust, and (c) any reserve maintained by the Trust on account of such Claim shall revert to the non-reserved assets of the Trust for Distribution in accordance with the Plan.

7.1.12  Each Tort Claimant participating in the Allocation Plans thereby consents to the use of $450,000.00 paid by Catholic Mutual and $14,000 paid by OneBeacon to the Diocese for the payment of Allowed administrative expenses.

**7.2      Class 5: Future Tort Claims**

7.2.1   On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Future Tort Claims (including Province Channeled Claims that are also Future Tort Claims) from the Future Tort Claims Reserve Fund pursuant to the provisions of the Plan and Trust Documents.  The Debtor or the Reorganized Debtor shall pay the costs of administering the Future Tort Claims Reserve Fund.  The Future Tort Claims Reserve Fund shall be the sole source of payment on account of Future Tort Claims  Whether or not a Future Tort Claim is paid or denied payment pursuant to the Allocation Plans, the Holder of such Future Tort Claim shall have no further rights against the Debtor, Reorganized Debtor, the Trust, Trustee, the Province or Settling Insurers relating to such Future Tort Claim.

7.2.2    Future Tort Claimants shall file Proofs of Claim substantially in form attached as Exhibit G to the Plan and shall include information sufficient for the Abuse Claims Reviewer to make an initial evaluation pursuant to Section 5.2(a) of the General Allocation Plan and an evaluation of the Claim pursuant to the evaluation factors in Section 5.2(b) of the General Allocation Plan.  Such Future Tort Claims shall be filed by submitting the claims to the Trustee at the address provided on the form.

7.2.3    Future Tort Claims (including Province Channeled Claims that are also Future Tort Claims) shall be treated pursuant to the General Allocation Plan, including review of such Claims by the Abuse Claim Reviewer in accordance with the General Allocation Plan. Fees payable to the Abuse Claims Reviewer for review of the Future Tort Claims shall be paid by the Debtor or the Reorganized Debtor.

7.2.4    Nothing in this Plan shall affect, diminish or impair any Future Tort Claimant's rights against any Co-Defendant, including that Co-Defendant's joint and several liability for Abuse.

7.2.5    The Debtor, the Reorganized Debtor and their counsel shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee as requested by the Abuse Claims Reviewer or the Trustee in connection with any inquiries by either in the administration of the Allocation Plans, including with respect to the initial evaluation in Section 5.2(a) of the General Allocation Plan.

7.2.6    No Future Tort Claimant may challenge the merit, validity, or amount of any Tort Claim or Future Tort Claim.  The Trustee has the sole and exclusive right to object to any Future Tort Claim.  Neither the Reorganized Debtor nor the Province shall have the right to object to a Future Tort Claim.

7.2.7    The Trust shall pay Future Tort Claimants in accordance with the terms of the Plan, Confirmation Order and Trust Documents, as follows:

(i)     The Trustee shall make a Distribution to Future Tort Claimants at least once during every twelve (12) months after the Effective Date.  The date of any such Distribution is referred to herein as a "Distribution Date."

(ii)    The maximum value of a point allocated to the Future Tort Claimants pursuant to the General Allocation Plan shall be equal to the average value of a point allocated to all other Tort Claimants who receive payment under the General Allocation Plan (such amount, the "Maximum Future Tort Claim Amount").

(iii)   During any twelve (12) month period, the Trustee shall distribute no more than (a) ten percent (10%) of the remaining Future Tort Claims Reserve Fund collectively to all Future Tort Claimants who have filed allowed Future Tort Claims as of a given Distribution Date and (b) four percent (4%) of the remaining Future Tort Claims Reserve Fund to any single Future Tort Claimant; provided, however, that the Trustee shall not distribute

Second Amended Plan of Reorganization     27

more than the Maximum Future Tort Claim Amount to any Future Tort Claimant; provided further, however, that upon any Distribution, the Trustee shall (x) first distribute funds to Future Tort Claimants who filed allowed Future Tort Claims after other Future Tort Claimants had already received a Distribution until Holders of such later filed Claims receive an amount equal (on a per point basis) to the amount already distributed to Future Tort Claimants who previously received a Distribution and (y) thereafter distribute additional available funds to all holders of allowed Future Tort Claims as of such Distribution Date.

(iv)    The Future Tort Claims Reserve Fund shall be dissolved upon the tenth (10th) anniversary of the Effective Date (the "Dissolution Date").  Upon the occurrence of the Dissolution Date, the Trustee shall distribute all remaining funds of the Future Tort Claims Reserve Fund to Holders of allowed Future Tort Claims who previously received point awards:  provided, however, that no single Tort Claimant shall be paid more than Maximum Future Tort Claim Amount. If any of the Future Tort Claims Reserve Fund remains after all Future Tort Claims who previously received point awards have been paid the Maximum Future Tort Claim Amount as of the Dissolution Date, then the remaining funds shall be distributed to all Tort Claimants and Future Tort Claimants based on the points allocated to each claim; provided, however, that to the extent there are not sufficient funds to pay an average of $50.00 to each Tort Claimant or Future Tort Claimant, then any remaining funds shall be donated to a non-profit organization in the United States selected by the Trustee (after notice and a hearing) that is dedicated to helping survivors of childhood sexual abuse.

7.2.8    The Distributions from the Trust are in full settlement of the Claims against the Protected Parties only.

7.2.9    The fees and expenses of attorneys representing Future Tort Claimants who receive payment from the Trust will be payable solely from the Future Tort Claims Reserve Fund from the amount awarded to such Claimant based on applicable state law and individual arrangements made between such Future Tort Claimants and their respective attorneys. The Protected Parties Trust, or the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Future Tort Claimants.

7.2.10    Penalty Claims will receive no distribution under the Plan.

7.2.11    A Future Tort Claimant may withdraw a Future Tort Claim at any time on written notice to the Trustee.  If withdrawn, (a) the Future Tort Claim will be withdrawn with prejudice and may not be reasserted, (b) as a condition to withdrawal of the Future Tort Claim, any funds paid to the Future Tort Claimant by the Trust (inclusive of attorneys' fees and costs) shall be returned to the Trust, and (c) any reserve maintained by the Trust on account of such

Claim shall revert to the non-reserved assets of the Trust for distribution in accordance with the Plan.

7.2.12    Any Tort Claimant who (a) is not a Province Claimant described on Exhibit J to the Plan and (b) asserts that he or she is a Holder of a Province Channeled Claim after the Confirmation Date shall have their Tort Claim treated as a Future Tort Claim; provided, however, that such Claimant shall not receive a Distribution greater than the Maximum Tort Claim Amount (as defined below) on account of such Holder's Tort Claim (including both the Tort Claim and the Channeled Province Claim together).

7.2.13    The Future Claims Representative consents to the use of $450,000 paid by Catholic Mutual and $14,000 paid by OneBeacon to the Diocese for the payment of Allowed administrative expenses.

### 7.3    Class 6: General Unsecured Claims

The holders of Allowed General Unsecured Claims will receive payment from the Reorganized Debtor of their Pro Rata share of the sum of $1,294,635.03, to be paid as soon as reasonably practicable after all General Unsecured Claims have either been Allowed or Disallowed, but subject to the filing and allowance of Claims under Section 502(h) of the Bankruptcy Code.[4]

### 7.4    Class 7:  Penalty Claims

Allowed Penalty Claims, if any, will be subordinated to all other Allowed Claims and will receive no Distribution.

### 7.5    Class 9: Abuse Related Contingent Claims

In accordance with Section 502(e)(1) of the Bankruptcy Code, each Abuse Related Contingent Claim held by any Entity against the Debtor shall be disallowed and will receive no Distribution.

### 7.6.    Class 10:  Shaela Evenson Claim

The Plan provides that the Holder of the Class 10 Claim shall be allowed to the extent determined in litigation in *Evenson v. Butte Central Catholic Schools*, Case No. CV14-55-BU-BWM-JCL, U.S. District Court, District of Montana.  The Claim shall be paid only through applicable insurance coverage.  Notwithstanding the definition of Tort Claimant, the Class 10 Claimant shall receive no other treatment or Distribution from the Debtor or the Trust under the Plan.

### 7.7    Class 11:  Deposit and Loan Fund Claims

Upon the Effective Date, the Deposit and Loan Transferred Assets and Liabilities shall be transferred to the Deposit and Loan Restoration Trust.  Each Holder of a Deposit and Loan Fund

---

[4] It is anticipated that certain Parishes or guarantors will contribute to payment of certain General Unsecured Claims, as appropriate, reducing Debtor's ultimate monetary responsibility for these Claims.  Nothing in this Plan modifies the obligations of any Parish or Entity as co-obligor or guarantor on any General Unsecured Claim.

Claim shall receive a pro rata beneficial interest in the Deposit and Loan Restoration Trust. The Holder of such Claim shall receive no other distribution from the Debtor under the Plan.

**7.8     Class 12:  Province Contribution Claim**

If the Province Settlement is approved and the Confirmation Order includes the Province Channeling Injunction, the Province Contribution Claim will be Disallowed. If the Province Settlement is approved without the inclusion of Province Channeling Injunction in the Confirmation Order, the Contribution Claim is subject to the Province Contribution Claim Cap. To the extent that the Province Contribution Claim is Allowed by Final Order, the Province will receive payments over a three (3) year period commencing from entry of the Final Order allowing the Province Contribution Claim.

## SECTION VIII
## ACCEPTANCE OR REJECTION OF PLAN

**8.1     Classes Entitled to Vote**

Each Claimant in Classes 4, 5, 6, 10, 11 and 12 are impaired and entitled to vote separately to accept or reject the Plan.

### 8.1.1    Presumed Acceptance of the Plan

Classes 1, 2, 3 and 8 are unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

### 8.1.2    Presumed Rejection of this Plan

Classes 7 and 9 are impaired and shall receive no Distribution and are, therefore, conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

**8.2     "Cram Down" Request**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied if an impaired Class of Claimants, accepts the Plan by a vote of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan. The Debtor requests confirmation of this Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept this Plan pursuant to Section 1126(c) of the Bankruptcy Code. The Debtor reserves the right to modify this Plan to the extent that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

## SECTION IX
## TRUST

**9.1     Establishment of Trust**

On the Confirmation Date, the Trust shall be established in accordance with the Trust Documents. The Trust shall qualify as a Qualified Settlement Fund pursuant to Section 468B of

the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

### 9.2     Funding

The Trust will be funded as follows:

9.2.1 Within ten (10) days after the Conditions to Effectiveness set forth in Section 11.1 (a), (b), and (c) have occurred, the Reorganized Debtor will pay to the Trust the sum of $2,000,000.00.

9.2.2 Within ten (10) days after the Settling Insurers receive written notice from the Trustee that the Conditions to Effectiveness set forth in Section 11.1 (a), (b), and (c) have occurred, the Settling Insurers will make payments to their respective attorneys' trust accounts as follows:

American Home:  Four Hundred Eighty Seven Thousand Five Hundred Dollars ($487,500);

Catholic Mutual:  Three Million Eight Hundred Thousand Dollars ($3,800,000);

Fireman's Fund:  Four Million Dollars ($4,000,000);

Great American Insurance:  Three Million Five Hundred Thousand Dollars ($3,500,000);

MIGA:  Five Hundred Thousand Dollars ($500,000);

OneBeacon:  One Hundred Thousand Dollars ($100,000); and

Travelers: Two Million Dollars ($2,000,000).

9.2.3  Within ten (10) days after the Settling Insurers receive written notice from the Trustee that all of the Conditions to Effectiveness set forth in Section 11.1 have occurred, the Settling Insurers shall cause their respective attorneys to pay to the Trust the amounts deposited in the attorneys' respective trust accounts pursuant to Section 9.2.2.

9.2.4  Within ten (10) days after the Conditions to Effectiveness set forth in Section 11.1(a), (b) and (c) have occurred and the Confirmation Order includes the Province Channeling Injunction, the Province will deliver the Province Contribution in the amount of Four Million Four Hundred Fifty Thousand Dollars ($4,450,000) in cash to the Province Escrow for distribution to the Trust of so much of the Province Contribution as the Debtor and the Committee have allocated to the Trust, but not less than $3,950,000 upon satisfaction of the conditions in the Province Escrow for delivery of such Province Contribution to the Trust.  Five Hundred Thousand Dollars ($500,000) of the $4.45 million Province Contribution shall be used for administrative expenses related to incorporation of the Province Settlement into the Plan and Disclosure Statement and the additional funding of the Future Tort Claims Reserve Fund by the Province.  Any remainder shall be delivered to the Trust for payment of Class 4 Claims.  The

Second Amended Plan of Reorganization     31

$500,000 may not be used for any other purpose. Notwithstanding the foregoing, if the Confirmation Order does not include the Province Channeling Injunction and the Province Alternate Settlement is effective, the Province will make the Province Contribution in the amount $3,950,000 in cash to the Reorganized Debtor for distribution to the Trust, but the Province shall not be obligated to make the Province Contribution under the Province Alternate Settlement unless and until the Province has received an executed Province Release from each Claimant asserted a Claim against the Province and the Province Litigation has been dismissed with prejudice in accordance with the terms of the Province Escrow. Upon Province Escrow's receipt of the Province Releases and Province Dismissals, the Province Escrow shall release the Province Contribution to the Trust and deliver the Province Dismissals in accordance with instructions from the Province.

9.2.5   Within ten (10) days after the Conditions to Effectiveness set forth in Section 11.1(a), (b), and (c) have occurred, the Debtor will be funded in the amount of $450,000.00 from Catholic Mutual and $14,000.00 from OneBeacon. Such amounts will not be paid to the Trust, but will be paid directly to the Debtor.

### 9.3    Reserve Accounts

As set forth in the Trust Agreement, the Trustee shall establish Reserves for various purposes.

### 9.4    No Execution

All property held in the Trust will remain property of the Trust until such time as the property actually has been paid to and received by an Entity entitled to receive payment pursuant to the terms of the Plan, Plan Documents, Confirmation Order, Allocation Plans and Trust Documents. Except as expressly provided in the Plan, Plan Documents, Confirmation Order, Allocation Plans and the Trust Documents, the Trust shall not be responsible for any Claims against the Debtor.

### 9.5    Trust Distributions

9.5.1   No Tort Claimant shall receive any Distribution unless and until the Tort Claimant has executed a written release of any and all Claims against all of the Protected Parties, all Entities insured by any of the Settling Insurers, and any of the Settling Insurers' reinsurers or retrocessionaires that, directly or indirectly, relate to the Tort Claims, the injuries or damages alleged by the Tort Claimants, or the Policies. This release shall be incorporated into the ballot for voting on the Plan. The release of any Tort Claimant that timely submits a ballot may be executed by the Tort Claimant's counsel of record if, in the same document that contains the release, counsel of record represents and warrants that he or she explained the terms and effects of the Plan and release to the Tort Claimant and has full authority to sign the ballot and release on behalf of the Tort Claimant. A Tort Claimant who does not timely submit a ballot must personally execute the release required by this Section 9.5.1. The Trust shall be obliged to provide copies of the Tort Claimants' releases to the Settling Insurers and the Province.

9.5.2   Before the Trustee makes the first Distribution to any Tort Claimant, the Trustee shall determine whether any Conditional Payment, as defined in 9.5.3.11.2, has been made to or on behalf of any Tort Claimant. If any Conditional Payment has been made to or on

behalf of any Tort Claimant, the Trustee shall, within the respective time period called for by the MSP, (i) reimburse the appropriate Medicare Trust Fund for the appropriate amount, and (ii) submit the required information for any Tort Claimant to the appropriate agency of the United States government.

9.5.3    The capitalized terms used in Section 9.5.3 are defined in Sections 9.5.3.9 and 9.5.3.11 and their subsections, or if not defined therein shall take the meanings ascribed in Sections I and II of this Plan.  It is the position of the Debtor that neither the Trust nor the Protected Parties will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA.  Prior to making any payments to any Claimants, the Trust shall seek a statement or ruling from the HHS that neither the Trust nor the Protected Parties have any reporting obligations under MMSEA with respect to payments to the Trust by the Protected Parties or payments by the Trust to Claimants.  Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Ninth Circuit or the United States Supreme Court), or a letter from the Secretary of HHS confirming that the Protected Parties have no reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to contributions the Protected Parties have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the Protected Parties and shall timely submit all reports that would be required to be made by any of the Protected Parties under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the Protected Parties were determined to be "applicable plans" for purposes of MMSEA, or any of the Protected Parties were otherwise found to have MMSEA reporting requirements.  The Trust, in its role as reporting agent for the Protected Parties, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

9.5.3.1        If the Trust is required to act as a reporting agent for the Protected Parties pursuant to the provisions of Section 9.5.3, the Trust shall provide a written certification to each of the Protected Parties within ten (10) Business Days following the end of each calendar quarter, confirming that all reports to CMS required by Section 9.5.3 have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance, and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

9.5.3.2        With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any of the Protected Parties, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, Claimants, guardians, conservators and/or other personal representatives, as applicable.  With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by any of the Protected Parties provide the Protected Parties copies of such resubmissions; provided, however, that the Trust may redact

from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, Claimants, guardians, conservators and/or other personal representatives, as applicable. In the event the Trust is unable to remedy any issue of noncompliance, the provisions of Section 9.5.3.6 shall apply.

9.5.3.3    If the Trust is required to act as a reporting agent for the Protected Parties pursuant to the provisions of Section 9.5.3, then with respect to each Claim of a Medicare Beneficiary that was paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any of the Protected Parties promptly provide the last four digits of the Claimant's Social Security number, the year of the Claimant's birth and any other information that may be necessary in the reasonable judgment of any of the Protected Parties to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event any of the Protected Parties inform the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS. All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

9.5.3.4    If the Trust is required to act as a reporting agent for the Protected Parties pursuant to the provisions of Section 9.5.3, the Trust shall make the reports and provide the certifications required by Sections 9.5.3 and 9.5.3.1 until such time as each of the Protected Parties determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust. Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in 9.5.3, and if any of the Protected Parties reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 9.5.3 and 9.5.3.1.

9.5.3.5    Section 9.5.3 is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that any of the Protected Parties are in fact "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

9.5.3.6    In the event that CMS concludes that reporting done by the Trust in accordance with Section 9.5.3 is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any of the Protected Parties a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any of the Protected Parties a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 9.5.3.1, 9.5.3.2, or 9.5.3.3 or other credible information, then each of the Protected Parties shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any party that elects to file its own reports such information as the electing party may require in order to comply with MMSEA, including, the

full reports filed by the Trust pursuant to Section 9.5.3 without any redactions. The Protected Parties shall keep any information they receive from the Trust pursuant to this Section 9.5.3.6 confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

       9.5.3.7      Notwithstanding any other provisions hereof, if the Trust is required to act as a reporting agent for any of the Protected Parties then such entities shall take all steps necessary and appropriate as required by CMS to permit any reports contemplated by this Section to be filed.  Furthermore, until the Protected Parties provide the Trust with any necessary information that may be provided by the CMS's Coordination of Benefits Contractor to effectuate reporting, the Trust shall have no obligation to report under Section 9.5.3 with respect to any such entity that has not provided such information, but only so long as such entity has not provided such information; and the Trust shall have no indemnification obligation under Section 9.5.3.10 to any of the Protected Parties for any penalty, interest or sanction that may arise solely on account of such Protected Parties' failure to timely provide such information to the Trust in response to a timely request by the Trust for such information.

       9.5.3.8      In connection with the implementation of the Plan, the Trustee shall obtain prior to making a Distribution to Claimants' counsel or the Claimant, if *pro se*, a certification from the Claimant to be paid that said claimant has provided for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim; otherwise the Trust shall withhold from any payment to the Claimant funds sufficient to assure that any obligations owing or potentially owing under MSP relating to such Channeled Claim are paid to CMS.  The Trust shall provide a quarterly certification of its compliance with this Section to each of the Protected Parties and permit reasonable audits by such entities, no more often than quarterly, to confirm the Trust's compliance with this Section. For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section regardless of whether any of the Protected Parties elects to file its own reports under MMSEA pursuant to Section 9.5.3.

       9.5.3.9      Before the Trustee makes the first payment to any Tort Claimant, that Claimant must provide a third-party vendor, which vendor has been approved by the Committee or the Trustee ("Approved Vendor") or, if no Approved Vendor has been retained by or on behalf of a Tort Claimant, the Trustee, with his or her name, date of birth, Social Security Number or Health Insurance Claim Number (collectively, the "Personal Information"), a signed Social Security Release Form or a Medicare Release form, or both, when requested by the Approved Vendor or the Trustee, as the case may be, and any other information or documents reasonably required to comply with Sections 9.5.3.9.1,  9.5.3.9.2, and 9.5.3.9.3.

       9.5.3.9.1    Each Medicare Beneficiary expressly authorizes the Approved Vendor or the Trustee, as the case may be, to use the Personal Information to submit a query to the Social Security Administration to verify whether he or she is a Medicare Beneficiary. Before the Trustee will pay any Tort Claimant who Claims that he or she is not a Medicare Beneficiary, the Tort Claimant will provide a letter  from an Approved Vendor supported by documentation from the Social Security Administration, received within ninety (90) days prior to the Trustee making such payment or, if no Approved Vendor has been retained by or on behalf of a Tort Claimant, documentation from the Social Security Administration received within ninety (90) days prior to the Trustee making such payment,

confirming that the Tort Claimant is not a Medicare Beneficiary. In the absence of such a confirming letter or documentation, each Tort Claimant will be presumed to be a Medicare Beneficiary.

9.5.3.9.2    Each Medicare Beneficiary expressly authorizes the Approved Vendor or the Trustee, as the case may be, to use the Personal Information to submit a query to the CMS, the CMS Coordination of Benefits Contractor ("COBC"), and/or the Medicare Secondary Payer Recovery Contractor ("MSPRC") to determine the amount of each and every Conditional Payment, if any, subject to reimbursement by a "primary plan," as the phrase is defined in Section 1395y(b)(2) of the MSP. Before the Trustee will pay any Medicare Beneficiary, such Medicare Beneficiary must provide the Trustee with a letter from the MSPRC ("MSPRC Letter") received within ninety (90) days prior to the Trustee making such payment: (a) setting forth the Conditional Payment estimate made to or on behalf of the Medicare Beneficiary that is subject to reimbursement by a "primary Plan," as the phrase is defined in Section 1395y(b)(2) of the MSP; or (b) stating that no such Conditional Payment has been made to or on behalf of the Medicare Beneficiary. If the MSPRC Letter sets forth a Conditional Payment estimate, no payment shall be made to such Medicare Beneficiary before the Trustee sets aside a reserve for the full amount of the Conditional Payment estimate, or pays a negotiated amount agreed to by the MSPRC and the Medicare Beneficiary. If the Trustee sets aside a reserve for the full amount of the Conditional Payment estimate, that reserved amount shall be withheld from the payment to the Medicare Beneficiary until the Conditional Payment estimate has been paid in full or a negotiated amount that has been agreed to by the MSPRC and the Medicare Beneficiary has been paid.

9.5.3.9.3    The failure by one or more Medicare Beneficiaries or other Tort Claimants to comply with these provisions shall not delay or impair the payment by the Trustee to any other Medicare Beneficiary or other Tort Claimant complying with these provisions.

9.5.3.9.4    If the Tort Claimant is the estate of a Tort Claimant, then the letters or documentation required pursuant to Section 9.5.3.9.1 and 9.5.3.9.2 need not be received by the Trustee within ninety (90) days of the date of payment by the Trustee to such Claimant, provided that the date of death of the Tort Claimant is at least ninety (90) days prior to the date of such letters or documentation.

9.5.3.9.5    Notwithstanding any of the above, a Tort Claimant can elect to provide the Trustee with the documentation from the Social Security Administration required pursuant to Section 9.5.3.9.1, or a Medicare Beneficiary can elect to provide the Trustee with the letter from MSPRC required pursuant to Section 9.5.3.9.2, without retaining an Approved Vendor and without providing an Approved Vendor or the Trustee with his or her Personal Information, except to the extent that such information is disclosed in such documentation or letter.

9.5.3.9.6    The Trust shall defend, indemnify and hold harmless the Protected Parties from any Claims in respect of Medicare Claims reporting and payment obligations arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the

Second Amended Plan of Reorganization     36

Trust's obligations under Section 9.5.3. The Trust shall not create a reserve for this potential obligation.

9.5.3.9.7   In the event of a violation or breach of Sections 9.5.3.9 and 9.5.3.9.1 through 9.5.3.9.7 herein, the Trust shall be liable to the Settling Insurers and the Province for compensatory damages, injunctive relief, attorneys' fees, costs, and expenses resulting from such breach or violation.

9.5.3.9.8   Subject to the provisions of Section 9.5.3 and its subsections, the Diocese agrees that the Trust and the Plan shall provide that the assets in the Trust shall be used solely for payment of indemnity and expenses relating to reimbursing the United States government for reimbursement obligations for Conditional Payments made pursuant to the MSP applicable to any given Medicare Beneficiary and, after satisfaction thereof, to such Medicare Beneficiaries and Tort Claimants. Except for the payment of the Settlement Amounts, none of the Settling insurers shall be obligated to make any other payments, including any payments to the Trust. Except for payments of the Province Contribution the Province shall not be obligated to make any other payments, including payments to the Trust.

9.5.3.9   Compliance with the provisions of this Section 9.5.3 shall be a material obligation of the Trust in favor of the Settling Insurers under their respective Insurance Settlement Agreements, and to the Province under the Province Settlement, which authorizes funding to the Trust.

9.5.3.10   The Trust shall defend, indemnify and hold harmless the Protected Parties from any Claims in respect of Medicare Claims reporting and payment obligations in connection with Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under this Section 9.5.3.10.

9.5.3.11   **Definitions Applicable to Sections 9.5.2 and 9.5.3**

The following definitions shall apply to Sections 9.5.2 and 9.5.3, only:

9.5.3.11.1   **"CMS"** means the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor Entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA and pursuing Claims under MSP, including Claims for reimbursement of payments made to Tort Claimants who recover from the Trust (**"Medicare Claims"**).

9.5.3.11.2   **"Conditional Payment"** means any payment made pursuant to Section 1395y(b)(2)(B) of the Medicare Secondary Payer Act, codified at 42 U.S.C. § 1395y, and the regulations promulgated thereunder, found at 42 C.F.R. § 411.1 *et. seq.*

9.5.3.11.3   **"HHS"** means the United States Department of Health and Human Services.

Second Amended Plan of Reorganization     37

9.5.3.11.4 **"Medicare Beneficiary"** means any individual who has received or is eligible to receive benefits under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, enacted July 1, 1966, including all subsequent amendments thereto, and is the holder of a Channeled Claim.

9.5.3.11.5 **"Medicare Secondary Payer Act"** or **"MSP"** means 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules or regulations issued in connection therewith or amendments thereto.

9.5.3.11.6 **"MMSEA"** means Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Entities with payment obligations under the MSP.

9.5.4   On the first Business Day following the date that (a) the Trust has paid all of its funds to Claimants and (b) complied with all of its obligations pursuant to Sections 9.5.3 – 9.5.3.11, the Trust shall terminate, and shall have no further obligation under Section 9.5.3.11.

9.5.5   No Admission

Section 9.5.3 and its subsections are intended to be purely prophylactic in nature, and do not imply, and shall not constitute an admission that the Debtor, any Settling Insurer or the Province are in fact "applicable plans" within the meaning of the Medicare, Medicaid and SCHIP Extension Act of 2007, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under Medicare, Medicaid and SCHIP Extension Act of 2007 or any other statute or regulation.

9.5.6   Delay Re Failure To Comply

The failure by one or more Medicare Beneficiaries, Tort Claimants or Future Tort Claimants to comply with these provisions shall not delay or impair the payment by the Trustee to any other Medicare Beneficiary, Tort Claimant or Future Tort Claimant who is complying with these provisions.

**SECTION X**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**10.1   Funding of Plan**

Cash in the total amounts set forth in Section 9.2 shall be contributed by wire transfer to the Trust by or on behalf of the Debtor and Settling Insurers, and, to the extent required by the Province Settlement, the Province.  The source of the payments to the Trust, the payments to the other creditors and to the Reorganized Debtor for post Effective Date operating capital shall be Cash on hand, the proceeds of the Insurance Settlement Agreements, the Province Contribution, sales of real and personal property (including the sales under the Insurance Settlement Agreements), the Placid Enterprises, LLC Loan, borrowings and contributions.

On entry of the Confirmation Order, the Debtor and the Reorganized Debtor shall be authorized to enter into the Placid Enterprises, LLC Loan and to perform all of the borrower's

obligations thereunder.  The Placid Enterprises, LLC Loan shall be binding on the Reorganized Debtor and any successors thereof.

The Diocese is creating operating budgets to minimize expenses while continuing to provide for pastoral and administrative programs as required by Canon Law.  The goals for the annual appeal and the rate for the assessment to parishes have been raised.  The Debtor is confident through increased giving, through decreased expenses, by having current and accurate financial reporting, and through the pledges of cooperation by the various parishes and programs to assist in Debtor's reorganization efforts, that Debtor will reorganize successfully.  Readers are referred to the Disclosure Statement for further detail on the Debtor's efforts and goals to emerge successfully from bankruptcy.

### 10.2     Insurance Settlement Agreements

The Insurance Settlement Agreements are binding on the Trust, the Diocese Parties, the Claimants and the Settling Insurers, and any of their successors.

### 10.3     Debtor Waiver and Release of Claims Against Settling Insurers

As set forth in the Insurance Settlement Agreements, in consideration of the monetary contributions provided by each Settling Insurer and other consideration to be provided by each Settling Insurer, the Debtor irrevocably and unconditionally, without limitation, shall release, acquit, and forever discharge all Settling Insurers from any and all Claims and/or Causes of Action against any Settling Insurer, or the property thereof, except that the Debtor and Catholic Mutual shall retain all rights and obligations under any Claims-made certificates or policies of insurance issued or allegedly issued by Catholic Mutual to the Diocese Parties for a policy period July 1, 2014 through July 1, 2015 and the two immediately prior policy periods, *i.e.*, July 1, 2012 through July 1, 2013, and July 1, 2013 through July 1, 2014, other than with respect to Tort Claims, for which the Debtor has waived coverage and released Catholic Mutual.

### 10.4     Province Settlement

The Province Settlement is binding on the Trust, the Diocese Parties, and the Claimants, and any of their successors.

### 10.5     Debtor Waiver and Release of Claims Against Province

In consideration of the Province Settlement at $4.45 million, and other consideration provided and to be provided by the Province, the Debtor irrevocably and unconditionally, without limitation, releases, acquits, and forever discharges the Province from any and all Claims and/or Causes of Action against it or its property.  If the Province Alternate Settlement is in effect at $3.95 million, the Debtor does not release, acquit, or forever discharge the Province from and all Claims and/or Causes of Action it may have against the Province or its property but only for purposes of asserting any defense, recoupment, or setoff with respect to the Province Contribution Claim; for all other purposes, the Debtor irrevocably and unconditionally, without limitation, releases, acquits, and forever discharges the Province from any and all Claims and/or Causes of Action against it or its property.

### 10.6    Additional Documentation; Non-Material Modifications

From and after the Effective Date, the Trustee, the Reorganized Debtor, the Settling Insurers and the Province shall be authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Plan and Plan Documents without further Order of the Bankruptcy Court. Additionally, the Trustee, the Reorganized Debtor, the Settling Insurers and the Province may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement, subject to Bankruptcy Court approval, provided that the amendment or modification does not materially and adversely change the treatment of any holder of a Class 4 Claim without the prior written agreement of such holder. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented hereunder, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class. An Order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section X shall constitute an Order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

### 10.7    Closing

Closing will be conducted at such location designated by the Debtor and the Committee, as soon as reasonably practicable following the Effective Date for the purpose of the Reorganized Debtor executing and delivering the Plan Documents and completing those actions necessary for the Reorganized Debtor to establish and fund the Trust and make other Distributions required to be made upon, or promptly following, the Effective Date in accordance with the terms of the respective Insurance Settlement Agreements.  As soon as practicable after conditions set forth in Section XI have been satisfied or waived in accordance with Section XI, the Trustee shall file notice of the Closing and the occurrence of the Effective Date.

### 10.8    Obligations of the Reorganized Debtor

The Reorganized Debtor will:

a) In the exercise of its respective business judgment, review all Claims filed against the Estate except for Tort Claims and, if advisable, object to such Claims;

b) After the Effective Date, not object to any Tort Claims. Notwithstanding the foregoing, the Reorganized Debtor may provide the Abuse Claims Reviewer with information regarding Tort Claims.

c) Honor the Debtor's obligations arising under any settlement agreement that has been approved by the Bankruptcy Court; and,

d) Perform all of its obligations under this Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

### 10.9    Objections to Claims

Objections to a Claim (except for Tort Claims) as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Bar Date.  Any objections to Claims by the Reorganized Debtor will be filed and served not later than sixty (60) days after the later of (i) the Effective Date or (ii) the date such Claim is filed, provided that the Reorganized Debtor may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any Entity, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.  No party other than the Trustee may object to a Tort Claim.

### 10.10   Provisions Governing Distributions

#### 10.10.1      Distribution To Holders of Claims

Except as otherwise provided in the Plan, Distributions will be made only to the holders of Allowed Claims and in the case of Tort Claims, pursuant only to the Plan, Plan Documents and Trust Documents.  Until a Disputed Claim becomes an Allowed Claim, the holder of that Disputed Claim will not receive any Distribution otherwise provided to the Claimants under this Plan or the Plan Documents. If necessary in determining the amount of a Pro Rata Distribution due to the holders of Allowed Claims in any class, the Reorganized Debtor or the Trustee, as applicable, will make the Pro Rata calculation as if all Unresolved Claims were Allowed Claims in the full amount Claimed or in the Estimated Amount.  When an Unresolved Claim in any class becomes an Allowed Claim, the Reorganized Debtor or the Trustee, as applicable, will make full or partial Distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

#### 10.10.2      Transmittal of Distributions

Except as otherwise provided in this Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to Tort Claimants will be made by the Trustee and Distributions to all other Claimants will be made by the Reorganized Debtor.  Distributions to Tort Claimants will be made (a) to the client trust account for attorneys of record of Tort Claimants, (b) if the Tort Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of Claim filed with the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor or Trustee, as applicable, by such Claimant in writing, or (c) if no such proof of Claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor or Trustee, as applicable, to the mailing address set forth in the schedules filed by the Debtor in this Case.  Distributions to other Claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the Claimant, (b) if the Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of

Claim filed with the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor, as applicable, by such Claimant in writing, or (c) if no such proof of Claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, to the mailing address set forth in the schedules filed by the Debtor in this Case. If a Claimant's Distribution is not mailed or is returned to the Reorganized Debtor or Trustee because of the absence of a proper mailing address, the Reorganized Debtor or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address.  The Trustee shall have no liability to a Tort Claimant on account of Distributions made to the client trust account of a Tort Claimant's attorney.

### 10.10.3       Timing of Distributions

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under this Plan, the Allocation Plans or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by this Plan or any applicable agreement or instrument.

Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Trustee as undeliverable, or is deemed to be an undeliverable Distribution, provide the Trustee with a written notice asserting its Claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any Claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtor, the Trust, the Settling Insurers, the Trustee or their property.  Any undeliverable Distributions that are not claimed under this Section will become available to distribute to other Claimants or be retained by the Reorganized Debtor in accordance with the Plan.  Nothing in the Plan requires the Reorganized Debtor, the Trust or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

### 10.10.4       Negotiation of Instrument

If an instrument delivered as a Distribution to a Claimant is not negotiated within one hundred and twenty (120) days after such instrument was sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and it shall become Cash available to the Trustee for any Trust purpose or the Reorganized Debtor, as the case may be.

### 10.10.5       Form of Distributions

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution, all Distributions will be made, at the option of the Reorganized Debtor or Trustee, by a check by first class mail, postage prepaid, or wire transfer.

10.10.6        **No Professional Fees or Expenses**

No professional fees or expenses incurred by a Claimant will be paid by the Debtor, the Reorganized Debtor, the Settling Insurers or the Trustee with respect to any Claim except as specified in this Plan or the Trust Documents.

**10.11   Reservation of Rights to Object to Claims Other Than Tort Claims**

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any and all rights, interests and objections of the Debtor, or the Estate to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured or unsecured (but not Tort Claims), whether under the Bankruptcy Code, other applicable law or contract. The Debtor's failure to object to any Claim in the Chapter 11 Case shall be without prejudice to the Reorganized Debtor's rights to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the holder of such Claim.

**10.12   Service of Objections**

An objection to a Claim shall be deemed properly served on the holder of such Claim if the objector effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Claimant is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such holder in the Chapter 11 Case.

**10.13   Determination of Claims**

From and after the Effective Date, any Claim (except for Tort Claims) as to which a proof of Claim or motion or request for payment was timely filed in the Chapter 11 Case or deemed timely filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties without the need for Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtor, the Reorganized Debtor, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section 10.11 shall constitute or be deemed a waiver of any Claims, rights, interests or Causes of Action that the Debtor or the Reorganized Debtor may have against any Entity in connection with or arising out of any Claim or Claims, including any rights under

Second Amended Plan of Reorganization      43

28 U.S.C. § 157. Notwithstanding the foregoing, no party in interest other than the Trustee may object to a Tort Claim.

### 10.14   No Distributions Pending Allowance

No Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Reorganized Debtor may, in its discretion, make a Distribution on account of the portion of such Claim that is an Allowed Claim.

### 10.15   Claim Estimation

In order to effectuate Distributions and avoid undue delay in the administration of the Chapter 11 Case, the Reorganized Debtor, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502I of the Bankruptcy Code, estimating or limiting, on account of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for Distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502I of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate a Tort Claim.

### 10.16   Timing of Distributions S/A/P Claims

On the Effective Date, the Reorganized Debtor shall establish the S/A/P Claims Reserve for all Disputed S/A/P Claims and Allowed S/A/P Claims not paid prior to the Effective Date. As soon as practicable after (and to the extent) that a Disputed S/A/P Claim becomes an Allowed S/A/P Claim, the Reorganized Debtor shall make a payment from the S/A/P Claims Reserve to the holder of such Claim in the Allowed amount of such Claim. After (and to the extent) a Disputed S/A/P Claim is determined not to be an Allowed S/A/P Claim, the portion of the S/A/P Claims Reserve reserved for such Claim shall be released from the S/A/P Claims Reserve and distributed or retained by the Reorganized Debtor, as applicable, pursuant to the terms of the Plan.

### 10.17   Judgment Reduction.

10.17.1     In any proceeding, suit or action involving any of the Diocese Parties or the Trust, as applicable, and one or more Non-Settling Insurer, where any Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against any Settling Insurer, then any judgment obtained by a Diocese Party or the Trust against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such Settling Insurer would have been liable to pay such Non-Settling Insurer as a result of the Non-Settling Insurer's Contribution Claim so that the Contribution Claim by such Non-Settling Insurer against the Settling Insurer is thereby satisfied and extinguished entirely. The Diocese Parties and the Trust further agree that,

in order to effectuate this clause in any action against a Non-Settling Insurer where the Settling Insurers are not parties, the Diocese Parties or the Trust, as applicable, shall obtain a finding from that court of what amount the Settling Insurers would have been required to pay such Non-Settling Insurer under its Contribution Claim, before entry of judgment against such Non-Settling Insurer.

   10.17.2  In any settlement agreement between a Diocese Party or the Trust, as applicable, and one or more Non-Settling Insurers, where any Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against a Settling Insurer, then any settlement amount agreed by the settling parties shall be automatically reduced by the amount, if any, that the Settling Insurer would have been liable to pay such Non-Settling Insurer as a result of the Non-Settling Insurer's Contribution Claim so that the Contribution Claim by such Non-Settling Insurer against the Settling Insurer is thereby satisfied and extinguished entirely. In the event that the settling parties are unable to agree on the amount of the Contribution Claim being extinguished, the settling parties shall obtain a finding from a court of competent jurisdiction of what amount the Settling Insurer would have been required to pay such Non-Settling Insurer under its Contribution Claim.

### 10.18 Insurance Neutrality

(a) Nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to impair or diminish, or have the effect of impairing or diminishing, the Non-Settling Insurer's legal, equitable or contractual rights, if any, against any Entity other than the Settling Insurers, including any rights under any policies of insurance issued to, or providing coverage to, the Diocese and/or any agreements related thereto, if applicable. Nothing in this Section 10.18(a) shall: (i) impair or diminish, or have the effect of impairing or diminishing, any Non-Settling Insurer's rights under the Confirmation Order or the Plan; or (ii) preclude the entry or effectiveness of the injunctions set forth in Section XII hereof or the judgment reduction provisions in Section 10.17 hereof; provided, however, Section XII of the Plan shall not operate as an injunction against or release of the Diocese's obligations to any Non-Settling Insurer.

(b) Except as set forth below in this Section 10.18(b), nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to impair or diminish, or have the effect of impairing or diminishing, the Settling Insurers' legal, equitable or contractual rights, if any, in any respect, including any rights under the Policies, if applicable, and the Insurance Settlement Agreements, as applicable; provided, however, this Section 10.18(b) shall not preclude the entry or effectiveness of the injunctions set forth in Section XII hereof or the judgment reduction provisions in Section 10.17 hereof. Nothing in this Section 10.18 shall impair or diminish, or have the effect of impairing or diminishing, any of the Settling Insurers' rights under the Confirmation Order, the Plan or the Insurance Settlement Agreements.

### 10.19 Insurance Preservation

Nothing in the Plan or the Confirmation Order (including any other provision that purports to be preemptory or supervening), except for Section 10.17 of the Plan, is intended to impair or modify the Debtor's rights under (a) any policy of insurance issued by a Non-Settling Insurer or (b) any Claims-made certificates or policies of insurance issued or allegedly issued by Catholic

Mutual to the Diocese Parties for a policy period of July 1, 2014 through July 1, 2015, and the two immediately prior policy periods, i.e., July 1, 2012 through July 1, 2013, and July 1, 2013 through July 1, 2014, other than with respect to Tort Claims, for which the Debtor has waived coverage and released Catholic Mutual.   To the extent the Diocese has obligations on any policies of insurance and/or any agreements related thereto, the Diocese shall be liable in full for such obligations regardless of whether the obligations arise before or after the Effective Date.

### 10.20   No Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Claimant and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Claimant shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Plan Documents, Confirmation Order or Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.   Nothing herein affects the obligations of any co-obligor or guarantor with respect to such interest.

### 10.21   Withholding Taxes

The Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution, the Reorganized Debtor may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

### 10.22   Closing of the Case

As soon as practicable after the Effective Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Case shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, the Trustee, or any other party in interest to reopen the Case for any matter over which the Bankruptcy Court or the U.S. District Court for the District of Montana has retained jurisdiction under this Plan.   Any order closing this Case will provide that the Bankruptcy Court or the U.S. District Court for the District of Montana, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Case, and the obligations created by this Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under this Plan and the Plan Documents.

### 10.23   No De Minimis Distributions

Notwithstanding anything to the contrary in this Plan, no Distribution of less than $100 will be made by the Reorganized Debtor or the Trustee to any Holder of an Allowed Claim.   No consideration will be provided in lieu of the unpaid amounts that are not made under this

Section.  Allowed Claims that are entitled to a Pro Rata Distribution of less than $100 shall continue to accrue until such time as the Pro Rata Distribution on account of such Claim will be $100 or more.

### 10.24   Manner of Payments

Payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or, at the Trustee's option, by wire transfer from a domestic bank.  Payments to foreign Claimants may be paid, at the Trustee's option, either in the same manner as payments to domestic Entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

**SECTION XI**
**CONDITIONS PRECEDENT**

### 11.1   Conditions to Effectiveness

The Effective Date will occur when each of the following conditions have been satisfied or waived in accordance with Section 11.2 of this Plan:

    (a)   The Bankruptcy Court shall have entered an order or orders approving all Insurance Settlement Agreements and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to each of those parties, and such order or orders shall have become Final Orders, and no stay of such Orders shall be in effect;

    (b)   The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor, the Committee, the Settling Insurers, the Province and the Confirmation Order shall have become and be a Final Order and not stayed;

    (c)   The Trustee and Reorganized Debtor have signed the Trust Agreement;

    (d)   Counsel for the Debtor and counsel for each of the Settling Insurers have notified each other, counsel for the Committee, and the Trust that their clients have made the payments described in Sections 9.2.1 and 9.2.2 of the Plan.

### 11.2   Waiver of Conditions

Any condition set forth in Section XI of this Plan may be waived by the mutual written consent of the Proponents, and the Settling Insurers, and, if the Province Settlement is approved, the Province.

### 11.3   Non-Occurrence of Effective Date

Unless the Bankruptcy Court orders otherwise, in the event that the Effective Date does not occur within ninety (90) days of entry of a Final Order or Final Orders confirming the Plan and approving all Insurance Settlement Agreements, the Plan shall become null and void.  A statement shall be filed with the Court within three (3) Business Days after either the Effective Date or the occurrence of any event that renders the Plan null and void.

# SECTION XII
## EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

### 12.1    Discharge

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE DISCLOSURE STATEMENT, NOTHING CONTAINED IN THE PLAN SHALL CONSTITUTE A RELEASE OF ANY TORT CLAIM OR CONSTITUTE AN INJUNCTION AGAINST PROSECUTION OF A TORT CLAIM AGAINST (A)  AN ENTITY THAT BECOMES A SUCCESSOR OF THE DEBTOR AFTER THE EFFECTIVE DATE, TO THE EXTENT SUCH SUCCESSOR'S  LIABILITY FOR AN ACT OR ACTS OF ABUSE, IS INDEPENDENT OF THE DEBTOR'S LIABILITY AND SUCH ENTITY IS NOT A PROTECTED PARTY AND (B) A PERPETRATOR.  THE DISCHARGE AND INJUNCTION PROVISIONS OF THE PLAN DO NOT APPLY TO (A) THE OBLIGATIONS ARISING UNDER THE INSURANCE SETTLEMENT AGREEMENTS APPROVED BY THE BANKRUPTCY COURT, WHICH ARE NOT AND WILL NOT BE DISCHARGED; (B) AN ENTITY THAT BECOMES A SUCCESSOR TO THE DEBTOR AFTER THE EFFECTIVE DATE, TO THE EXTENT SUCH SUCCESSOR'S LIABILITY FOR AN ACT OR ACTS OF ABUSE IS INDEPENDENT OF THE DEBTOR'S LIABILITY AND SUCH ENTITY IS NOT A PROTECTED PARTY; AND (C) THE OBLIGATIONS ARISING UNDER THE PROVINCE SETTLEMENT APPROVED BY THE BANKRUPTCY COURT, WHICH ARE NOT AND WILL NOT BE DISCHARGED.  TORT CLAIMS BASED ON ABUSE THAT HAPPENED AFTER THE PETITION DATE WILL NOT BE DISCHARGED, RELEASED OR IMPAIRED, WITH THE EXCEPTION OF ANY SUCH CLAIMS AGAINST THE SETTLING INSURERS.

On the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor will be discharged from all liability for any and all Claims that arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of this Case, including all Tort Claims (except as provided in Section 12.1.1 of the Plan) and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; or (c) the holder of such Claim has accepted this Plan.  Nothing contained in this paragraph shall affect, impair or diminish the Debtor's indemnification obligations under the Insurance Settlement Agreements, which obligations are excepted from the Debtor's discharge.

### 12.1.1  Postpetition Tort Claims

Notwithstanding Section 12.1 of the Plan, Tort Claims against the Debtor based on Abuse that happened after the Petition Date will not be discharged, released or impaired.  To the extent any such Claim is against a Settling Insurer, such Claim is enjoined pursuant to the injunctions in this Section XII.

## 12.2    Vesting of Assets

In accordance with §§ 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Revested Assets shall revest in the Reorganized Debtor on the Effective Date free and clear of all Interests of any Entity, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Entity, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

## 12.4    Continued Existence of Reorganized Debtor

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as A separate Entity in accordance with the applicable laws of the States of Montana, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501I(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

## 12.5    Exculpation and Limitation of Liability

**Except as expressly provided in this Plan, none of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any Claimant, any other party in interest, or any of their respective Representatives, financial advisors, or Affiliates, or any of their successors or assigns, for any act or omission in or relating to this Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the Trust, except liability for their willful misconduct or gross negligence (provided, however, the Debtor and Reorganized Debtor will be discharged from any such liability for such acts or omissions occurring prior to the Effective Date) and in all respects, such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Case. Without limiting the generality of the foregoing, the Debtor and its members, financial advisors, and other professionals shall be entitled to and granted the benefits of § 1125(e) of the Bankruptcy Code.**

**The Settling Insurers, the Province, the Reorganized Debtor, the Trust, the Trustee and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental entity or insurer, on account of payments made to a Tort Claimant, including any liability under the Medicare Secondary Payer Act.**

## 12.6 A  Channeling Injunction

**In consideration of the undertakings of the Protected Parties pursuant to their respective settlements with the Debtor, the funding of the Trust, and other consideration, and to further preserve and promote the agreements between and among the Protected Parties and the protections afforded the Protected Parties and pursuant to Section 105 of the Bankruptcy Code:**

Second Amended Plan of Reorganization    49

(a) any and all Channeled Claims, excluding Claims against the Province, are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims, excluding Claims against the Province; and

(b) all Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any of the Protected Parties, excluding the Province, including:

    (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties (excluding the Province) or against the property of any of the Protected Parties (excluding the Province);

    (ii) enforcing, attaching, collecting or recovering, by any manner or means, from any Protected Parties (excluding the Province), or from the property of any Protected Parties, excluding the Province, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Protected Parties (excluding the Province);

    (iii) creating, perfecting or enforcing any lien of any kind against any Protected Parties (excluding the Province), or the property of any Protected Parties (excluding the Province) with respect to any such Channeled Claim; and

    (iv) asserting, implementing or effectuating any Channeled Claim of any kind against:

        (1) any obligation due any Protected Parties (excluding the Province);

        (2) any Protected Parties (excluding the Province); or

        (3) the property of any Protected Parties (excluding the Province).

    (v) taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and

    (vi) asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due any of the Protected Parties (excluding the Province,) or the property of the Protected Parties (excluding the Province).

**12.6 B Province Channeling Injunction**

In consideration of the undertakings of the Province pursuant to its respective settlements with the Debtor, the funding of the Trust, and other consideration, and to further preserve and promote the agreements between and among the Province and the Plan Proponents and the protections afforded the Province, and pursuant to Section 105 of the Bankruptcy Code:

Second Amended Plan of Reorganization     50

(a)    any and all Province Channeled Claims against the Province are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Documents as the sole and exclusive remedy for all holders of Province Channeled Claims against the Province; and

(b)    all Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Province Channeled Claim against the Province, or any of the other Diocese Parties, whether or not such Entity has received or will receive any Distribution under the Plan, are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Province Channeled Claim against the Province, including:

    (i)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any Province Channeled Claim against the Province, or against the property of any of the Province;

    (ii)    enforcing, attaching, collecting, or recovering, by any manner or means, from the Province, or from the property of the Province, with respect to any such Province Channeled Claim, any judgment, award, decree, or order against Province;

    (iii)    creating, perfecting or enforcing any lien of any kind against the Province, or the property of the Province, with respect to any such Province Channeled Claim; and

    (iv)    asserting, implementing or effectuating any Province Channeled Claim of any kind against:

        (1)    any obligation due the Province;

        (2)    the Province; or

        (3)    the property of the Province.

    (v)    taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan;

    (vi)    asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Province or the property of the Province.

**12.7    Supplemental Injunction Preventing Prosecution Of Claims Against Settling Insurers**

Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including any of the Settling Insurers' purchases of Policies from the Diocese Parties free and clear of all Interests pursuant to Section 363(f) of the Bankruptcy Code, any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Future Tort Claimants, Perpetrators, Non-Settling Insurers, and all others holding Interests of any kind or nature

whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Protected Parties, Insured Entities, or the Policies, which, directly or indirectly, relate to, any of the Policies, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers, Insured Entities, and/or the Policies, including:

      (a)    Commencing or continuing in any manner any action or other proceeding against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

      (b)    Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

      (c)    Creating, perfecting, or enforcing any lien of any kind against the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities;

      (d)    Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Settling Insurers or the Insured Entities or the property of the Settling Insurers or the Insured Entities; and,

      (e)    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

## 12.8   Insurance Settlement Agreement Injunctions

Any injunction contained in an Insurance Settlement Agreement is incorporated into the Plan by reference, is deemed fully set forth in this Plan, is approved and is in addition to the injunctions expressly set forth in this Plan.

## 12.9   Term of Injunctions or Stays and Confirmation of Settlements With Settling Insurers

On the Effective Date, the injunctions provided for in this Plan shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable. All injunctions and/or stays provided for in this Plan, the injunctive provisions of Sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased its Policies in a Section 363 Sale, are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified. The Insurance Settlement Agreements previously authorized by the Bankruptcy Court are hereby affirmed and any obligations of Debtor with respect to such Insurance Settlement Agreements are excepted from the Debtor's discharge and shall be assumed by the Reorganized Debtor and Trust, as applicable, on the Effective Date.

### 12.10   Limitation of Injunction and Discharge

Notwithstanding any provision of this Plan, the foregoing injunctions and discharge preventing prosecution of Tort Claims against Protected Parties provides absolutely no protection to a Perpetrator.

## SECTION XIII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 13.1   Assumed Employee and Retiree Benefit Plans

To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor is a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

### 13.2   General; Assumed if Not Rejected

Subject to the requirements of Section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor.  In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.

### 13.3   Claims for Contract Rejection

All proofs of Claim based on the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the Effective Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for the filing of Claims arising from such rejection, proofs of Claim with respect thereto must be filed within 30 days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Final Order, or such Claims will be forever barred.

## SECTION XIV
## COMMITMENTS

### 14.1   Nonmonetary Commitments

In order to further promote healing and reconciliation, and in order to continue the Plan Proponents' efforts to prevent sexual abuse from occurring in the Diocese of Helena, the Debtor and Reorganized Debtor agree that beginning thirty (30) days after the Effective Date (unless a different date is provided below):

Second Amended Plan of Reorganization     53

For a period of not less than ten (10) years from the Effective Date, the Diocese will post on its website home page the names of all known past and present alleged perpetrators of the Diocese who are identified in the Sexual Abuse Claims or the complaints filed in the *Whalen* and *Does* cases as child sexual abusers between the 1930's and 1970's, including Joseph Balfe, James Barry, Brynes (first name unknown), Callan (first name unknown), Thomas Connolly, John Delane, Farther Delaney, M.A. (first name unknown), Harper (first name unknown), Bernard Harris, Robert Hartman, John (last name unknown), Paul Kirchen, Larson (first name unknown), Emmett Lowney, Egon Mallman, McCarthy (first name unknown), James McCormick, Gabriel Menager, Joseph Obersinner, O'Brien (first name unknown), Martin Phillipsen, Peter Pritzl, Edmund Robinson, Wilson Smart, Sorisio (first name unknown), Leonard Spraycar, Patrick Stimatz, Sullinger (first name unknown) Sullivan (first name unknown), Louis Taelman, Rufina Karges "Mother Loyola," Frances Seymor "Mother Cecelia," Sister John (last name unknown), Sister Marion (last name unknown), Sister Monica (last name unknown), Sister Glennyatoss (last name unknown), Sister Margaret (last name unknown), Sister Rita (last name unknown), Sister Henrietta (last name unknown), Sister Mary Laurence (last name unknown), Sister Camilla (last name unknown);

The Ursulines reserve the right to file a statement of position that in substance provides:  The Province understands the Debtor has committed for itself to publish the foregoing names as past and present alleged perpetrators of the Diocese.  The Province, in settling the state court litigation to avoid further expense, has not had the opportunity to evaluate claims against any of these individuals to determine whether the allegations of abuse claims are credible.  The Province notes that the foregoing list includes some individuals who, to the best of the Province's collective knowledge, were never members of the Province and/or were never assigned to St. Ignatius Mission.  Publication of this list should not be construed as an admission of liability by the Province or any of its members.  For purposes of clarity, this statement of position does not create or address any dispute between the Province and the Diocese which may be based upon Canon Law or the First Amendment rights of the parties.  This statement of position is not an objection to plan confirmation.

The Debtor will work with the Ursulines and the Committee to refine the above-list to add last names wherever possible and other identifying information

The Diocese (including its parishes and missions) will never seek to, direct, pay or hire any agent or employee or third party to retract, oppose or challenge the constitutionality or legitimacy of any reform of a civil or criminal statute of limitations; or to eliminate the Montana existing mandatory child abuse reporting statutory requirements or other laws which serve to shield child sexual abusers from investigation, apprehension, prosecution and conviction in Montana or similar legislation or law in any other state or jurisdiction;

The Diocese shall provide, through a prominent link on its website, a phone number and email address to which anonymous abuse complaints can be made.  If a report of abuse is made to anyone in the Diocese or any parish or mission of the Diocese or through the phone number, email address or direct report to the Diocese, parish or mission, then the Diocese, parish or mission will encourage the survivor to report the information to law enforcement and the Diocese, parish or mission will promptly report the information to law enforcement, as well;

Second Amended Plan of Reorganization     54

The Diocese will adopt a whistle-blower policy concerning the method by which a report concerning abuse within the Diocese (including its parishes and missions) can be made and expressly providing that the Diocese, as well as its parishes, missions, clergy and/or employees, will not take any retaliatory actions against persons who report such information in good faith;

The Bishop of Helena will be available upon reasonable notice to have a private conference with any survivor of sexual abuse, including survivors who did not file a claim in this case;

The Bishop of Helena will personally visit each deanery in which abuse occurred or where Identified Abusers (as defined below) served, specifically the Bozeman Deanery, Butte Deanery, Conrad Deanery, Missoula Deanery, Helena Deanery and Kalispell Deanery, with a schedule to be published at least thirty (30) days in advance of each meeting (including by posting on the Diocese's website, posting in the parishes, publishing in *The Montana Catholic Monthly*, and by reasonable notice to all Sexual Abuse Claimants), inviting all known survivors of abuse in that parish or geographical area to attend and shall provide a forum/discussion during his visit to address questions and comments;

The Diocese will publish in *The Montana Catholic Monthly* magazine four times per year a prominent statement urging persons sexually abused by clergy, employees, volunteers or any other individual serving within the Diocese, its parishes or missions to come forward and contact law enforcement;

The Diocese will produce to Sexual Abuse Claimants or to anyone who has alleged to be a survivor of sexual or physical abuse or their designee any and all personal records of the survivor, including but not limited to school records and sacramental records within thirty (30) days of request, and such documents shall not redact the identity of the requesting sexual abuse survivor's identity;

All documents produced to plaintiffs' counsel in the State Court Litigation regarding the Abuse of a Tort Claimant may be disclosed to the Tort Claimant regardless of any orders or agreements in the State Court Litigation, subject to redaction of identifying information regarding any other Tort Claimant. The deadline for disposition of any documents produced in the State Court Litigation to plaintiffs' counsel shall be one year from the Effective Date. Upon thirty (30) day notice by written request, the Diocese shall provide any Tort Claimant whose claim is not the subject of a pending objection (other than the Whalen and Does plaintiffs) with all documents related to the Abuse of such Tort Claimant, subject to: (a) a confidentiality agreement on the same terms and conditions of the protective order in the State Court Litigation, (b) the redaction of any identifying information regarding any other Tort Claimant and (c) the Tort Claimant's agreement that the documents will be returned or destroyed within one year of receipt of the documents from the Diocese.

The Diocese will make available reasonable space, but not more than one printable page per quarter on the Diocese's website, www.diocesehelena.org, for two (2) years after resolution of the case to allow survivors to tell their stories of abuse, if they desire to publish their stories;

Within thirty (30) days after the Effective Date, the Diocese will send letters of apology to all Sexual Abuse Claimants. Letter of apology will state that survivors were not at fault for

the abuse and that the Diocese takes responsibility for the abuse. The Bishop of Helena will personally sign the letters of apology and an original signed letter of apology shall be sent to any requesting claimant;

The Diocese will publicly announce and post on its website, www.diocesehelena.org, the full and complete release of all sexual abuse survivors from any confidentiality requirement in the sex abuse settlements that they have previously signed as a condition of settlement with the Diocese. No survivor's identity may be released or revealed without his or her permission. The Diocese shall contact each previously settling sexual abuse survivor who has previously entered into such a confidentiality agreement with the Diocese to notify them of the full and complete release of their covenant of confidentiality as to the Diocese. Such release of confidentiality obligations shall apply to any documents in the depository described above. Any future settlement related to sexual abuse entered into by the Diocese shall not contain any confidentiality provision except at the written request of the settling survivor;

The Diocese will continue the protection of children initiatives it is currently implementing including the VIRTUS training program, background checks, and psychological evaluations for seminarians;

The Diocese shall take all reasonable steps to ensure that any Roman Catholic religious institute or similar organization not operated by the Diocese has a program reasonably equivalent to the Diocese's initiatives for the protection of children;

The Diocese will make every effort to require that its clergy, employees, representatives, agents and spokespersons, not refer either verbally or in print to Sexual Abuse Claimants or plaintiffs as "alleged" claimants or plaintiffs, "alleged" victims or "alleged" survivors;

The Bankruptcy Court shall retain jurisdiction to adjudicate disputes that arise with respect to these non-monetary undertakings. The Trust shall have standing and shall be authorized, but not directed, to seek enforcement of any of the terms of these non-monetary undertakings.

## SECTION XV
## MISCELLANEOUS PROVISIONS.

### 15.1    Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date:

15.1.1 Except as otherwise set forth in this Plan, Plan Documents or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with this Plan, including the following:

a) The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

b) The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

c) The granting of relief in aid of this Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Protected Parties from actions prohibited under this Plan or the Plan Documents;

d) Amendments to and modifications of this Plan;

e) Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

f) Enforcement of the Channeling Injunctions issued pursuant to Section XII of the Plan, and Confirmation Order;

g) Claims by any Tort Claimants not listed in Exhibit J that he or she should have been included as a Province Claimant, and;

h) The closing of this Case.

On the Effective Date, all actions removed by the Debtor or any other Co-Defendant during this Case shall be remanded to the Court from which they were removed and can continue against the Debtor and any other Entity who is not a Settling Insurer, only to the extent set forth in the Plan. Any party to the removed action may submit an order, with notice only to the other parties to the removed action, providing for remand of the action. Nothing in this paragraph is intended to limit or modify the discharge of Claims against the Debtor.

## 15.2   Modification of Plan

The Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify or withdraw this Plan prior to the entry of the Confirmation Order, provided, however, that any such amendment or modification that involves directly or indirectly the Province Settlement and the rights and obligations of the Province under the Province Settlement shall not be effective unless consented to by the Province. After the entry of the Confirmation Order, the Proponents may, upon order, amend or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan. If the Province Settlement is not approved, the Plan Proponents may move for confirmation of an Amended Plan that excludes the Province Settlement, provided, however, confirmation of an Amended Plan that excludes the Province Settlement shall not affect the enforceability of the Province Alternative Settlement or the Province Releases between the Province and the Tort Claimants.

### 15.3    Severability

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.  That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of any of the Plan Proponents, in which case the Plan may be unilaterally withdrawn by such Plan Proponents. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated; provided, however, that if any such holding, alteration or interpretation pertains to the Province or the Province Settlement, the Province shall have the right to unilaterally withdraw the Province Settlement.   The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.  In the event of a successful collateral attack on any provision of this Plan (i.e., an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of this Plan will remain binding on the Debtor, the Reorganized Debtor, the Trustee, the Committee, all Tort Claimants, all Claimants, and all other parties in interest.

### 15.4    Section 1146 Exemption

(a)    Pursuant to Bankruptcy Code Section 1146(c) any transfer of property pursuant to the Plan will not be subject to any document, recording tax, stamp tax, or similar tax, mortgage tax, real estate transfer tax, or other governmental assessment in the United States, and the Confirmation Order will direct the appropriate state or local governmental officials and/or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  The Bankruptcy Code Section 1146 exemption applies, to properties transferred within 5 years of the Effective Date, including:   Legendary Lodge; Cemetery Property, First Street Property.

### 15.5    Headings

The headings of the Sections of this Plan are inserted for convenience only and will not affect the interpretation hereof.

### 15.6    Notices

All notices or requests to the Reorganized Debtor in connection with this Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties:

If to the Debtor or Reorganized Debtor:

> Roman Catholic Bishop of Helena, Montana
> Attn:  Father John Robertson
> 515 N. Ewing
> Helena, MT  59601

With a copy to:

> ELSAESSER JARZABEK ANDERSON
>   ELLIOTT & MACDONALD, CHTD
> Attn:  J. Ford Elsaesser, Esq.
> Attn:  Bruce A. Anderson, Esq.
> 320 East Neider Avenue, Suite 102
> Coeur d'Alene, ID  83815

If to the Trustee:

> Omni Management Group, LLC
> Attn:  Eric Schwarz
> 5955 DeSoto Avenue, Suite 100
> Woodland Hills, CA 91367

With a copy to:

> James I. Stang, Esq.
> Ilan D. Scharf, Esq.
> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Boulevard, 13th Floor
> Los Angeles, CA 90067

## 15.7    Notices to Claimants

All notices and requests to an Entity holding any Claim will be sent to them at the last known address listed for such Entity with the Bankruptcy Court or to the last known address of their attorney of record. The Claimant may designate in writing any other address, which designation will be effective upon actual receipt by the Reorganized Debtor and the Trustee. Any Entity entitled to receive notice under this Plan will have the obligation to provide the Reorganized Debtor and the Trustee with such Entity's current address for notice purposes. The Reorganized Debtor and Trustee will have no obligation to attempt to locate a more current address in the event any notice proves to be undeliverable to the most recent address which has been provided to the Reorganized Debtor and the Trustee.

## 15.8    Post-Confirmation Court Approval

Any action requiring Bankruptcy Court, U.S. District Court or state court approval after the Effective Date will require the Entity seeking such approval to file an application, motion, or other request with the Bankruptcy Court, U.S. District Court, or state court, as applicable, and obtain a Final Order approving such action before the requested action may be taken. The Entity

filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on the Reorganized Debtor, the Committee, and the Trustee by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide the recipients at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

### 15.9    Election Pursuant to Section 1129(b) of the Bankruptcy Code

If necessary, the Proponents hereby request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except Section (a)(8) thereof, are met with regard to the Plan. In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of this Plan shall be deemed deleted from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class.

### 15.10    Consummation of the Plan

The Proponents reserve the right to request that the Confirmation Order include a finding by the Bankruptcy Court that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order.

### 15.11    No Admission

Nothing contained in this Plan constitutes an admission or denial by any party of liability for, or the validity, priority, amount, or extent of any Claim, lien, or security interest asserted against the Debtor or against any third party.

### 15.12    Current Insurance Coverage

Except as set forth in the Insurance Settlement Agreements, the Plan and Confirmation Order have no effect on Debtor's insurance coverage under any Claims-made certificates or policies of insurance issued or allegedly issued by Catholic Mutual to the Diocese Parties for a policy period July 1, 2014 through July 1, 2015 and the two immediately prior policy periods, *i.e.*, July 1, 2012 through July 1, 2013, and July 1, 2013 through July 1, 2014.

### 15.13    Waivers

Except as otherwise provided in the Plan or in the Confirmation Order, any term of the Plan may be waived by the party benefited by the term to be waived.

### 15.14    Setoffs, Recoupments, and Defenses

Except with respect to Class 4 and Class 5 Claims, and except as otherwise provided in Section 10.5 of the Plan or the Confirmation Order, all Claims and defenses of any nature of the Debtor, Reorganized Debtor, and Trustee are explicitly reserved and protected.  The failure of any of the Debtor, Reorganized Debtor, or the Trustee to assert any such Claim or defense at any time shall not constitute the waiver, abandonment or other relinquishment of such Claim or defense.  Notwithstanding the foregoing, nothing in this Section 15.14 shall authorize or preserve any Claim, setoff, right of recoupment, or defense by any Entity against any of the Settling Insurers or in any way operate to impair or diminish, or have the effect of impairing or diminishing, the Settling Insurers' legal, equitable or contractual rights, if any, in any respect.

### 15.15    Withdrawal or Revocation of the Plan

The Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date but the consent of all Proponents is required  If the Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the Plan shall have no force and effect and in such event nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Estate or any other Entity, or to prejudice in any other manner the rights of a Proponent, whether one or more, or any other Entity in further proceedings involving a Proponent or Proponents and specifically shall not modify or affect the rights of any party under any prior orders of the Bankruptcy Court.  Notwithstanding any withdrawal or revocation of the Plan pursuant to Section 15.15, the Province Alternate Settlement shall not be affected.

### 15.16    Default

Except as otherwise provided in the Plan or in the Confirmation Order, in the event the Reorganized Debtor, a Settling Insurer, the Province, or the Trustee shall default in the performance of any of their respective obligations under the Plan or under any of the Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the Plan or Plan Documents or in any instrument issued to or retained by a Claimant under the Plan, then within 30 days after receipt of written notice of default), then the Entity to whom the performance is due may pursue such remedies as are available at law or in equity.  An event of default occurring with respect to one Claim shall not be an event of default with respect to any other Claim.

### 15.17    Governing Law

Subject to the Insurance Settlement Agreements of this Plan, except to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan or under the Plan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Montana without giving effect to the principles of conflicts of laws thereof.

### 15.18    Reservation of Rights

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full.  Any concessions or settlement reflected herein, if any, are made for purposes of the Plan

only, and if the Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement. If the Plan is not confirmed with the Province Settlement, the Plan Proponents may move for confirmation of an Amended Plan that excludes the Province Settlement.

### 15.19    Controlling Documents

Nothing in this Plan shall diminish the rights, or increase the obligations or burdens of any Settling Insurer under the Insurance Settlement Agreements. To the extent this Plan affords less protection or benefits, or imposes different or greater obligations upon the Settling Insurers than the Insurance Settlement Agreements, the Insurance Settlement Agreements shall control.

### 15.20    Successors and Assigns

The Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants, the Settling Insurers, the Province and all other parties in interest affected thereby and their respective successors, heirs, Representatives and assigns.

### 15.21    Direction to a Party

On and after the Effective Date, the Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Entity to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### 15.22    Certain Actions

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Debtor.

### 15.23    Rounding of Fractional Numbers

All fractional numbers, including payments or Distributions under the Plan, Plan Documents, Confirmation Order and Trust Documents shall be rounded (up or down) to the nearest whole number.

### 15.24    Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities

in the Chapter 11 Case and under the Bankruptcy Code, except that such Entities shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Case, which shall remain in full force and effect according to their terms, provided that such Entities shall continue to have a right to be heard with respect to any and all (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses pursuant to § 503(b) of the Bankruptcy Code for making a substantial contribution in the Case.

### 15.25    Saturday, Sunday or Legal Holiday

If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

### 15.26   Exhibits

All Exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.  The Exhibits are as follows:

Exhibit A-1 – General Allocation Plan
Exhibit A-2 – Province Allocation Plan
Exhibit B – Settlement Agreement, Release, and Policy Buyback
Exhibit C – Settlement Agreement, Buy Back of Policies, Release of Claims and
                     Covenant Not to Sue
Exhibit D – Pro-Forma Financial Statements
Exhibit E – Trust Agreement
Exhibit F – Deposit and Loan Fund Trust Agreement
Exhibit G – Pro Forma Future Tort Claim Proof of Claim Form
Exhibit H – Term Sheet
Exhibit I – Province Release
Exhibit J – Listing of Province Claimants

--Rest of Page Intentionally Left Blank--

## SECTION XVI
## RECOMMENDATIONS AND CONCLUSION

The Proponents strongly believe that Plan confirmation and implementation are preferable to any feasible alternative because the Plan will provide Claimants holding Claims with significantly greater recoveries than any available alternatives.

Dated: March 4, 2015

**ROMAN CATHOLIC BISHOP OF HELENA, MONTANA, a Montana Religious Corporation Sole,**

*Debtor and Debtor-in-Possession*

By: _____
Most Reverend Bishop
George Leo Thomas

ELSAESSER JARZABEK ANDERSON ELLIOTT & MACDONALD, CHTD

_____
J. Ford Elsaesser, Esq.
Bruce A. Anderson, Esq.
320 East Neider Avenue
Suite 102
Coeur d'Alene, ID  83815
(208) 667-2900

PACHULSKI STANG ZIEHL & JONES LLP

_____
James I. Stang, Esq.
Ilan D. Scharf, Esq.
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
(310) 277-6910

Attorneys for the Official Committee of Unsecured Claimants

## CERTIFICATE OF SERVICE

I, Bruce A. Anderson, declare as follows:

I am employed by Elsaesser Jarzabek Anderson Elliott & Macdonald, Chtd., Coeur d'Alene, Idaho; I am over the age of eighteen years and not a party to this action; the firm's business address is 320 East Neider Avenue, Suite 102, Coeur d'Alene, Idaho 83815.

I certify that on March 4, 2015, I served the foregoing SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE ROMAN CATHOLIC BISHOP OF HELENA, MONTANA AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, and AMENDED SCHEDULE 2.40 on all ECF participants as indicated on the Court's ECF system.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: March 4, 2015

ELSAESSER JARZABEK ANDERSON
ELLIOTT & MACDONALD, CHTD.

_/s/ Bruce A. Anderson_
Bruce A. Anderson